1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Graham S. Henry,                    )
                                        )        No. CV 02-656-PHX-SRB
10             Petitioner,              )
                                        )        <u>DEATH PENALTY CASE</u>
11  vs.                                 )
                                        )        **MEMORANDUM OF DECISION**
12                                      )        **AND ORDER**
    Charles L. Ryan, et al.,[1]         )
13                                      )
               Respondents.            )
14  _____)

15

16          Petitioner Graham Henry, a state prisoner under sentence of death, has filed an

17  Amended Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced

    in violation of the United States Constitution.  (Dkt. 154.)[2]  The petition raises twenty-five
18
    claims.  Pursuant to the Court's general procedures governing resolution of capital habeas
19
    proceedings, the parties have completed briefing of both the procedural status and the merits
20
    of Petitioner's claims.  (Dkts. 154, 167, 173.)  Petitioner has also filed a Motion for Record
21
    Expansion, Discovery, and an Evidentiary Hearing.  (Dkt. 178; *see* Dkts. 189, 191.)  As set
22
    forth below, the Court concludes that Petitioner is not entitled to either evidentiary
23
    development or habeas relief.
24

25

26  _____

27         [1]     Charles L. Ryan, Interim Director of the Arizona Department of Corrections,
    is automatically substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).
28
           [2]     "Dkt." refers to the documents in this Court's case file.

## BACKGROUND

On June 6, 1986, a patrolman stopped a pickup truck going the wrong way down Highway 93 in Mohave County.[3]  The vehicle was driven by Petitioner.  Also in the truck was Vernon Foote.  Petitioner, who identified himself as "Harold Williams," was arrested for driving under the influence.

A check on the truck showed that it was registered to a Las Vegas man named Roy Estes.  In the back of the truck were several rifles, VCRs, and stereo equipment.  Petitioner told the patrolman, Officer Michael Racine, that he had paid a friend fifty dollars to borrow the vehicle and that the items in the back belonged to its owner.  Officer Racine later testified that both Petitioner and Foote had obviously been drinking, and that Foote was lying on the ground at the scene of the traffic stop in an "extremely intoxicated" condition.

Petitioner and Foote were transported to the Kingman Office of the Department of Public Safety.  Authorities determined that Estes, the truck's owner, had been reported missing from Las Vegas.  The report indicated that earlier in the day two suspects had taken Estes, a fifty-five-year-old invalid, from his apartment complex, apparently under forced circumstances.

Petitioner, at the time still known as "Williams," was questioned during the early morning hours of June 7 at the Mohave County Sheriff's Office.  He denied any knowledge of Estes's whereabouts.  He said that Foote had arranged with Estes to use the truck.  According to the interrogating officer, Detective Wayne Patterson, Petitioner said he "wasn't sure" if Estes was in the truck when they left Las Vegas.

The next day, June 8, officers learned of an outstanding warrant suggesting that "Harold Williams" might actually be Graham Saunders Henry.  Detective William Flanagan went to the jail and addressed Petitioner as "Mr. Henry." At that point, Petitioner indicated:

---

[3]     This summary is based on the Court's review of the record and the facts set forth in the Arizona Supreme Court's opinion upholding Petitioner's convictions.  *State v. Henry*, 176 Ariz. 569, 573-75, 863 P.2d 861, 865-67 (1993).

"You know who I am, I knew this was going to happen."  He immediately volunteered his version of the events of June 6, stating that he had watched Foote kill Estes and that he was not going to "take the beef for him."  Petitioner led the officers to the scene of the murder.

Petitioner and Foote were tried separately.  Evidence at Petitioner's trial indicated that he had encountered Foote, a prior acquaintance, in Sacramento and that they decided to leave California together.  Although Petitioner was wanted on charges of attempted murder, he denied fleeing from the outstanding California warrant, instead maintaining that he simply "decided it was time to change states."  Before leaving California, Petitioner and Foote, driving Petitioner's truck, stopped at the house of a person Petitioner claimed owed him money and took the items later found in the back of Estes's truck.

Petitioner testified that he and Foote drank heavily during the trip.  His truck broke down and was towed to a bar outside Las Vegas.  The tow truck driver testified at trial that in terms of intoxication Foote "was worse off.  Petitioner seemed to have a grasp on what was going on.  He was real coherent but [Foote] wasn't."

Petitioner claimed that Foote left the bar and upon returning announced that Estes would drive them to Kingman, Arizona, for fifty dollars.  He said they went to Estes's apartment complex, which was located near the bar.  He stated that Estes was waiting for them in his truck.  As the three men left the complex, Estes waved to the apartment manager to "tell her he wouldn't be late."  The manager, Lucille Salvato, testified that on June 6 she saw Estes walking between two men; he was crying and calling out to her.  She immediately notified the police, who arrived six and a half hours later.  Larry Matzke, a friend from Estes's church, testified that he never saw anyone else drive Estes's truck.  Matzke also opined that Estes would not have given anyone a ride of a hundred miles.

Petitioner claimed that he got into the truck's camper and went to sleep, leaving the highly intoxicated Foote to drive.  According to Petitioner, he woke up when the truck left the highway and he heard Foote and Estes arguing.  They proceeded about a mile down a dirt

1    road, where Foote pulled over and stopped.  Petitioner testified that he saw Foote drag Estes

2    away from the vehicle and stab him with a knife.  Petitioner claimed that he leaped up the

3    berm, ran toward the victim, tried to resuscitate him, then dragged him toward a shady area

4    beneath a bush.  On realizing that Estes was dead, Petitioner ran back to the truck and began

5    to drive off.  Foote jumped in the passenger side and washed off the knife with whiskey.

6    When they were stopped by the highway patrol, Petitioner did not tell the officers about the

7    killing because doing so would have caused him to go to jail and "lose everything," including

8    tools and other items of personal property he had left in his truck

9        An expert tracker, Bernell Lawrence, testified for the State that footprints depicted in

10   photographs of the crime scene, taken by Detective Patterson, matched those of both

11   Petitioner and Foote.  He stated that two individuals supported the victim and dragged him

12   up the berm, as evidenced by toe marks and footprints located on either side of the drag

13   marks.  The victim had been stabbed near a bush; the area was covered with blood.  The

14   footprints indicated that Petitioner thereafter dragged the body behind a larger bush, where

15   it was hidden from the roadway.  A forensic serologist testified that no blood was found on

16   Foote's clothing.  Petitioner's clothes were spattered with a small amount of blood, some of

17   which could have come from Estes, Foote, or Petitioner.

18       A jury convicted Petitioner of first-degree murder, kidnapping, robbery, and theft.[4]

19   At sentencing, the trial court found as aggravating factors that the murder was committed in

20   expectation of pecuniary gain, that Petitioner previously had been convicted of a serious

21   offense, and that he previously had been convicted of a felony punishable by life

22

23

24

25       [4]    Foote was tried nine months later.  After the jury deadlocked on the first-degree
26   murder count, the prosecutor offered to let Foote plead guilty to attempted murder.  He
     accepted and was sentenced to fifteen years in prison.  *See State v. Henry*, 189 Ariz. 542,
27   551, 944 P.2d 57, 66 (1997).

28                                        - 4 -

imprisonment.  (RT 4/1/88 at 106-13.)[5]  The court found one statutory mitigating factor, that Petitioner's capacity to appreciate the wrongfulness of his conduct was impaired, but determined it was insufficient to warrant leniency and sentenced Petitioner to death on the murder count.  (*Id.* at 120-21.)

Before filing his direct appeal, Petitioner filed a petition for post-conviction relief (PCR) pursuant to Arizona Rule of Criminal Procedure 32.[6]  (PCR I, 7/16/90.)  The trial court held an evidentiary hearing and denied the petition (ME 1/29/91).  *See State v. Henry*, 176 Ariz. 569, 585, 863 P.2d 861, 877 (1993) ("*Henry I*").

Petitioner filed a petition for review with the Arizona Supreme Court, which consolidated the petition and the direct appeal.  *Id.* at 589, 863 P.2d at 881.  The court affirmed Petitioner's convictions but remanded the case for resentencing on the first-degree murder conviction, holding that Petitioner's prior California conviction for involuntary manslaughter did not qualify as a serious offense under A.R.S. § 13-703(F)(2).  *Henry I*, 176 Ariz. at 586-87, 863 P.2d at 878-79.

After conducting a new sentencing hearing, the trial court again sentenced Petitioner to death.  (RT 2/23/95 at 146.)  Petitioner appealed.  The Arizona Supreme Court rejected Petitioner's claims and, following its independent review of the resentencing, concluded that the mitigating factors were not sufficiently substantial to call for leniency and affirmed the death sentence.  *State v. Henry*, 189 Ariz. 542, 545, 944 P.2d 57, 60 (1997) ("*Henry II*").

Petitioner then filed a pro per second PCR petition with the trial court, alleging

---

[5]     "RT" refers to the state court reporter's transcript.  "ROA" refers to the record on appeal from trial and sentencing prepared for Petitioner's first direct appeal to the Arizona Supreme Court (Case No. CR-88-0123).  "ROA II" refers to Petitioner's direct appeal from resentencing (Case No. CR-95-0088).  "ME" refers to the minute entries of the state court. The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court.  (Dkt. 199.)

[6]     Mohave County Superior Court Judge Steven F. Conn presided over Petitioner's trial and sentencing, resentencing, and PCR proceedings.

numerous claims of ineffective assistance of post-conviction counsel. (PCR 2, 11/6/92.) The petition sat dormant until Petitioner filed a third PCR petition in 2001.  (PCR 3, 1/16/01.) The trial court treated the second PCR petition as an extension of the third and concluded that Petitioner had presented no colorable claims.  (ME 7/23/01.)  The Arizona Supreme Court denied Petitioner's petition for review on March 21, 2002.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA).  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).  The following provisions of the AEDPA will guide the Court's consideration of Petitioner's claims.

**Principles of Exhaustion and Procedural Default**

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).  Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004).  A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of

1   a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing

2   state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*,

3   319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

4           In Arizona, there are two primary procedurally appropriate avenues for petitioners to

5   exhaust federal constitutional claims:  direct appeal and post-conviction relief proceedings.

6   Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides

7   that a petitioner is precluded from relief on any claim that could have been raised on appeal

8   or in a prior PCR petition.   Ariz. R. Crim. P. 32.2(a)(3).   The preclusive effect of Rule

9   32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d)

10  through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a

11  prior petition or not presented in a timely manner.  *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b),

12  32.4(a).

13          A habeas petitioner's claims may be precluded from federal review in two ways.

14  First, a claim may be procedurally defaulted in federal court if it was actually raised in state

15  court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S.

16  at 729-30.  Second, a claim may be procedurally defaulted if the petitioner failed to present

17  it in state court and "the court to which the petitioner would be required to present his claims

18  in order to meet the exhaustion requirement would now find the claims procedurally barred."

19  *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the

20  district court must consider whether the claim could be pursued by any presently available

21  state remedy).  If no remedies are currently available pursuant to Rule 32, the claim is

22  "technically" exhausted but procedurally defaulted.  *Coleman*, 501 U.S. at 732, 735 n.1; *see*

23  *also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

24          Because the doctrine of procedural default is based on comity, not jurisdiction, federal

25  courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

26  468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a

27

28                                          - 7 -

procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court.  *Coleman*, 501 U.S. at 750.

Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Id.* at 753.  Objective factors which constitute cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  "Prejudice" is actual harm resulting from the alleged constitutional error or violation.  *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).  To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension.  *United States v. Frady*, 456 U.S. 152, 170 (1982).

**Standard for Habeas Relief**

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"  *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1940 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final."  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially

indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of

1    correctness.  *Miller-El I*, 537 U.S. at 341-42. ("The clear and convincing evidence standard

2    is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of

3    factual issues, rather than decisions.").

4                          **Evidentiary Development Standard**

5          **A.    Discovery**

6          Rule 6(a) of the Rules Governing Section 2254 Cases provides that "[a] judge may,

7    for *good cause*, authorize a party to conduct discovery under the Federal Rules of Civil

8    Procedure, and may limit the extent of discovery."  Rule 6(a), Rules Governing § 2254

9    Cases, 28 U.S.C. foll. § 2254 (emphasis added).  Thus, unlike the usual civil litigant in

10   federal court, a habeas petitioner is not entitled to discovery "as a matter of ordinary course,"

11   *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358

12   (1993), nor should courts allow him to "use federal discovery for fishing expeditions to

13   investigate mere speculation," *Calderon v. United States Dist. Ct. for the N. Dist. of Cal.*

14   *(Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064,

15   1067 (9th Cir. 1999) (habeas corpus is not a fishing expedition for petitioners to "explore

16   their case in search of its existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689

17   (1st Cir. 1970)).  Whether a petitioner has established "good cause" for discovery under Rule

18   6(a) requires a habeas court to determine the essential elements of the petitioner's substantive

19   claim and evaluate whether "specific allegations before the court show reason to believe that

20   the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

21   entitled to relief."  *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300

22   (1969)).

23         **B.    Evidentiary hearing**

24         Historically, the district court had considerable discretion to hold an evidentiary

25   hearing to resolve disputed issues of material fact.  *See Townsend v. Sain*, 372 U.S. 293, 312,

26   318 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited*

27

28                                        - 11 -

*by* § 2254(e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall determine if an evidentiary hearing is required). That discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA. *See Baja*, 187 F.3d at 1077-78.

Section 2254 provides that:

*If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –*

(A) the claim relies on –

(I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. A hearing is not barred, however, when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Id.*; *see Baja*, 187 F.3d at 1078-79 (allowing hearing when state court denied opportunity to develop factual basis of claim).

When the factual basis for a particular claim has not been fully developed in state court, the first question for a district court is whether the petitioner was diligent in attempting to develop the factual record. *See Baja*, 187 F.3d at 1078 (quoting *Cardwell v. Greene*, 152 F.3d 331, 337 (4th Cir. 1998)). The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information

available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney "fails" to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court. *See id.* at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence because petitioner knew of and raised claims of judicial bias and jury irregularities in state court, but failed to investigate all the factual grounds for such claims).

Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.) (finding no diligence because petitioner neither requested an evidentiary hearing in the trial court nor filed a state habeas petition), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001). The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003) (no effort to develop the record or assert any facts to support claim); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005) (no development of evidence available through himself, family members and literature, and no appeal of denial of funds and hearing); *Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004) (lack of diligence if petitioner does not proffer "evidence that would be readily available if the claim were true.").

In sum, if this Court determines that a petitioner has not been diligent in establishing the factual basis for his claims in state court, then the Court may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, the petitioner

has not failed to develop the factual basis of a claim in state court, the Court will then proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in *Townsend*.  372 U.S. 293; *see Baja*, 187 F.3d at 1078 (quoting *Cardwell*, 152 F.3d at 337); *Horton, II v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005).

Pursuant to *Townsend*, a federal district court *must* hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *Townsend*, 372 U.S. at 312-13; *cf. Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations).

In any other case in which diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim."  *Id*. at 318 (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing.").

## C.    Expansion of the record

Rule 7 of the Rules Governing Section 2254 Cases authorizes a federal habeas court to expand the record to include additional material relevant to the petition.  The purpose of Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing."  Advisory Committee Notes, Rule 7, 28 U.S.C. foll. § 2254; *see also Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977).  Any time expansion of the record is sought, the Court must assess whether the materials submitted are relevant to resolution of the petition.

Section 2254(e)(2), as amended by the AEDPA, limits a petitioner's ability to present

new evidence through a Rule 7 motion to expand the record to the same extent that it limits the availability of an evidentiary hearing. *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (applying § 2254(e)(2) to expansion of the record when intent is to bolster the merits of a claim with new evidence) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam)). Thus, when a petitioner seeks to introduce new affidavits and other documents never presented in state court, for the purpose of establishing the factual predicate of a claim, he must either demonstrate diligence in developing the factual basis in state court or satisfy the requirements of § 2254(e)(2)(A) & (B). However, when a petitioner seeks to expand the record for other reasons, such as to cure omissions in the state court record, *see Dobbs v. Zant*, 506 U.S. 357, 359 (1993) (per curiam), establish cause and prejudice, or demonstrate diligence, the strictures of § 2254(e)(2) do not apply. *See Boyko*, 259 F.3d 781, 790 (7th Cir. 2001).

## ANALYSIS OF CLAIMS

Before discussing Petitioner's individual habeas claims, the Court will summarize the allegations on which several of the claims are founded and which form the basis of his requests for evidentiary development.

As noted above, Petitioner testified that he was asleep in the camper of the victim's truck while Foote drove and Estes occupied the passenger seat. He awoke to hear Foote and Estes arguing as the truck turned onto a rough side road. When the truck stopped, Petitioner exited from the rear of the vehicle and saw Foote dragging Estes backwards up a berm alongside the road. By the time Petitioner exited the rear of the camper, Foote had stabbed Estes. Petitioner then leapt across the berm and ran to Estes, attempting to revive him and then dragging him to the location where the body was found.

Bernell Lawrence, the State's expert tracker, examined the crime scene photographs taken by Detective Patterson on June 8, 1986; he also visited the scene on June 14. Lawrence testified that the evidence showed that Estes was led up the roadside berm by one

or more people; that he was then dragged face-down away from the berm by a person wearing boots (Petitioner) and a person wearing flat-soled shoes (Foote), one on either side; that he was stabbed to death at the location to which the two people had dragged him; that the person wearing boots dragged the body to another location underneath a bush and then walked back to the vehicle; and that the person wearing flat-soled shoes took the victim's walker a short distance away and threw it into the desert.

Petitioner contends that his version of events was corroborated by evidence that was suppressed and tampered with by the State (Claim 1) or improperly excluded by the trial court (Claim 3), and that his attorney's handling of the crime scene evidence constituted ineffective assistance of counsel (Claim 7). He alleges that the suppressed evidence would have supported his description of the actions he and Foote took at the crime scene, discrediting the testimony of the State's tracking expert and demonstrating that Petitioner did not participate in the killing of Estes.

**Claim 1**        ***Brady/Napue* Violations**

Petitioner contends that the State suppressed and failed to disclose critical exculpatory and impeachment evidence in violation of its constitutional duties under *Brady v. Maryland*, 373 U.S. 83 (1963). (Dkt. 154 at 37-50.) He also asserts that the State knowingly presented perjured testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). (Dkt. 154 at 37-50.) Specifically, Petitioner alleges that the State (A) failed to disclose notes and a drawing of the crime scene made by co-defendant Foote, (B) failed to disclose crime scene photographs and offered photographs at trial that were altered copies of the originals, and (C) presented false testimony by Detective Patterson regarding the footprint evidence. (*Id.*)

With respect to these allegations, Petitioner requests extensive evidentiary development. He seeks to expand the record to include declarations from David Hill, purportedly an "expert in image analysis"; trial, appellate, and post-conviction counsel; Bernell Lawrence, the tracker who testified at Petitioner's trial; various defense investigators; and Joel Hardin, the owner of a tracking business. (Dkt. 178 at 33-40, Exs. 1-10; Dkt. 186,

Ex. 15.)  Petitioner seeks discovery in the form of requests for admission, requests for production of documents, and requests to depose Detectives Patterson and Flanagan, Bernell Lawrence, the prosecutor, and various unnamed deponents.  (Dkt. 178 at 40-47.)  Finally, Petitioner requests an evidentiary hearing at which he intends to call twenty-plus witnesses, including the individuals mentioned above, unidentified experts, and "any and all records custodians" from the Mohave County Attorney's Office, the Mohave County Sheriff's Office, and "any other governmental or third party agencies or individuals with knowledge and ability to authenticate . . . all documents to be referenced and/or offered for admission at the evidentiary hearing in this matter."  (*Id.* at 50.)

Petitioner concedes that he did not allege a *Brady* or *Napue* violation in state court. (Dkt. 154 at 38.)  The claims are therefore procedurally defaulted because no state court remedy is currently available.  *Coleman*, 501 U.S. at 732, 735 n.1.  Petitioner contends that he has overcome the procedural default by showing cause and prejudice.  As cause for the default, Petitioner, citing *Banks v. Dretke*, 540 U.S. 668 (2004), relies on the substantive allegations set forth in Claim 1 – namely, that he was prevented from discovering the factual basis of the claim because the State violated its disclosure obligations under *Brady*.  (Dkt. 154 at 38.)

*Brady* requires the State to disclose material evidence favorable to the defense. 373 U.S. at 87.  To succeed on a *Brady* claim, a petitioner must establish that the evidence was (1) favorable to the accused, either as exculpatory or impeachment evidence; (2) suppressed by the prosecution, either willfully or inadvertently; and (3) material, so that prejudice to the defense resulted from its suppression.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Establishing the second factor also establishes cause for any failure to develop a *Brady* claim in state court.  *Banks*, 540 U.S. at 691.  Likewise, the prejudice component of the cause and prejudice requirement is satisfied if the suppressed evidence is material under *Brady*'s third prong.  *Id.*  Unless the evidence is material, its "suppression d[oes] not give rise to sufficient prejudice to overcome the procedural default."  *Strickler*, 527 U.S. at 282.  Evidence is

- 17 -

material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  In *Kyles v. Whitley*, 514 U.S. 419, 435 (1995), the Court explained that the materiality standard for *Brady* claims is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[7]

## A.    Foote's statement and drawing

Petitioner indicates that habeas counsel, during the course of their investigations, received from the Mohave County Sheriff several hundred pages of documents related to this case. (Dkt. 154 at 42.)  Included in these records was a copy of ten pages of notes, along with a crime scene drawing, undated but apparently drafted by co-defendant Foote.  (*Id.* at 42-43; *see* Dkt. 173, Ex. A.)

In the notes, Foote states that he was innocent of the Estes murder and that the only thing he was "guilty of is being intoxicated and not being able to stop Henry from killing Estes." (Dkt. 173, Ex. A at 5.)  He indicates that he did not know what Petitioner was going to do and would not have gotten in the vehicle with Petitioner if he had known but instead would have called the police.  (*Id.* at 9.)  He further writes that Petitioner was not asleep in the camper of the vehicle but "was in the front seat of the truck all the time."  (*Id.* at 3.) Foote indicates that he suspects Petitioner's involvement in other murders.  (*Id.* at 10-11.)

Petitioner contends, however, that the drawing included with Foote's notes is exculpatory because it corroborates Petitioner's version of events at the crime scene and conflicts with the testimony of the State's tracker. (Dkt. 154 at 43-44.)  This characterization is flawed.  To the extent the drawing can be deciphered, it can be interpreted as showing that Petitioner did not accompany Foote in dragging Estes from the vehicle. (Dkt. 173, Ex. A at

---

[7]    The Court, in carrying out its analysis of Claim 1, has reviewed and considered all of the evidence proffered by Petitioner in his motion for evidentiary development in support of the alleged *Brady* violations. (Dkts. 178, 183, 186, Exs.1-15.)

8.) However, the diagram also contradicts a key element of Petitioner's testimony – it clearly indicates that Petitioner exited from the driver's seat, not from the rear of the truck. (*Id.*)

For the purpose of this analysis, the Court will assume that the notes and diagram are what they purport to be, documents drafted by Foote before Petitioner's trial representing Foote's version of events at the crime scene. The Court will further assume that the evidence would have been admissible at trial or would have led to admissible evidence.[8] Finally, the Court will assume that Petitioner's allegations satisfy the first and second prongs of *Brady*, in that the information was favorable to Petitioner and suppressed by the State.[9] Nonetheless, the Court finds that Petitioner is not entitled to relief because he has not demonstrated that the evidence was material under *Brady*'s third prong.

While the diagram apparently does not support the State's theory that Petitioner and Foote together dragged the victim from the vehicle to the location where he was stabbed, it does nothing to exculpate Petitioner. In fact, together with the notes accompanying the drawing, the information reflects Foote's attempt to assign sole responsibility for the murder to Petitioner. Therefore, the inculpatory value of the information exceeds any exculpatory or impeachment value, and the evidence was not "material" under *Brady*. *See Doan v. Carter*, 548 F.3d 449, 463 (6th Cir. 2008) (undisclosed evidence was not material because it "was just as inculpatory as exculpatory"); *Wilson v. Whitley*, 28 F.3d 433, 439-42 (5th Cir.

---

[8]     *Cf. Paradis v. Arave*, 240 F.3d 1169, 1178-79 (9th Cir. 2004) (noting that circuit law is not consistent on issue of whether undisclosed evidence must be admissible to constitute a *Brady* violation).

[9]     The *Brady* doctrine applies to impeachment as well was exculpatory evidence. *Bagley*, 473 U.S. at 676. Prosecutors have a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police,"*Kyles*, 514 U.S. at 437-38, and a violation can occur "irrespective of the good or bad faith of the prosecution," *Brady*, 373 U.S. at 87. *See United States v. Augurs*, 427 U.S. 97, 107 (1976). Finally, evidence "having both an inculpatory and exculpatory effect" must be disclosed to the defense. *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004).

1    1994) (undisclosed police report was not material; although some discrepancies existed

2    between report and testimony of identifying witness, the report was inculpatory rather than

3    exculpatory); *Rodriguez v. Peters*, 63 F.3d 546, 555 n.1 (7th Cir. 1995) (undisclosed

4    evidence that witness previously viewed photo lineup and identified defendant was not

5    favorable to defense and therefore not material under *Brady*); *cf. United States v. Sumner*,

6    171 F.3d 636, 637 (8th Cir. 1999) (undisclosed evidence showing absence of defendant's

7    fingerprints was of little or no import given that other people were involved in the crime).

8    Petitioner has failed to show that if the evidence had been disclosed there was a reasonable

9    probability that the outcome of his trial would have been different.

10        Also militating against a finding that the undisclosed notes were material under *Brady*

11   is the fact that defense counsel was familiar with the various statements Foote had provided

12   to law enforcement.  (*See* RT 12/4/87 at 16.)  In addition to the information available from

13   these statements, a defense investigator had interviewed Foote.  (RT 1/22/91 at 92-93.)

14   Therefore, while the diagram itself was not disclosed, Petitioner had access to the

15   information it depicted – namely Foote's explanations of the events at the crime scene.

16   Petitioner does not allege that the substance of the drawing or notes represented new

17   information.  "Evidence that is merely cumulative is not material."  *United States v. Strifler,*

18   851 F.2d 1197, 1202 (9th Cir. 1988); *see United States v. Marashi*, 913 F.2d 724, 732 (9th

19   Cir. 1990) (nondisclosure of interview notes did not constitute *Brady* violation where

20   virtually identical statement contained in other interview notes had been disclosed to

21   defendant, so that nondisclosed notes contained merely cumulative impeachment evidence);

22   *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) ("The strictures of *Brady* are not

23   violated, however, if the information . . . was reasonably available to the defendant.");

24   *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (no *Brady* violation where the

25   defendant "was aware of the essential facts that would enable him to take advantage of the

26   exculpatory evidence"); *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir. 1986) ("the

27   *Brady* rule does not apply if the evidence in question is available to the defendant from other

28

sources"); *Giles v. Maryland*, 386 U.S. 66 (1967) (Fortas, J., concurring) (convictions should not be reversed where nondisclosed information is "merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court").

Because the substance of Foote's notes was available from other sources and thus cumulative, its disclosure would not have cast the proceedings in a different light.  In sum, Petitioner has failed to show that if the evidence had been disclosed there was a reasonable probability that the outcome of his trial would have been different or that it could have affected the whole case in a such a manner that confidence in the verdict is undermined.

Petitioner raises the additional argument that access to this information would have supported the admissibility of a statement made by Foote to Detective Patterson to the effect that he alone dragged Estes away from the vehicle into the desert while Petitioner remained behind him.[10]  As discussed below with respect to Claim 3, the Arizona Supreme Court, in upholding the trial court's exclusion of Foote's hearsay statement, held that the statement was not trustworthy and lacked corroboration.  *Henry I*, 176 Ariz. at 575-76, 863 P.2d at 867-68.  Petitioner contends that Foote's undisclosed notes would have constituted corroboration for his statement to Patterson and strengthened his argument for its admissibility.  The Court disagrees.  The notes do nothing to alter the calculus by which the state supreme court determined that Foote's statement was not trustworthy.  Assuming that the diagram shows that Foote acted alone in removing Estes from the vehicle and taking him into the desert, it depicts a scenario, apparently one of several offered by Foote (*see* RT 12/4/87 at 16), that the supreme court rejected as contrary to the facts presented at trial.  *Henry I*, 176 Ariz. at 575-76, 863 P.2d at 867-68.

**B.    Altered/missing photographs**

_____

[10]     Petitioner has submitted a declaration from trial counsel in which counsel attests that he was never provided a copy of Foote's notes and that if he had been he would have used them to support his argument for the admissibility of Foote's statement to Detective Patterson.  (Dkt. 178, Ex. 2.)

- 21 -

Petitioner raises a series of allegations about the crime scene photographs used at his trial. As summarized by Petitioner, in this claim he alleges that:

> Newly discovered evidence . . . indicates that some or all of the crime scene photographs used at trial . . . were not the original crime scene photographs, were not made from the original negatives of the crime scene photographs taken by Detective Patterson, and had been altered. The newly discovered evidence also indicates that at least four rolls of film were shot at the crime scene, at least two cameras were used to take the crime scene photographs, and that not all of the crime scene photographs taken were provided to the defense.

(Dkt. 154 at 45.) Petitioner contends that some of the photographs disclosed by the State were "multi-generational" copies of prints which had been cropped, cut, spliced, and reordered. (*Id.* at 46-57.) According to Petitioner, these alterations, along with the State's failure to disclose other photographs, constituted an effort to "hide critical evidence" from the defense. (Dkt. 173 at 37.) Petitioner asserts that the hidden evidence could have been used to impeach the testimony of Detective Patterson and Bernell Lawrence. (*Id.* at 36.)

In support of his allegations, Petitioner relies on the findings of David Hill, whose analysis of the photographs, using "computerized enhancement procedures and photographic image analysis techniques" (*id.* at 46), constitutes the "newly discovered evidence" on which the claim is premised. Petitioner has attached to his motion for evidentiary development a report and declaration prepared by Hill. (Dkt. 178, Ex. 1; *see* Dkt. 183.)

Respondents contend that this claim is procedurally defaulted and meritless.

<u>Background</u>

The evidence at issue consists of trial exhibits II, JJ, and KK, which were introduced by the defense during the cross-examination of Detective Patterson. (Dkt. 191 at 6; *see* RT 12/2/87 at 44, 12/7/87 at 21.) The exhibits contain black and white photographs of negative strips of the crime scene photographs; the three exhibits together comprise a total of forty-four individual photographs.

Prior to trial, the court ordered the State to provide the defense with "any photographs [it] has in its possession or that it will [sic] at trial." (RT 9/14/87 at 119.) The State agreed, indicating that it already had provided the photos, including the negatives. (*Id.*; *see* RT

11/25/87 at 187.)   At trial, Lawrence testified that the photographs depicted in defense exhibits II, JJ, KK, and LL constituted all of the photos he was shown by Detective Patterson.[11]  (RT 12/2/87 at 45.)

Throughout the proceedings in state court, Petitioner complained that the State had engaged in misconduct with respect to the photographic evidence.  Prior to trial Petitioner expressed concern to counsel that the State was "knowingly withholding photos and other evidence" and that Detective Patterson's photographic technique led to distortions of scale and perspective.  (ROA 148t, 148v.)  In pro per motions filed after his conviction, however, Petitioner stressed that the photos provided by the State, if assembled in a lay-out of the crime scene, would clearly show that his testimony was accurate.  (ROA 167d-167e, 175ggg, 186z-186dd, 198p.)  In arguing Petitioner's motion for a new trial, defense counsel reiterated Petitioner's position with respect to the photographic lay-out and argued that such a construction would have demonstrated that the photograph the State introduced in its rebuttal case was "out of scale" and "inaccurate."[12]  (RT 1/28/88 at 26; *see* ROA 181.)

In an affidavit in support of his first PCR petition, Petitioner argued that the numbers on the negatives of the photographs demonstrated that Detective Patterson had photographed the crime scene in a counter-clockwise manner, as Petitioner had always contended.  (PCR 1, Addendum, Pet'r Aff. at 153.)  Petitioner also complained that the photos were distorted and taken at "trick angles."  (*Id.* at 163, 171, 178.)

Evan Williams, the defense investigator throughout Petitioner's pretrial and trial

---

[11]     Along with exhibits II, JJ, and KK, the defense offered into evidence exhibit LL. (RT 12/2/87 at 44, 12/4/87 at 197, 12/7/87 at 21, 12/8/87 at 162.) The forty-four photos referred to by Petitioner and Hill do not account for the images in exhibit LL.  Petitioner submitted a declaration from defense counsel Everett who attests that he did not prepare exhibits II, JJ, and KK, and that to the best of his recollection the exhibits were provided to the defense by the prosecution. (Dkt. 191, Ex. 17.) The defense also offered into evidence color prints made by the State from exhibits II, JJ, KK, and LL. (RT 12/7/87 at 21.)

[12]     Petitioner is referring to Exhibit 50, which is the subject of Claim 6.

proceedings, testified at the PCR evidentiary hearing. Williams, whose background included expertise in photography (RT 11/30/90 at 5-7; *see* RT 12/3/87 at 85-88), testified that he could ascertain the order in which the photos were taken by the numbers on the negatives (*id.* at 117-18). He did not suggest that the photographs showed evidence of tampering. (*Id.* at 117-19.) Williams disagreed with Petitioner's belief that the State's photos were "distorted" but "thought they could have been a lot better." (*Id.* at 121.) Blair Abbot, Petitioner's PCR investigator, also an expert in crime scene photography, testified extensively about the photographs. (RT 1/23/91 at 61-71.) Abbot, who had access to the original negatives, ascertained that two rolls of film had been shot. (*Id.* at 62.) Some of the negatives were missing; with respect to these negatives, Abbot discovered that they had been enlarged as defense exhibits. (*Id.* at 63-67.) He did not testify that any images were missing entirely. (*Id.*) Abbot also testified regarding the appearance of the negatives, their numbering and other identifying features, and the manner in which the strips of negatives were cut, but did not indicate there was any evidence they had been spliced, cropped, reordered, or otherwise altered. (*Id.* at 70-71.) Defense counsel Wilkinson testified that he had subpoenaed all of the State's photographs and did not believe any were withheld. (RT 1/22/91 at 92.) Nevertheless, Petitioner, in his testimony at the evidentiary hearing, insisted that some photographs were missing, including a third roll of film, and that "this indicates an intentional tampering of evidence." (RT 1/24/91 at 16-17.)

In an affidavit filed during the course of his second PCR proceeding, and attached to his third PCR petition, Petitioner repeated and expanded his allegations. (PCR 3, Ex. C.) He wrote that, having finally gained possession of all of the State's photographs, he was able to determine that the State had removed, withheld, altered, and switched photographs "before they finally allowed [the] 'illegally revamped' record to be forwarded to the Arizona Supreme Court more than two and one-half <u>years</u> after my conviction." (*Id.* at 43.)

During the resentencing proceedings, Petitioner again accused the State of altering and switching the crime-scene photos before sending them to the Arizona Supreme Court. (ROA

II 15, Pet. for Special Relief Action at 7.)  Through counsel, Petitioner also filed a discovery motion seeking disclosure of all of the State's photographic negatives.  (ROA II 40.)  The motion stated that Petitioner "believes the State has withheld, either accidentally or intentionally, photographs taken at the crime scene which would prove his innocence." (*Id.*)  The State did not oppose the motion, and the prosecutor indicated that he had "no problem with them having access to any of the evidence both in the court files or in the sheriff's office evidence." (RT 2/21/95 at 11.)  The court granted the motion, explaining that the motion was "specifically directed not only to those photographs that are part of the record in this case but would also include photographs that the State may have in their possession that they chose . . . not to introduce at trial." (*Id.*)  During his testimony at the resentencing hearing, Petitioner once more accused the State of altering and switching the crime scene photographs and violating *Brady* by withholding photos from an undisclosed third roll of film.  (RT 2/23/95 at 107, 123-26.)

    Analysis

    As previously noted, Petitioner acknowledges that he never presented this *Brady* claim in state court.  Petitioner contends that the claim is not procedurally barred because an available state court remedy may exist in the form of the exceptions to preclusion set forth in Rule 32.1(e) and (h) of the Arizona Rules of Criminal Procedure.  Alternatively, Petitioner argues that he can demonstrate cause and prejudice to overcome the procedural default of the claim.[13]

---

[13]     Petitioner further asserts that any waiver of his *Brady* claims in state court was subject to the "knowing, voluntary, and intelligent" requirement; according to Petitioner, because this requirement, which applies to claims of "sufficient constitutional magnitude," *see* Ariz. R. Crim. P. 32.2(a)(3), was not satisfied, Claim 1 is not precluded under Arizona law.  (Dkt. 173 at 27.)  The Court need not address this argument, having concluded that Petitioner's *Brady* claims are without merit.

1          *Available state court remedy*

2          It is the role of the district court to determine if a petitioner presently has a remedy

3   available in state court. *See Ortiz*, 149 F.3d at 931 (citing *Harris*, 489 U.S. at 269-70

4   (O'Connor, J., concurring)).   In making that determination, the court must "assess the

5   likelihood that a state court will accord the habeas petitioner a hearing on the merits of his

6   claim." *Phillips v. Woodford*, 267 F.3d 966, 974 (9th Cir. 2001) (citing *Harris*, 489 U.S. at

7   268 (O'Connor, J., concurring)). The question is whether "there is some reasonable

8   probability that (state) relief . . . will actually be available." *Matias v. Oshiro*, 683 F.2d 318,

9   320 (9th Cir. 1982) (citing *Powell v. Wyrick*, 657 F.2d 222, 224 (8th Cir. 1981)).

10         Petitioner argues that this claim represents an exception to the preclusive effect of

11  Rule 32.2(a) because it relies on newly-discovered evidence and constitutes a claim of

12  "actual innocence." According to the relevant provisions of Rule 32.1, a petitioner is not

13  precluded from filing a successive PCR petition when "[n]ewly discovered material facts

14  probably exist and such facts probably would have changed the verdict or sentence" or he

15  "demonstrates by clear and convincing evidence that the facts underlying the claim would

16  be sufficient to establish that no reasonable fact-finder would have found [him] guilty of the

17  underlying offense beyond a reasonable doubt, or that the court would not have imposed the

18  death penalty." Ariz. R. Crim. P. 32.1(e), (h).  For the reasons set forth below, the Court

19  finds that Petitioner does not have an available state court remedy under Rule 32.1(e) or (h).

20         To satisfy the newly discovered evidence exception to preclusion, a petitioner must

21  show, along with the probable existence of new, material facts which probably would have

22  changed the verdict or sentence, that the facts were discovered after the trial, that he

23  exercised "due diligence" in securing the facts, and that the facts are not cumulative or used

24  solely for impeachment.  Ariz. R. Crim. P. 32.1(e).  Petitioner's *Brady* claim regarding the

25  photographic evidence used at trial does not satisfy these criteria.

26         Despite the detail and complexity of Mr. Hill's analysis of defense exhibits II, JJ, and

27  KK, there has been no showing that the allegedly altered or undisclosed photographs

28

contained any information favorable to the defense.  Petitioner speculates that the missing photographs or altered images would show footprint evidence consistent with his version of the events at the crime scene.  Given the nature of Petitioner's specific allegations – that the photos in the defense exhibits were simply reordered, degraded, or cropped copies of the original negatives – the Court concludes that Petitioner's speculation regarding the content of the original and missing images is insufficient to show that defense access to the material would probably have made a difference in Petitioner's trial or sentencing.[14]

Petitioner also was not diligent in securing the facts regarding the photographic evidence.  More than twenty years passed between the trial and the filing of the amended habeas petition; in that time, Petitioner never raised a *Brady* claim.  In fact, prior to the filing of the amended petition, habeas counsel asserted that Petitioner's allegations regarding the crime scene photographs – his "conspiracy theory" – were "delusional," "implausible," and unsupported by independent investigation; thus, counsel contended it constituted evidence, not that *Brady* had been violated, but that Petitioner was mentally incompetent for believing so.  (*See* Dkt. 123 at 5-9.)  Petitioner does not contend that the State's alleged misconduct with respect to the crime scene photographs could not have been discovered if it had been investigated at some point during the state court proceedings.  Further, given Petitioner's allegations at trial, the "facts" regarding this *Brady* claim were "known" to Petitioner and not discovered after the trial.  *See State v. Saenz*, 197 Ariz. 487, 490, 4 P.3d 1030, 1033 (App. 2000) ("Evidence is not newly discovered unless it was unknown to the trial court, the defendant, or counsel at the time of trial and neither the defendant nor counsel could have known about its existence by the exercise of due diligence.").  Based upon these

_____

[14]   The weakness of these allegations is highlighted by the fact that Petitioner's tracking expert reviewed the photographic evidence which Petitioner contends was altered and concluded that it showed Petitioner's explanation of the footprint evidence was accurate and Detective Patterson's testimony was false. (Dkt. 154 at 49; Dkt. 186, Ex. 15.) Petitioner cannot claim that he was harmed by the alteration of photographic evidence and also assert that the altered evidence establishes his innocence.

considerations, Petitioner would not be entitled to raise this claim in state court pursuant to Rule 32.1(e).

Petitioner has likewise failed to demonstrate by clear and convincing evidence that the facts underlying his *Brady* claim would be sufficient to establish that no reasonable fact-finder would have found him guilty of the Estes murder or that the court would not have sentenced him to death. Ariz. R. Crim. P. 32.1(h). To the extent that Petitioner has attempted to provide facts supporting this claim, they are offered in support of Mr. Hill's theory that photos were altered or were not disclosed. Petitioner's argument that Hill's theory supports the corollary proposition that the State's handling of the crime scene photographs resulted in the suppression of exculpatory evidence, with which Petitioner "would have been able to counter Detective Patterson's false claim that the footprints going up the berm from the area behind the truck were his, not Henry's" (Dkt. 173 at 37), is based wholly on speculation.

Because there is no remaining state court remedy with respect to these allegations, Claim 1(B) is technically exhausted but procedurally defaulted.

*Cause and prejudice*

Petitioner contends he can demonstrate cause and prejudice to overcome the default. *See Coleman*, 501 U.S. at 749-50. In order to demonstrate cause, a petitioner must "show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). As previously noted, in the context of a defaulted *Brady* claim "cause" parallels a component of a substantive *Brady* violation; i.e., a petitioner shows "cause" for the default when the reason for his failure to raise the claim earlier was the State's suppression of relevant evidence. *Banks*, 540 U.S. at 691.

In *Banks*, the Court held that the petitioner was not at fault for failing to develop the factual basis of a *Brady* claim in state court because the prosecutor had continually

suppressed evidence that one of its main trial witnesses had been a police informant. 540 U.S. at 692-93.  The prosecution had operated under an "open file" policy, informing the defense that it had disclosed all *Brady* evidence and confirming the defense's reliance on that representation; because Banks was entitled to rely on the prosecution's statements, cause existed for his failure to investigate the witness and discover his status as an informer.  *Id.*; *see Strickler*, 527 U.S. at 283 (state's suppression of witness notes together with its announced open file policy constituted cause for default of *Brady* claim).

The circumstances of this case are distinguishable from those present in *Banks*, in which the petitioner never knew or had reason to know that the prosecution had withheld information.  Here, Petitioner himself offered into evidence the photographic evidence that he now alleges was altered.  Given that the photographs were in his possession at trial, and that Petitioner himself consistently expressed concerns about the crime scene photography, Petitioner has not demonstrated that he was impeded by an external cause from raising a claim related to the integrity or nondisclosure of crime scene photographs.  "[E]vidence is not 'suppressed' if the defendant knows about it and has it in her possession." *Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2004) (evidence of empty bag not suppressed where defense was aware of its existence from viewing of videotape); *see Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (where the defendant is aware of the essential facts regarding his medical records, enabling him to take advantage of any exculpatory evidence, the government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense); *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996) (defense need not be aware of the specific details of the exculpatory information or precisely what it is so long as the defense knew of and had access to the material that contained such information); *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001) (*Brady* does not apply to evidence that a defendant would have been able to discover himself through reasonable diligence).

Even assuming Petitioner could show cause for the default of this claim, he cannot show prejudice. The prejudice component of "cause and prejudice" tracks the materiality prong of a *Brady* claim.  Thus, prejudice is shown when the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Banks*, 540 U.S. at 691.  To establish prejudice, a petitioner must "shoulder the burden of showing not merely that errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.  The burden is substantial, *Engle v. Isaac*, 456 U.S. 107, 134-35 (1982), and Petitioner fails to meet it.

As discussed above, Petitioner's allegations that the State tampered with and withheld photographic evidence, even if true, do not put the case in a new light; nor do they demonstrate that the State's alleged misconduct worked to Petitioner's actual and substantial disadvantage.  Petitioner has made no showing that the allegedly undisclosed information fundamentally undermined the State's case or supported the defense theory.  He does not explain how an alteration in the sequence of the images affected the evidence against him, and there is no indication – beyond Petitioner's speculation – that any degraded or missing images supported Petitioner's version of the crime. *See Moore v. Quarterman*, 534 F.3d 454, 464 (5th Cir. 2008) ("speculative" suggestion insufficient to establish materiality); *Mason v. Mitchell*, 320 F.3d 604, 628-630 (6th Cir. 2003) (petitioner failed to show cause or prejudice based on "conclusory" allegations regarding undisclosed witness statements).

Having failed to show cause and prejudice, Petitioner has also failed to satisfy two of the criteria of a substantive *Brady* claim.  Thus, for the reasons set forth above, Claim 1(B) is both procedurally barred and meritless.

## C.    Perjured testimony

Petitioner alleges that "Detective Patterson falsely testified that certain footprints were [Petitioner's] when he knew that they were not."  (Dkt. 154 at 49.)  Although Petitioner

- 30 -

voiced his suspicions regarding Detective Patterson's testimony throughout the various state court proceedings, he did not file a claim alleging perjury. As asserted by Respondents, the claim is therefore defaulted. The Court's discussion addresses both the merits and cause and prejudice.

A conviction violates the Fourteenth Amendment if it is obtained by the use of perjured testimony that the prosecutor knows to be false. *Napue v. Illinois,* 360 U.S. 264 (1959). To prevail on this claim, therefore, Petitioner must show that Detective Patterson's testimony was false, that it was material, and that the prosecutor knew or should have known it was false. *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir. 2008); *see Napue*, 360 U.S. at 269-71. A habeas petitioner must show that a witness's statement was "indisputably false." *See Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). Petitioner has not made that showing with respect to Detective Patterson's testimony.

Petitioner's assertion that Detective Patterson "simply lied" in his testimony about the footprints at the crime scene is substantiated only by the opinion of a new expert who disagrees with Detective Patterson and the State's tracker, Bernell Lawrence. Specifically, Petitioner relies on Hardin's interpretation of the "crime scene photographs and related testimony," which contradicts Detective Patterson's testimony that certain boot prints were Petitioner's and supports Petitioner's testimony that he exited the back of the truck, ran, and leaped up the berm to render aid to the victim. (*Id.* at 48; *see* Dkt. 173 at 39.) The fact that another expert disagrees with the testimony and opinions offered by the State's witnesses is not sufficient to demonstrate that the latter committed perjury. *See Harris v. Vasquez*, 949 F.2d 1497, 1524 (9th Cir. 1990) ("conflicting psychiatric opinions do not show that [an expert's] testimony was false"); *Fuller v. Johnson,* 114 F.3d 491, 496-97 (5th Cir. 1997) (finding that disagreement over an expert's methods or conclusions does not prove the testimony false; rather, it should be the subject of cross examination). Simply put, not every discrepancy in testimony translates into perjury. *Lambert*, 387 F.3d at 249 ("Lambert would,

in effect, have us find a due process violation anytime a prosecutor elicits testimony that contradicts testimony that the defense elicits.").

Petitioner has failed to show anything more than a disagreement with Detective Patterson's testimony about the crime scene evidence and Lawrence's interpretation of the crime scene photographs. Whether a witness lied or erred in his perceptions or judgments is a question to be addressed by cross-examination and determined by the jury. *See United States v. Zuno-Arce*, 44 F.3d 1420, 1422-23 (9th Cir. 2003); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1141 (5th Cir. 1988). In *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1998), the petitioner alleged that a key prosecution witness, Daniels, a police officer, knowingly lied about important pieces of evidence, including his testimony that the petitioner's tire tracks were not found at the murder scene because other vehicles' tracks had contaminated the site. The court rejected the petitioner's claim of a due process violation because the petitioner "has not sufficiently proven that Daniel's testimony was false and that the prosecution knew so. At most, the record shows that Daniel's statements fall under the 'mere inconsistencies' distinction." *Id.*; *see also Koch v. Puckett,* 907 F.2d 524, 530-31 (5th Cir. 1990) (petitioner's bare allegations that sheriff and two of his investigators lied at trial as to inculpatory statements allegedly made by petitioner neither established valid due process claim nor warranted an evidentiary hearing). As discussed below, defense counsel vigorously and in great detail challenged Patterson's testimony and Lawrence's opinions while thoroughly presenting Petitioner's version of the crime and explanation of the footprint evidence. *Zuno-Arce*, 44 F.3d at 1422-23; *Johnson v. Mullin*, 505 F.3d 1128, 1154 (10th Cir. 2007) (after strenuous cross-examination, credibility of witness left to jury); *Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004).

Although Petitioner's failure to demonstrate that Detective Patterson testified falsely necessarily defeats any allegation that the State knew of the alleged perjury, the Court also notes that Petitioner does not assert, let alone demonstrate, that the State was aware that

Patterson was committing perjury when he testified about the crime scene. Therefore, his claim would fail even if he could demonstrate that Patterson's testimony was untruthful. *See Briscoe v. LaHue*, 460 U.S. 325, 326 n.1 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights."); *see also Jacobs v. Scott,* 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of cert.) (noting that Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecutor did not know of the testimony's falsity at trial) (citing *Durley v. Mayo,* 351 U.S. 277, 290-91 (1956)). Even when the State does not contest, during a habeas proceeding, that the testimony at issue was scientifically inaccurate or "false," courts have not found a *Napue* violation:

> First, there has been no factual finding by the state courts or the district court that Ede knowingly provided scientifically inaccurate testimony. Second, even assuming that Ede acted knowingly, Supreme Court precedent does not clearly establish that Ede's knowledge should be imputed to the prosecution for purposes of *Napue.* Indeed, the Supreme Court has not directly addressed the issue, and there appears to be a split of opinion among the circuits on the issue.

*Smith v. Massey*, 235 F.3d 1259, 1272 (10th Cir. 2000), *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001).

In sum, Petitioner has not met his burden of showing that the State knowingly presented false testimony regarding the crime scene evidence. Therefore, Petitioner cannot demonstrate prejudice to excuse his procedural default; Claim 1(C) is procedurally barred and meritless.

## D.   Evidentiary development

Claims 1(B) and 1(C) are procedurally defaulted, so Petitioner is not entitled to evidentiary development with respect to his allegations that the State tampered with and suppressed crime scene photographs and that Detective Patterson provided false testimony. In any event, as noted above, Petitioner was not diligent in pursuing the factual bases of these

contentions in state court.  The footprint evidence, as depicted in the State's crime scene photographs, was the focus of the defense theory and the subject of Petitioner's suspicions throughout the state court proceedings; the photographs and negatives were examined by defense investigators.  Thus, the factual predicate of a *Brady*/*Napue* claim, if such a predicate existed, could have been uncovered with reasonable diligence during the state court proceedings.  28 U.S.C. § 2254(e)(2).

With respect to Claim 1(A), even assuming that the State violated *Brady* and thus caused Petitioner's default of the claim, Petitioner is not entitled to evidentiary development.  The facts underlying the claim are not sufficient to establish by clear and convincing evidence that no reasonable factfinder would have convicted Petitioner if Foote's drawing and statement had been disclosed.  *See Townsend*, 372 U.S. at 312-13; *Schriro v. Landrigan*, 127 S. Ct. at 1940 (evidentiary hearing not required where facts, if proven, would not warrant relief).

To the extent that the evidentiary requests with respect to Claim 1 are the same as to Claims 2, 6, 7, 8, 9, 11, 12, 14, 15, 17, and 19, these requests are denied without further discussion.[15]

### E.    Conclusion

Petitioner is not entitled to relief on Claim 1.  His allegations regarding the nature of the allegedly suppressed material are based on speculation.  He did not diligently pursue the allegations in state court, and as presented here they fail to show prejudice to excuse Petitioner's default of the claims or materiality under *Brady*.  Petitioner's request for evidentiary development is likewise denied.

**Claim 2   Denial of Motion for Acquittal**

---

[15]    Evidentiary development is also denied for claims 21, 23, 24, and 25 on the ground that, even if the allegations contained therein were true, Petitioner would not be entitled to relief.  The Court will address Petitioner's requests for evidentiary development as to Claims 13 and 29 below.

Petitioner contends that his due process rights were violated by the trial court's failure to grant his motion for acquittal on the kidnaping and robbery counts and the related felony murder charge.  (Dkt. 154 at 50-63.)

Background

At the conclusion of the State's case, Petitioner moved for a directed verdict on the theft, armed robbery, kidnapping, and first-degree murder charges.  (RT 12/3/87 at 4-39.) The trial court denied the motion, explaining, with respect to the kidnapping charge:

> I think if you look at the tracks located at the scene out at White Hills Road, regardless of what Counsel may think of Officer Lawrence's testimony, I certainly think that the jury could be justified in this case in believing his testimony which I think more than suggests that the victim was dragged from the area of the berm to the point where he apparently bled to death and that he was dragged there by two people.
>
> And I'm basing that not so much on the fact that there are two sets of prints that are necessarily next to each other because I'm not really convinced that Officer Lawrence ruled out the possibility that Mr. Henry could have come along in his version, gone to the body and just happened to walk exactly along the drag marks. I think what is more convincing as far as from Officer Lawrence is that those are not drag marks that would be left by one person dragging one victim. There would not be the forward – straight and forward prints of the person doing the dragging.
>
> So, I feel that the jury would be justified in finding that Mr. Henry and Mr. Foote dragged the victim to the area where he apparently was murdered and that would constitute a restraint and I find very little difficulty in finding that this would have been done either with the intent to injure the victim or to take control of his vehicle; either of which would be within the conduct that has to be intended to constitute the offense of kidnapping.
>
> . . . I think the State has more than met their burden as to the kidnapping charge so it's ordered denying the Motion for Directed Verdict on the kidnap charge.

(*Id.* at 28-30.)

In rejecting the motion for a directed verdict on the robbery count, the trial court discussed the factual bases for a finding that property had been taken from the victim:

> Well, I notice that you [defense counsel] keep referring to money or valuables.  The crime – elements of the offense, of course, refer to property of another.  Property of another basically is just something that has value.
>
> I'm not convinced necessarily at this point there was money taken from

the victim. I'm not sure that there has been a showing of that but at the very least there has been testimony that his wallet was taken from him and a wallet is a piece of property that has value to it. I also feel that there is testimony that would allow the taking of the vehicle to also constitute the taking of property that would be necessary to satisfy the armed robbery charge.

The element that perhaps needs to be addressed a little more as far as armed robbery of the vehicle is the requirement that the property has to be taken from the person or immediate presence of the victim and I think that it is not at all illogical to argue in this case that when the Defendant was removed from – when the victim was removed from the vehicle and if you believe the reconstruction that was presented by Officer Lawrence, the testimony was that the victim was basically dragged from just a few feet from his vehicle out into the desert.

I would certainly think that the dragging of him constitutes force or threat which is what happened to be used and that the robbery starts at that point at which time the vehicle is in the immediate presence of the victim and that therefore the robbery is satisfied by the finding that the vehicle was taken.

. . . I think that the armed robbery charge could be satisfied either by the testimony concerning the wallet that belonged to the victim and I also feel that the theft of the vehicle, which I have already indicated there was enough evidence on for that to go forward, I think that could also be relied upon to meet the requirement of robbery and I think the fact that there were valuables left behind, that really just doesn't make any difference so it's ordered denying the Motion for Directed Verdict on the armed robbery charge.

(*Id.* at 33-35.)

On direct appeal, the Arizona Supreme Court affirmed the trial court's denial of Petitioner's motion for a directed verdict, holding that "[f]or each crime, the record contains sufficient evidence to support the verdict of guilt beyond a reasonable doubt." *Henry I*, 176 Ariz. at 576, 863 P.2d at 868. With respect to the kidnapping and robbery counts, the court explained:

Testimony from the apartment manager concerning the victim's obvious distress; the unlikelihood that this physically disabled victim would have offered to drive someone a hundred miles; and the evidence that two people, one of whose footprints matched Henry's, dragged the man up the berm, support the kidnapping charge. This proof, coupled with testimony from an officer that the victim's wallet was found on the highway near the scene, and the fact that Henry admitted driving off in the victim's truck immediately after the murder, also supports the robbery charge. The same evidence additionally provides adequate basis for the felony-murder conviction. The trial court correctly denied Henry's motion.

*Id.* at 576-77, 863 P.2d at 868-69 (citations and footnotes omitted).

1

<u>Analysis</u>

2        In reviewing a claim of insufficient evidence to support a conviction, "the relevant

3  question is whether, after viewing the evidence in the light most favorable to the prosecution,

4  any rational trier of fact could have found the essential elements of the crime beyond a

5  reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In reaching a

6  determination as to the sufficiency of the evidence, this Court may not substitute its

7  determination of guilt for that of the factfinder and may not weigh the credibility of

8  witnesses. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993); *Jackson*, 443 U.S. at 319

9  n.13.  In addition, a state court's construction of its own statute is binding on this court.

10  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of

11  state law").  This type of claim is properly analyzed under the deferential standard of

12  § 2254(d)(1); thus, the Court asks whether it was an objectively unreasonable application of

13  *Jackson* for the Arizona Supreme Court to deny this claim.  *See Sarausad v. Porter*, 479 F.3d

14  671, 677-78 (9th Cir.), *vacated in part on other grounds*, 503 F.3d 822 (9th Cir. 2007).

15  "These factors combine to suggest that AEDPA deference may well be at its highest when

16  a habeas petitioner challenges a state court's determination that the record evidence was

17  sufficient to satisfy the state's own definition of a state law crime." *Policano v. Herbert*, 453

18  F.3d 79, 92 (2d Cir. 2006).

19        As explained below, it is readily apparent that a rational factfinder could have

20  determined that the State had proven all of the elements of the kidnapping and robbery

21  charges.

22        **A.      Kidnapping**

23        Petitioner argues that there was insufficient evidence to support either of the

24  kidnapping theories advanced by the State: that Estes was kidnapped from his apartment

25  complex in Las Vegas, or that the kidnapping occurred when he was removed from his

26

27

28

- 37 -

1    vehicle and dragged to the spot where he was killed.[16]

2          The Court disagrees. Under the facts presented at trial, a rational factfinder could

3    determine that Petitioner, either as a principal or as an accomplice, kidnapped the victim.

4    Lucille Salvato, the manager of the apartment complex where Estes lived, testified that she

5    watched as Estes was taken to his pickup by two men, placed between the two men in the

6    vehicle, and then driven away.  (RT 11/24/87 at 152.)  Salvato testified that during these

7    events Estes "was crying and calling me."  (*Id*.)  She was so concerned by what she

8    witnessed that she immediately called the police to report the incident.  (*Id*. at 153.)  This

9    evidence, coupled with additional testimony indicating that Estes was a solitary individual

10   and a church-going teetotaler, who was notably reluctant to let others drive his truck and

11   would not drive at night (*id*. at 150, 158, 162-65), enables a reasonable factfinder to

12   determine that Estes did not, as Petitioner contends, voluntarily accompany the highly

13   intoxicated Petitioner and Foote as they drove off in his vehicle.

14         The State also presented evidence identifying tracks of two individuals dragging the

15   victim to the area where he was stabbed to death.  Lawrence testified that the tracks at the

16   crime scene indicated that two persons dragged the victim from his pickup truck to the berm

17   and into the desert.  (RT 12/2/87 at 25, 28-30.)  Lawrence testified that while he could not

18   specifically identify the tracks next to the drag marks going up the berm, the disturbance in

19   the soft soil there indicated that more than one person was involved.  (*Id*. at 23-24.) Lawrence

20   further testified that once the victim was over the berm, two sets of footprints were apparent,

21   one on either side of the drag marks, indicating that two individuals were dragging the

22   victim. (*Id*. at 25.)  According to Lawrence, one of the people dragging the victim wore

23   tennis shoes; the other wore heeled boots.  (*Id*. at 28-30.)  These prints were consistent with

24   _____

25         [16]      Pursuant to A.R.S. § 13-1304(A), "A person commits kidnapping by

26   knowingly restraining another person with the intent to: . . . 3.  Inflict death, physical injury
     or a sexual offense on the victim, or to otherwise aid in the commission of a felony;  or . . .

27   6.  Seize or exercise control over any . . . vehicle."

28

the footwear worn by Foote and Petitioner.  (*Id.*)  Given Petitioner's acknowledgment that he was at the scene with Foote and the victim, Lawrence's testimony regarding the footprint evidence was sufficient for a rational factfinder to conclude that Petitioner participated in restraining Estes by dragging him from the vehicle to the place where he was killed.

Petitioner contends that the state courts ignored evidence beneficial to the defense, including Petitioner's version of events, in which Estes voluntarily accompanied Petitioner and Foote and Foote alone pulled Estes into the desert and stabbed him to death.  Petitioner also criticizes the courts for not rejecting Lawrence's "questionable" testimony about the crime scene.  As already noted, however, this Court must view the evidence in the light most favorable to the State, *Jackson*, 443 U.S. at 319, and may not substitute its determination of guilt for that of the factfinder or weigh the credibility of witnesses.  *See Herrera*, 506 U.S. at 401-402; *Jackson*, 443 U.S. at 319 n.13.  Applying these principles, the Court concludes that a reasonable juror could have convicted Petitioner of kidnapping.

## B.    Robbery

Petitioner argues that there was insufficient evidence that he committed robbery because prior to the murder he never intended to take the victim's vehicle; instead, he took the vehicle because it was the only means available to him to leave the murder scene.[17]  (Dkt. 154 at 60.)  Again, the Court disagrees that the robbery conviction was not sufficiently supported by the evidence.

The evidence at trial showed that in the days immediately preceding the crimes, Petitioner, who was the subject of a California arrest warrant, was living in a motel in Sacramento under the name "Harold Williams."  (RT 12/4/87 at 27.)  On June 5, 1986, the day before Estes was killed, Petitioner, accompanied by Foote, left Sacramento; prior to

---

[17]    Under A.R.S. § 13-1902(A), "A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property."

leaving, they removed rifles, VCRs, and tapes from the home of someone Petitioner claimed owed him money.  (RT 12/4/87 at 43-45.)  The evidence showed that when Petitioner's truck broke down outside Las Vegas, he and Foote commandeered Estes's truck.  (RT 11/24/87 at 153.)  Finally, the evidence showed that after arriving in Arizona, Petitioner and Foote traveled down a side road and, stopping in a remote location, together dragged Estes from his vehicle into the desert where he was stabbed to death.  Thereafter, Petitioner and Foote, with Petitioner behind the wheel, drove off in the victim's truck.  Based on these facts, a rational juror could conclude that Petitioner murdered Estes to obtain his vehicle, in satisfaction of the elements of armed robbery.

 For the reasons set forth above, Petitioner's challenges to the sufficiency of the evidence are without merit.  Claim 2 is denied.

**Claim 3        Exclusion of Co-defendant's Hearsay Statements**

Petitioner contends that his due process rights were violated by the trial court's exclusion of a statement made by Vernon Foote. (Dkt. 154 at 63-74.)  Petitioner argues that the evidence was admissible as a statement against penal interest under state evidentiary rules and that its exclusion deprived him of a fair trial.

Background

At the conclusion of the State's case, Petitioner moved to admit, under Arizona Rule of Evidence 804(b)(3), portions of a recorded statement made by Foote to Detective Patterson.[18] (RT 12/4/87 at 15.)  The statement, made January 19, 1987, contained the following colloquy:

| | |
|---|---|
| Foote: | Okay.  He [the victim] got outa the truck an' had my arm aroun' him, uh, I believe he had his arm aroun' my shoulder. |
| Patterson: | You had – what arm did he have around your shoulder? |
| Foote: | His right arm.  He was on my left side I recall.  An' we left the |

---

[18]    Prior to that date, the defense had sought to exclude Foote's statements. (*See, e.g.*, ROA 110, 128; RT 12/4/87 at 16.)

1            berm, walked him up to the spot, helped set him down.

2    Patterson:    Okay. When you say the spot, that's up the berm, inta the desert
             about twenty feet . . .
3

4    Foote:       point – point A where the blood was.

5    Patterson:    Okay.  You helped him all the way there by yourself?

6    Foote:       Yes.

7    Patterson:    Okay.  Ho – how do ya know that?

8    Foote:       Uh, because I recall HENRY talking ta me from behind.

9    Patterson:    You mean jist immediately behind you or?

10   Foote:       Uh, I don't recall how far.  Uh, he – he coulda still been settin'
             in the truck.
11
     Patterson:    Okay.  So he – in – in your mind, he was maybe back by the
12            truck?

13   Foote:       Yes.

14   Patterson:    Okay.  An' then what did you do, jis' drop the ol' man?

15   Foote:       No, I jis' – I jis' help set him down an' he – if I recall, he was
             kina down an' wa' holdin' (inaud.) isself up wi' one elbow.
16
     (*Henry I*, 176 Ariz. at 575, 863 P.2d at 867; *see* RT 12/4/87 at 18.)  The court refused to

17   admit these excerpts in evidence after the following discussion with the defense counsel

18   (Kenneth Everett) and the prosecutor:

19   Everett:     I think they're not only against his penal interests but should
20            come in to show the inconsistencies in his statements from one
             time to the other.
21
                 There are specific factual inferences where he said at one
22            point that he was alone at a particular point up there on that
             berm with the body and at another point where he said he was
23            not alone.

24   Court:       Well, I guess it's – my recollection was that although I don't
25            think we ever had a specific motion connected to this, I know at
             least the flavor of one of your motions – several of your motions
26            that you filed early on in this case was to prevent the State from
             using statements by Mr. Foote so are you telling me basically
27            you want to go through the interviews and essentially take out
             everything that helps your case from Mr. Foote – everything that

28
                                  - 41 -

|  |  |
|---|---|
|  | is against Mr. Foote's interest and use that and that I shouldn't let the State use the rest? |
| Everett: | No.  As a matter of fact, Judge, I don't have any problem with all of it coming in. |
|  | . . . |
| Prosecutor: | The State opposes the request.  Whatever inconsistencies – well, this is the first time this came up.  The State was unaware that the Defendant was going to reverse his position. |
|  | Second, mere inconsistencies of a – they're hearsay, of course.  They're merely inconsistent statements which do not necessarily go against – not so contrary to the Defendant's criminal liability to make them admissible nor do they have otherwise the circumstances of trustworthiness.  Basically, they are different versions of what happened.  Certainly, they do lay the blame back on Mr. Henry in great deal.  There are a lot of inconsistencies but the statements are not against his interest per se so the State opposes. |
| Court: | Well, if you had a statement that Mr. Foote would have made to Mr. Patterson or anyone else saying I killed the old man or I killed Mr. Estes which was sort of what I was lead to believe we were going to hear yesterday and somehow that never did materialize, I would probably be inclined to let that in but it sounds like you are really trying to get in statements more in the way of impeaching Mr. Foote by showing inconsistencies in his version of the incident. |
|  | I think that would be certainly proper if Mr. Foote were a witness but I'm not sure that there is anything under the rules of evidence that would allow you to use hearsay to basically just show that a person who is not testifying has made inconsistent statements. |
|  | I'm also at least – well, I just don't think that would be proper under the circumstances so I'm going to deny your request to use the prior inconsistent statements of Mr. Foote. |

(RT 12/4/87 at 15-18; *see* ROA 64r-64s.)

The Arizona Supreme Court rejected the claim that the trial court's ruling was erroneous, holding that Foote's statement was inadmissible under Rule 804(b)(3) and that the statement, even if admissible, was not exculpatory:

> Henry argues that these were statements against Foote's interest. Three elements must exist to admit a statement against the declarant's interest offered to exculpate the accused:  (1) the declarant must be unavailable; (2) the statement must have been "at the time of its making so far contrary to the

- 42 -

declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true"; and (3) "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."  Rule 804(b)(3), Ariz.R.Evid.

The first two elements are met.  The record supports the trial judge's finding that Foote was unavailable because he would have asserted his 5th Amendment privilege if called upon to testify.  The state also concedes that Foote's statements sufficiently tended to subject him to criminal liability.

Because the third element is lacking, however, we hold that the trial judge did not abuse his discretion in excluding the statements.  The only corroborating evidence was Henry's self-serving testimony that Foote alone dragged the victim backwards up the berm.  Without more, and in the face of substantial contradictory evidence, such testimony is generally insufficient to meet the corroborating circumstances requirement.  Virtually all of the other evidence contradicted Foote's statements, including the tracker's uncontroverted testimony that two people supported the victim as they dragged him forward up the berm, as demonstrated by the front-facing footprints on either side of the toe drag marks at the scene; the blood on Henry's clothes and lack of it on Foote's clothes; and Foote's extreme intoxication at the time, which casts considerable doubt on his recollection of the events and on the likelihood that he stabbed the victim without getting any blood on himself.

Foote's statements were neither spontaneous, nor were they ever repeated.  They were made months after the crime during questioning by police.  They were not said to anyone close to Foote (to whom such admissions might be more naturally expected).  Furthermore, the record suggests that Foote fabricated the statements because Henry had threatened him and his family.

Our conclusion might be different had Foote admitted killing the victim, or unequivocally stated that Henry was asleep in the back of the truck when he decided to drag the man into the desert and kill him.  But here Foote simply surmised, prompted by a detective's suggestion, that when he helped the victim up the berm, Henry "coulda" "maybe" been back as far as the truck because he remembered hearing his voice from behind.   While the issue of trustworthiness raises questions of veracity, reliability and credibility, which are traditionally reserved to the finder of fact, we conclude here that no reasonable person could have believed Foote's statements under the circumstances.

Additionally, Foote's statements would not have exculpated Henry from the felony murder charge because we have concluded elsewhere in this opinion that the underlying felony convictions are supported by substantial evidence.

*Henry I*, 176 Ariz. at 575-76, 863 P.2d at 867-68 (citations omitted).

<u>Analysis</u>

- 43 -

1
2
3
4

Petitioner contends that the Arizona Supreme Court's ruling was an unreasonable application of clearly established federal law.  He also argues that the court made an unreasonable determination of the facts in finding that Foote's statement was not rendered trustworthy by corroborating circumstances.  The Court disagrees.

5
6
7
8
9
10
11
12

This Court's review of a habeas claim based upon the improper admission or exclusion of evidence is guided by the principle that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  This principle dictates that a habeas petitioner cannot obtain relief for any errors in state law evidentiary rulings unless they rise to the level of a deprivation of due process. *Id.* at 70.  Therefore, to prevail on Claim 3, Petitioner must show that the exclusion of Foote's statement resulted in an error so pervasive as to have denied him a fundamentally fair trial. *See Chambers v. Mississippi*, 410 U.S. 284 (1973).

13
14
15
16
17
18
19
20

In *Chambers*, the Supreme Court held that the defendant was denied a fair trial when the trial judge excluded out-of-court statements that were critical to the defense and that bore substantial assurances of trustworthiness. *Id.* at 298-303; *see Chia v. Cambra,* 360 F.3d 997, 1003 (9th Cir. 2004) ("when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation") (citing *Chambers,* 410 U.S. at 302).  This Court agrees with the Arizona Supreme Court's analysis and concludes that Foote's statement was neither sufficiently reliable nor material to Petitioner's defense.

21
22
23
24
25
26
27

Petitioner's contention that his due process rights were violated by the exclusion of Foote's statement is not supported by a review of *Chambers*.  The hearsay evidence excluded in *Chambers* consisted of a third party's confessions that he and not the defendant was responsible for the crime.  Because Mississippi did not recognize the hearsay exception for declarations against penal interest, the trial court did not allow the confessions into evidence.  In holding the ruling erroneous, the Supreme Court explained that "the hearsay rule may not

28

be applied mechanistically to defeat the ends of justice."  410 U.S. at 302; *see LaGrand v. Stewart*, 133 F.3d 1253, 1267 (9th Cir. 1998).

The Court stressed that the reliability concerns underlying the hearsay rule were satisfied in Chambers's case.  *Chambers*, 410 U.S. at 301.  The Court listed several distinct indicia of the declaration's reliability, including the fact that the statements consisted of spontaneous confessions made to three separate people, "close acquaintances," shortly after the crime.  *Id.*  The confessions were also corroborated by other evidence in the case, including eyewitness testimony that the declarant was carrying a gun immediately after the shooting.  *Id.*  Moreover, the declarant was in court and under oath and could have been cross-examined by the State.  *Id.*

In each of these particulars, Foote's statement is distinguishable.  The statement was not made spontaneously to a close acquaintance shortly after the murder; it was made to a detective several months after the crimes.  There was no corroborating evidence with respect to the portion of the statement favored by Petitioner, beyond Petitioner's own self-serving version of the crime, and the information contained in the statement was inconsistent with the other "four or five" versions of the crime Foote had provided.  (RT 12/4/87 at 16.)  Unlike the declarant in *Chambers*, Foote was not available for cross-examination.

In addition, again in contrast to *Chambers* where the declarant's statements were "in a very real sense self-incriminatory and unquestionably against interest," 410 U.S. at 300-01, Foote's statement does not exonerate Petitioner.  As the trial court and the Arizona Supreme Court noted, Foote did not indicate that he attacked Estes while Petitioner was asleep in the truck.  It is also clear that in the remaining portions of the statement Foote inculpated Petitioner.

The particulars of this claim also distinguish it from *Chia v. Cambra*, in which the Ninth Circuit granted relief on the petitioner's *Chambers* claim.  360 F.3d at 1008.  In *Chia*, as in Petitioner's case, the declarant invoked his Fifth Amendment rights and the trial court

1   excluded his statements as inadmissible hearsay.  *Id.* at 1001-02.  In *Chia*, however, the

2   declarant had made two consistent statements that the defendant was not involved in the

3   conspiracy and had urged the declarant not to participate.  *Id.* at 1001.  Thus, the statements

4   clearly exculpated the defendant while inculpating the declarant.  The statements were also

5   consistent with observations of DEA agents.  *Id.* at 1001, 1006. Again, by contrast, Foote's

6   statement does not directly inculpate himself while exculpating Petitioner; nor is it consistent

7   with other information provided by Foote himself, let alone supported by corroborative

8   evidence.

9       Finally, even if the exclusion of Foote's statement was constitutionally erroneous,

10  Petitioner is not entitled to habeas relief unless the error had a "substantial and injurious

11  effect" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see Fry v. Pliler*,

12  127 S. Ct. 2321, 2328 (2007); *LaGrand*, 133 F.3d at 1267-68.  As the Arizona Supreme

13  Court explained, admission of Foote's statement would not have exonerated Petitioner from

14  the felony murder charge.  *Henry I*, 176 Ariz. at 576, 863 P.2d at 868.  At best, the portion

15  of the statement defense counsel sought to admit suggested that at some point Petitioner was

16  positioned behind Foote and Estes.  It did not indicate that Petitioner was uninvolved in the

17  kidnapping, robbery, or killing.

18      Conclusion

19      The Arizona Supreme Court's denial of this claim was neither contrary to nor an

20  unreasonable application of clearly established federal law.  The trial court did not exclude

21  Foote's statement "as a result of rigid application of arbitrary or mechanistic rules of

22  admissibility," *LaGrand*, 133 F.3d at 1267; rather, exclusion was based on a proper

23  assessment of reliability.  The statement was simply not "reliable material evidence of

24  [Petitioner's] innocence," and its exclusion did not prevent Petitioner from presenting a full

25  defense or "preclude the jury from hearing material evidence of his innocence." *Chia*, 360

26  F.3d at 999, 1004.  Even if the court erred in excluding the statement, Petitioner was not

27  denied a fundamentally fair trial.  Therefore, Petitioner is not entitled to relief on Claim 3.

28

**Claims 4, 11, and 12**

Petitioner raises a series of claims arising from conflicts with his various counsel and the court at trial and resentencing.  As a guide to its discussion of these claims, the Court offers the following outline.  The Court will expand on these facts as necessary in addressing the individual claims and subclaims.

Background

Petitioner was initially represented by Claude Keller, who was appointed on June 12, 1986.  On June 30, 1986, Petitioner filed a motion for substitution of counsel, alleging that Keller had displayed "indifference, avoidance, and total lack of comprehension," that his performance was "ineffective, inadequate, and uninforming," and that his "steadfast avoidance" of Petitioner had impaired the defense.  (ROA 6a.)  On July 8, 1986, the court granted Petitioner's motion but informed him that "the next attorney I appoint you . . . is going to be your attorney throughout the rest of this case so you are going to be stuck with whoever I give you."  (RT 7/8/86 at 7.)  The court appointed Joseph Wilkinson to replace Keller.  (*Id.* at 9.)  On October 1, 1986, Petitioner filed another motion for substitution of counsel, alleging "numerous instances" in which Wilkinson had provided "ineffective aid of legal counsel."  (ROA 23.)  At a hearing on the motion, Petitioner presented a list of forty "grievances" against Wilkinson.  (RT 10/3/86 at 9.)  He also objected to Wilkinson's filing of a Rule 11 motion for a mental health examination.  (*Id.* at 13.)  Wilkinson acknowledged that his relationship with Petitioner had become "adversarial" and that his view of the case and Petitioner's "differ to such a degree that we cannot cooperate to the point where a satisfactory defense can be achieved."  (RT 10/3/86 at 15.)  At a subsequent hearing, Wilkinson informed the court that Petitioner had threatened to file a bar complaint against him, thereby producing a conflict of interest necessitating his removal from the case.  (RT 10/10/86 at 3.)  The court granted Petitioner's motion for substitution of counsel, this time appointing the Mohave County Public Defender's Office to represent Petitioner.  (*Id.* at 5-6.)

Thereafter, Kenneth Everett, the Mohave County Public Defender, became Petitioner's counsel.  On November 12, 1987, four days before trial, Petitioner moved to represent himself, alleging that Everett had deceived him, engaged in stall tactics to avoid collecting exculpatory evidence, and failed to interview potential witnesses. (ROA 135.) At a hearing on the motion, at which the court offered an extensive disquisition on the pitfalls of self-representation, the court found that Petitioner appreciated the significance of his decision and granted his request to represent himself.  (RT 11/12/86 at 35-36.)  The court appointed Everett as advisory counsel, allowed Evan Williams to remain as Petitioner's investigator, ordered the Mohave County Jail to grant Petitioner access to the law library, and continued the trial date for one week, to November 23, 1987.  (*Id.* at 36.)  Petitioner subsequently withdrew his request to represent himself and was represented by Everett at trial.

Following his conviction, Petitioner filed a number of motions seeking to dismiss Everett, to appoint substitute counsel, and/or to represent himself at sentencing.  (ROA 167, 171, 172, 177, 182, 194.)  Everett filed a motion to withdraw, citing differences with Petitioner over strategy at the sentencing phase and noting that Petitioner had accused him of conspiring with the State and had threatened to write a letter to the bar complaining about his performance.  (ROA 174.)  The court denied the motions (RT 1/6/88 at 7-9), and Everett represented Petitioner at the sentencing proceedings.

On appeal and during the PCR proceedings, Petitioner was represented by Wayne Yehling.  Upon remand for resentencing, Yehling moved to withdraw, citing "irreconcilable conflicts" and Petitioner's accusations, contained in a pro se PCR petition, that he was incompetent and unethical.  (ROA II 2.)  The motion was granted and the case was assigned to Peter Rosales of the Mohave County Legal Defender's Office.   (RT 4/5/94 at 9.) Petitioner also moved for a change of judge.  (ROA II 3.)  The motion, assigned to Judge James Chavez, was denied.  (ME 9/14/94.)  Petitioner then moved to replace Rosales with new counsel, alleging that Rosales refused to collect evidence for the defense and was

otherwise deficient.  (ROA II 11.)  At the hearing on Petitioner's motion for a change of judge, Judge Chavez determined that Rosales would continue to represent Petitioner.  (RT 9/13/94 at 22.)  Rosales subsequently left the legal defender's office and the case was transferred to Gerald Gavin.  (ME 10/5/94.)  Petitioner filed two motions to replace Gavin, alleging that he lacked the resources and interest to adequately represent Petitioner.  (ROA II 39, 45.)  Two days prior to the resentencing hearing, Gavin filed a motion to withdraw, which the court denied.  (RT 2/21/95 at 6-7.)  Finally, at the resentencing hearing, Petitioner made a "conditional" motion to represent himself.  (RT 2/23/95 at 14.)  When the court refused to accept his conditions, Petitioner withdrew his request for self-representation.  (*Id.* at 19.)  The hearing proceeded with Gavin representing Petitioner.

**Claim 4        Violation of Right to Self-representation**

Petitioner contends that his right to represent himself under *Faretta v. California,* 422 U.S. 806 (1975), was "unduly infringed."  (Dkt. 154 at 75-88.)  The claim alleges three instances in which Petitioner's right to self-representation was violated:  (A) prior to trial, when Petitioner was denied access to the law library, (B) during the litigation of his motion for a new trial, and (C) at resentencing.

In *Faretta*, the United States Supreme Court held that the right to counsel encompasses the right of the accused to waive counsel and represent himself at trial.  422 U.S. at 834-35.  Specifically, the Court held that where a competent defendant "weeks before trial . . . clearly and unequivocally declare[s] to the trial judge that he want[s] to represent himself and d[oes] not want counsel," the trial court lacks discretion to deny the request so long as it is knowing and voluntary.  *Id.* at 835.

**A.      Law library access**

Along with granting Petitioner's pretrial motion to represent himself, appointing Everett as advisory counsel, retaining Williams as Petitioner's investigator, and continuing the trial date, the court ordered the Mohave County Jail to grant Petitioner access to the law

library for three consecutive hours per week.  (RT 11/12/86 at 36.)  On November 19, 1987, Petitioner informed the trial court that he had not been permitted to use the library.  (RT 11/19/87 at 4.)  In response, the court ordered that Petitioner be allowed daily access to the library for three consecutive hours.  (*Id.* at 5.)  On November 23, 1987, Petitioner complained that because the court had granted him only a one-week continuance, he had not been granted any time in the law library and had no ability to secure witnesses; thus, he had no choice but to ask to be represented again by Everett.  (RT 11/23/87 at 68, 71.)

On direct appeal, Petitioner argued that the denial of access to the law library during the eleven-day period when he represented himself resulted in a violation of his right to self-representation under *Faretta*.  The Arizona Supreme Court rejected the claim:

A criminal defendant has a constitutional right to represent himself. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). When a defendant in custody exercises that right, the Fifth Amendment guarantee of access to the courts requires that he or she be provided an adequate law library or assistance from someone trained in the law. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72, 83 (1977).

Here, no constitutional violation occurred.  Library access is only one permissible means of affording the right of meaningful self-representation. Legal help is another.  *United States v. Wilson,* 690 F.2d 1267, 1271 (9th Cir.1982) (due process does not require law library access for defendant who declines assistance of counsel).  An inmate does not have the right to select his or her preferred means of access.  *Id.*  Due process rights are violated only when a defendant is denied *all* meaningful opportunity to prepare a defense. *Milton v. Morris,* 767 F.2d 1443 (9th Cir.1985) (defendant denied communication with outside world).

Henry was not denied *all* meaningful access.  At the November 12 hearing on his request to represent himself, he expressly agreed to have his lawyer serve as his legal advisor.  The trial judge granted Henry the right to represent himself, designated his previously-appointed lawyer as advisory counsel, authorized additional funds for Henry's investigator, granted him law library access for at least 3 consecutive hours a week, and continued the trial from November 16 to November 23.  On November 19, the trial judge increased library access to 3 hours a day.  On November 20, in addition to the motion to withdraw his prior waiver of counsel, Henry filed a handwritten Rule 10.1 motion to change the trial judge for cause, and a lengthy motion to continue trial.

The record conflicts as to whether Henry was denied library use, or was offered it and declined.  Regardless, appointment of both advisory counsel and an investigator who in fact did extensive work afforded him the meaningful

1       access required by the constitution.

2   *Henry I*, 176 Ariz. at 584, 863 P.2d at 876 (citations omitted).

3           Petitioner asserts that the Arizona Supreme Court unreasonably applied *Faretta* in

4   rejecting this claim "because it fail[ed] to recognize that because the relationship between

5   Petitioner and Everett was severely strained, the Mohave County Jail's failure to allow him

6   access to the law library and the trial court's failure to provide him the means to represent

7   himself deprived Petitioner of the opportunity to defend himself and forced him to give up

8   his constitutional right to self-representation."  (Dkt. 154 at 79.)  The Court disagrees.

9           First, as the Arizona Supreme Court noted, the record does not fully support

10  Petitioner's contention that he was denied access to the library.  At the PCR evidentiary

11  hearing, testimony from corrections officers indicated that Petitioner was taken to the law

12  library at least once, while on two other occasions he was offered an opportunity to use the

13  library but refused.  (RT 1/25/91 at 27, 49.)  In addition, after Petitioner waived his right to

14  counsel the court appointed Everett as advisory counsel, thereby satisfying the requirement

15  that "prison authorities . . . assist inmates in the preparation and filing of meaningful legal

16  papers by providing prisoners with adequate law libraries or adequate assistance from

17  persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see United States v.*

18  *Cooper*, 375 F.3d 1041, 1051-52 (10th Cir. 2004) ("Standby counsel is the equivalent of

19  library access."); *see also United States v. Plaza-Uzeta*, 282 F. App'x 522, 524 (9th Cir.

20  2008) (prisoner was afforded standby counsel but nevertheless "elected to rescind his *Faretta*

21  waiver and re-accept appointed counsel.  That was his choice.  While the lack of immediate

22  [library] access may have prompted [him] to rescind his *Faretta* waiver, it did not make that

23  choice involuntary.")

24          In support of his claim of a *Faretta* violation, Petitioner cites *Milton v. Morris*, 767

25  F.2d 1443, 1446 (9th Cir. 1985), in which the Ninth Circuit held that the rights guaranteed

26  under *Faretta* "mean, at a minimum, that time to prepare and some access to materials and

27

28                                              - 51 -

witnesses are fundamental to a meaningful right of representation." More recently, however, the United States Supreme Court, acknowledging an unresolved split in the circuits, clarified that *Faretta* does not clearly establish a right to law library access or any other specific legal aid that must be afforded to a criminal defendant who has chosen to represent himself. *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (per curiam). Thus, because the right to assistance recognized in *Milton* is not clearly established federal law as determined by the Supreme Court under 28 U.S.C. § 2254(d)(1), this Court cannot find "based on *Faretta*, that a violation of a law library access right is a basis for federal habeas relief." *Kane*, 546 U.S. at 10.

Petitioner distinguishes his claim from the holding in *Kane* by asserting that, "collectively," the trial court's refusal to grant a continuance, Petitioner's inability to secure witnesses, and the jail's refusal to afford law library access caused him "to withdraw his motion to proceed pro se and forced him to proceed with an attorney with whom he had become embroiled in an irreconcilable conflict." (Dkt. 173 at 54.) Again, this contention is unpersuasive.

Although it is true that Petitioner was involved in a conflict with Everett, as he was with each of the attorneys who represented him, it is equally true that "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc). A violation occurs only when the conflict between counsel and client "was so great that it resulted in a total lack of communication preventing an adequate defense." *Id.* at 1024-25. Thus, the existence of a conflict does not alone entitle a defendant to substitute counsel.

While indigent defendants are entitled to "competent representation," they do not have a right to "a meaningful relationship" with appointed counsel. *Id.* at 1026 (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)). Therefore, a personality conflict or a disagreement about trial strategy does not result in the abridgement of the right to effective counsel. *Id.* at 1027.

1    Significantly, a conflict of the defendant's own making does not constitute a constructive

2    denial of his Sixth Amendment rights. *Id.* at 1026-27 (court may be required to determine

3    whether the defendant himself has "sabotaged the [attorney-client] relationship or failed to

4    make reasonable efforts on his end to develop the relationship").  As the Ninth Circuit

5    explained in *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc):

6                we are not aware of any [Supreme Court case] that stands for the proposition
            that the Sixth Amendment is violated when a defendant is represented by a
7            lawyer free of actual conflicts of interest, but with whom the defendant refuses
            to cooperate because of dislike or distrust.  Indeed, *Morris v. Slappy* is to the
8            contrary.

9    Notwithstanding Petitioner's protestations to the contrary, it is abundantly clear from

10   the record that Petitioner actively sabotaged his relationship with each of his attorneys,

11   including Everett, manufacturing the conflicts about which he then complained to the court

12   in his motions for substitute counsel or to proceed pro per.  Also, contrary to Petitioner's

13   assertion, the court consistently made a record of Petitioner's grievances. (*See* RT 11/12/87

14   at 29-32.)  Ultimately, Petitioner chose to go forward represented by Everett.  As discussed

15   below with respect to Claim 7, the discord between Petitioner and Everett did not prevent

16   Everett from conducting an adequate defense.

17          **B.    New trial motion**

18          Following the guilt phase of his trial, Petitioner moved to waive counsel and proceed

19   pro se. (ROA 173, 182, 194.)  The trial court denied the motion, explaining that only legal

20   matters remained to be resolved, including the new trial motion and the application of

21   aggravating and mitigating circumstances; that Petitioner was not "skilled" enough in legal

22   matters to represent himself in such a context; and that he was not therefore "knowingly and

23   intelligently relinquishing his right to be represented by an attorney." (ME 1/20/88; *see* RT

24   1/6/88 at 9, 1/28/88 at 41-42.)

25          On direct appeal, the Arizona Supreme Court noted that, despite the trial court's

26   ruling, "Henry was allowed to file a 144-page handwritten motion for new trial in addition

27

28                                                - 53 -

to that filed by defense counsel, and was permitted to participate at the ensuing oral argument." *Henry I*, 176 Ariz. at 584, 863 P.2d at 876.  With respect to self-representation at sentencing, the court added that it "need not decide this issue, given our decision to remand for resentencing on other grounds."  *Id.*  The court reiterated that under *Faretta*, "a death-eligible defendant may represent himself at sentencing, provided he or she understands the proceedings, the possible consequences, and the disadvantages of acting as his or her own attorney. . . . The trial judge will have to make this determination should Henry again insist on representing himself at the resentencing proceeding."  *Id.* at 585, 863 P.2d at 877 (citations omitted).

Respondents contend that this issue is moot because the case was remanded for resentencing. (Dkt. 167 at 61-62.)  Petitioner counters that the Arizona Supreme Court's remand order did not render the claim moot because Petitioner's *Faretta* rights were violated when the trial court did not allow self-representation with respect to his motion for a new trial. (Dkt. 173 at 54.)  The Court has considered, and rejects, the Petitioner's argument that his *Faretta* rights were violated during litigation of the new trial motion.

As the Arizona Supreme Court noted, despite the trial court's denial of Petitioner's motion to represent himself, Petitioner was allowed to participate in the motion for a new trial.  He submitted a lengthy pro per motion. (ROA 175, 186.)  During oral arguments on the motion, the court indicated that, in addition to considering defense counsel's new trial motion, it had "read the entirety of Mr. Henry's Motion for New Trial"; the court also informed the parties that "if there are any grounds for a new trial set forth in Mr. Henry's motion, I will grant a new trial based upon them." (RT 1/28/88 at 1.)  Petitioner also offered several comments during the oral argument. (*Id.* at 6-7, 42-45.)

Petitioner argues that in denying relief on this claim the Arizona Supreme Court incorrectly applied a harmless error standard to the *Faretta* violation.  This Court disagrees with Petitioner's interpretation of the ruling and concludes that the state supreme court held

that, given the level of Petitioner's participation in the litigation of his new trial motion, no *Faretta* violation occurred; in effect, the supreme court correctly determined, Petitioner did represent himself for purposes of the new trial motion.

Petitioner also focuses on the *trial* court's rationale for denying his motion to proceed pro per – i.e., that he was incapable of knowingly and intelligently waiving his right to counsel because he lacked the legal knowledge necessary to represent himself at that point in the proceedings. However, it is not the trial court's ruling that is at issue, but the decision of the Arizona Supreme Court. *See Barker v. Fleming*, 423 at 1091 (9th Cir. 2005) (for habeas review, relevant state court decision is the last reasoned decision regarding a claim).

For the reasons stated above, the Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law and was not based upon an unreasonable determination of the facts.

## C.    Resentencing proceedings

Petitioner alleges that his right to represent himself was violated because the trial court denied him the time and resources necessary to proceed with self-representation. (Dkt. 154 at 54-57.) At the resentencing hearing, Petitioner explained that he had filed a "conditional agreement and request to proceed pro per." (RT 2/23/95 at 14.) He informed the court that he would take over his own defense on the condition that the court grant him a continuance of three or four weeks, order the State to help him procure witnesses, give him access to all photographic evidence, and order contact with his lawyer for one hour per day. (*Id*. at 14-15.) The trial court asked Petitioner if he was willing to represent himself if the court did not grant his requests. (*Id*. at 16.) After further discussion, Petitioner declined to represent himself if his conditions were not met. (*Id*. at 19.)

The Arizona Supreme Court rejected Petitioner's allegation that his rights were violated by the trial court's failure to accept his conditions for self-representation:

> A death-eligible defendant may represent himself at sentencing. *Henry*, 176 Ariz. at 585, 863 P.2d at 877. Here, however, defendant again failed to

make an unequivocal request. *See State v. Rickman,* 148 Ariz. 499, 503, 715 P.2d 752, 756 (1986). As with the removal hearing, we cannot conclude from the record that defendant would have been committed to representing himself had the court granted his conditions. The unequivocality requirement was designed to guard against such ambiguity. *See State v. Hanson,* 138 Ariz. 296, 300, 674 P.2d 850, 854 (App.1983).

In any event, we would uphold the court's ruling even if defendant had properly invoked this right. Motions for self-representation must be balanced against the "government's right to a 'fair trial conducted in a judicious, orderly fashion. . . .'" *State v. De Nistor,* 143 Ariz. 407, 412, 694 P.2d 237, 242 (1985) (citation omitted). In this case, defendant appears to have abused the protections afforded to accuseds by his repeated attempts to manufacture error and delay the proceedings. The record is replete with his frequent interruptions, lengthy digressions, and repeated requests for substitute counsel or self-representation. Given this history and the fact that defendant had a lawyer present who announced that he was ready for the hearing, there was no need for further delay.

Defendant further asserts that the court violated his rights to compulsory process, confrontation, and due process by preventing him from obtaining witnesses and materials needed for the hearing. These claims are equally meritless. He was not entitled to hybrid representation, and he was represented by counsel.

*Henry II*, 189 Ariz. at 550, 944 P.2d at 65 (citation omitted).

A waiver of the right to counsel must be "knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004); *Faretta,* 422 U.S. at 835. It must also be unequivocal, timely, and not for the purpose of delay. *Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007); *see United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990).

Petitioner's request to represent himself was neither timely nor unequivocal, and, as the Arizona Supreme Court noted, the record suggests that it was made for the purpose of delay. Petitioner moved to waive counsel on the day of the resentencing hearing. The motion was therefore untimely. The motion was conditioned on the court's willingness to meet several specific conditions, including granting a continuance and allowing Petitioner to have daily contact with "my attorney." (RT 2/23/95 at 15.) The motion was therefore highly equivocal. Finally, the motion continued a pattern of conduct designed to disrupt the proceedings. As he did with each of his previous attorneys, Petitioner alleged that resentencing counsel was incompetent and acting in bad faith. His complaints about counsel

were accompanied by requests for substitute counsel or to proceed pro per and, under either scenario, to be granted a continuance. The Arizona Supreme Court did not make an unreasonable determination of the facts or unreasonably apply *Faretta* when it denied this claim.

### D. Conclusion

For the reasons discussed above, the Court concludes that Petitioner is not entitled to relief on his allegations of a *Faretta* violation. Claim 4 is therefore denied.

### Claim 11      Violation of Rights at Recusal Hearing

Petitioner alleges that during the recusal proceedings on remand for resentencing, the trial court violated his right to counsel, his right to represent himself, his right to confront witnesses, and his right to due process, in violation of the Sixth, Eighth, and Fourteenth Amendments. (Dkt. 154 at 114-26.) According to Petitioner, these violations occurred when the trial court (A) denied his motion to replace Rosales without an inquiry into the basis for the request, (B) failed to grant a continuance to allow Petitioner to proceed pro per, and (C) refused to allow Petitioner to testify at the recusal hearing.

### A. Denial of motion to substitute counsel

Petitioner alleges that an irreconcilable conflict existed between him and counsel and the court denied his motion for substitute counsel without an inquiry into the basis for the request. He contends, therefore, that he was denied "competent counsel at his pre-resentencing hearing on his motion to recuse Judge Conn." (Dkt. 173 at 90.)

Background

As noted above, on remand Petitioner filed a motion to recuse the trial judge and a pro per motion to substitute a new lawyer for Rosales. (ROA II 3, 11.) The former was filed January 26, 1994, the latter August 19, 1994. Judge Chavez addressed both motions at the recusal hearing held September 13, 1994. With respect to the motion for change of counsel, Petitioner alleged that Rosales did not maintain sufficient contact with him and was unwilling

to present certain witnesses and evidence that Petitioner wished to offer in support of the

recusal motion.  (RT 9/13/94 at 5-9.)  At the hearing, Rosales explained to Judge Chavez:

> Mr. Henry has obviously not gotten along with just about everyone who's ever been appointed to him.  I didn't figure I was going to be an exception to the rule.  Mr. Henry wants to be his own lawyer, he wants to dictate strategy, he wants to dictate to the person appointed to him what the law is.  As far as contact with him, we corresponded on numerous occasions and I have talked to him on the phone at least once or twice, and there's no question that Mr. Henry has a certain view of the law and a certain view of what the issues of this particular hearing would be and what the issues of a resentencing would be.  That view is different from mine, and I have submitted to him and outlined for him, both my strategy with regard to what I feel the issues are and what I feel the law is, and he simply does not agree with me.

> With regard to the items he has requested, I felt in my own professional judgment that none of those items was relevant to the issues in this particular hearing or the issues of a resentencing.  He disagrees with me.  At this point I think that if he wishes to pursue representing himself as he had mentioned to me at one time he wanted to do, I think the Court is obligated to see if that is in fact what he wants to do and if he is competent to do it.

(*Id.* at 9-10.)

After further argument, the court denied Petitioner's request, finding that the conflict

with Rosales was based on Petitioner's desire to make strategic decisions that are properly

left to counsel.  (*Id.* at 13.)  Judge Chavez then advised Petitioner that he had to choose

between keeping his attorney and representing himself for purposes of the recusal hearing.

(*Id.* at 13-14.)  Petitioner continued to question and negotiate with the court, refusing to make

a choice unless the court divulged whether it would grant him additional time to prepare and

help him to secure witnesses.  The discussion between Petitioner and the court culminated

in the following exchange:

> The Court:    Mr. Henry, choose to represent yourself, or take Mr. Rosales. If you want to represent yourself, then I will discuss a continuance with you.

> Defendant:    If I acquiesced in the Court's choice here and waive my right to counsel, would that mean I'd also be saddled with Mr. Rosales, Mr. Freeman [Petitioner's investigator], both, with advisory counsel, because they both told me they would not help me in – with advisory capacities?

> The Court:    The answer is yes, clearly, I'd leave Mr. Rosales as advisory

counsel, and with him goes his investigator.

(*Id.* at 20.)  After Rosales indicated that he would likely assign the case to another attorney "who [Petitioner] got along with better," Judge Chavez confirmed that he would be appointing the Legal Defender's Office as advisory counsel.  (*Id.*)  Instead of accepting these conditions, Petitioner repeated his complaints about Rosales's performance and his argument that he should not be forced to choose between representation by Rosales and proceeding pro per.  (*Id.* at 20-21.)  Finally, Judge Chavez brought the colloquy to a conclusion:

> The Court:  Mr. Henry, maybe I missed this, but did you choose or did you not choose?
>
> Defendant:  I am objecting to being forced to choose.
>
> The Court:  I have heard your objection now for about five times.  I have overruled your objection.  It is well documented on the record.  Now you need to choose.
>
> Defendant:  Will Your Honor give me a reasonable continuance to try to work with Mr. Rosales and Mr. Freeman in some capacity to get the witnesses and the documents and records that I feel I need for a defense if I agree to relinquish my right to counsel?
>
> The Court:  Mr. Rosales, if you are counsel on this case, are you ready to proceed today?
>
> Rosales:  I am ready to proceed today, Your Honor.
>
> The Court:  Okay.  The answer is no.
>
> Defendant:  Which means if I take over my own defense, you still won't give me a continuance?
>
> The Court:  That's not what I said.  You need to choose.
>
> Defendant:  Well, I object, Your Honor, because I am at least entitled to know whether you'll give me adequate time to prepare my own defense in some fashion.
>
> The Court:  All right.  Thank you, Mr. Henry.  At this point I am going to assume that you're ready to proceed with Mr. Rosales as your counsel.
>
> Defendant:  No I am not, Your Honor.  I don't believe I have had a full and – opportunity to litigate the issue about his impropriety as counsel.

The Court:    Thank you.  Your objections are noted for the record.  We are
then going to take up the Motion For Change of Judge.

(*Id.* at 21-23.)  The hearing proceeded, with Rosales representing Petitioner and calling Judge

Conn as his sole witness.

On appeal, the Arizona Supreme Court determined that the trial court did not err in

denying Petitioner's request to replace Rosales:

> Those afforded representation, however, are entitled neither to attorneys of
> their own choosing, *State v. DeLuna,* 110 Ariz. 497, 500, 520 P.2d 1121, 1124
> (1974), nor to a meaningful relationship with them.  *Bible,* 175 Ariz. at 591,
> 858 P.2d at 1194.  When ruling on a motion to substitute counsel, courts
> should keep in mind "the rights and interest of the defendant . . . tempered by
> exigencies of judicial economy." *State v. LaGrand,* 152 Ariz. 483, 486, 733
> P.2d 1066, 1069 (1987).  A proper analysis includes consideration of the
> following:
>
> > Whether an irreconcilable conflict exists between counsel and the
> > accused, and whether new counsel would be confronted with the
> > same conflict;  the timing of the motion;  inconvenience to
> > witnesses;  the time period already elapsed between the alleged
> > offense and trial;  the proclivity of the defendant to change
> > counsel;  and quality of counsel.
>
> *Id.* at 486-87, 733 P.2d at 1069-70.  Unlike other factors, the presence of a
> genuine irreconcilable conflict *requires* the appointment of new counsel. *Bible,*
> 175 Ariz. at 591, 858 P.2d at 1194.
>
> According to defendant, Rosales rarely communicated with him prior
> to the removal hearing, failed to adequately prepare, and had been improperly
> influenced by one of his former attorneys.  This, he asserts, created an
> irreconcilable conflict.  We find that the argument lacks support in the record.
> There is ample evidence that the "conflict" in question amounted to nothing
> more than a disagreement over appropriate defense strategies.  Although
> tactical decisions may raise concerns about attorney competence, such matters
> are more properly analyzed in post-conviction relief proceedings. *See State v.
> Mata,* 185 Ariz. 319, 335, 916 P.2d 1035, 1051 (1996); Ariz.R.Crim.P. 32.
>
> Furthermore, this was not the first time defendant had expressed
> dissatisfaction with his lawyers.  His proclivity to change counsel lends strong
> support to the judge's decision.  *See LaGrand,* 152 Ariz. at 486, 733 P.2d at
> 1069.  Before trial, the court granted two defense motions to substitute
> counsel, one motion for self-representation, and another to withdraw the
> waiver of defendant's right to an attorney.  Between the time of his conviction
> and the motion in question, defendant moved either for new counsel or self-
> representation five more times.  When a defendant has repeatedly claimed
> "irreconcilable conflict" with a series of attorneys, the court may deny a
> motion for yet another lawyer where the orderly administration of justice so
> requires.  *See State v. Lee,* 142 Ariz. 210, 220, 689 P.2d 153, 163 (1984).
> Under the circumstances of this case, we cannot say that the court abused its

1    discretion.

2    *Henry II*, 189 Ariz. at 546-47, 944 P.2d at 61-62.

3    <u>Analysis</u>

4    Petitioner contends that the Arizona Supreme Court made an unreasonable factual

5    determination when it found that the conflict between Petitioner and Rosales consisted of a

6    mere disagreement over strategy.  He also argues that the court's denial of the claim was

7    contrary to or an unreasonable application of clearly established federal law requiring an

8    inquiry when a conflict is alleged between counsel and a defendant.  These contentions are

9    without merit.

10    As explained above, the Sixth Amendment guarantees effective assistance of counsel,

11    including the right to conflict-free representation, but it does not guarantee a "meaningful

12    relationship" between a defendant and his attorney.  *Morris v. Slappy*, 461 U.S. at 13-14.

13    While a total breakdown in communication constitutes grounds to substitute counsel, mere

14    differences over trial strategy do not.  *Schell v. Witek,* 218 F.3d 1017, 1026 n.8 (9th Cir.

15    2000) ("a lawyer may properly make a tactical determination of how to run a trial even in the

16    face of his client's incomprehension or even explicit disapproval"); *see also United States*

17    *v. Corona-Garcia*, 210 F.3d 973, 977 n.2 (9th Cir. 2000) (even if there were a severe conflict

18    with respect to trial tactics, the court would be "disinclined to reverse on that ground because

19    trial tactics are clearly within the realm of powers committed to the discretion of defense

20    counsel in any event"); *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990).

21    In moving for substitute counsel, Petitioner offered no credible allegations of an actual

22    conflict of interest and did not contend that communication between him and Rosales had

23    broken down.[19]  Instead, he cited a difference in opinion regarding the proper strategy to

24

25    _____

26    [19]    The Court rejects as unsupported and irrelevant Petitioner's allegation that
Rosales had "conflicting loyalty" due to his association with Petitioner's trial counsel Ken
27    Everett.  (ROA II 11 at 11.)  A conflict of interest refers to "legal conflicts of interest – an
incompatibility between the interests of two of a lawyer's clients, or between the lawyer's

28

1   pursue at the recusal hearing and the relevance of certain evidence to the issue of Judge

2   Conn's alleged bias; he also asserted that Rosales had not maintained an adequate level of

3   communication with him. (ROA II 11 at 9-13; RT 9/13/94 at 3-8.) Only now does Petitioner

4   contend that the lack of contact between Petitioner and Rosales and Rosales's failure to adopt

5   Petitioner's strategy in the recusal matter amounted to a "complete breakdown in

6   communication" such that Judge Chavez was required to make an inquiry. (Dkt. 154 at 119.)

7          The state courts found that Petitioner's objections to Rosales amounted to a

8   disagreement over strategy.  Under 28 U.S.C. § 2254(e)(2), this determination is presumed

9   correct.  Petitioner has not met his burden of rebutting that presumption by clear and

10  convincing evidence.  *Id.*   The record reveals that Petitioner's criticism of Rosales's

11  performance consists of the same complaints Petitioner brought against his prior attorneys

12  (and would soon level against Rosales's successor, Mr. Gavin).  In each instance, Petitioner

13  was frustrated at counsel's failure to fully accept his view of the case and pursue the

14  strategies he advocated.  The reason for the difficulties in the attorney-client relationship

15  "was the voluntary conduct of defendant, not any failure by the trial court to adequately

16  inquire into the reasons for the conflict." *Hudson v. Rushen*, 686 F.2d 826, 831-832 (9th Cir.

17  1982).

18         This case is readily distinguished from *Brown v. Craven*, 424 F.2d 1166 (9th Cir.

19  1970), relied on by Petitioner.  In *Brown*, the court found that "it was not unreasonable to

20  believe that had Brown been represented by counsel in whom he had confidence he would

21  have been convicted, if at all, of [a much lesser offense]."  424 F.2d at 1170.  By contrast,

22  there is no reason to believe an attorney existed in whom Petitioner would have had

23  confidence, let alone that a mutually respectful relationship between Petitioner and counsel

24

25  _____

26  own private interest and those of the client." *Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th
    Cir. 2008) (defendant's subjective belief that counsel was not acting ethically and in his best

27  interest did not constitute an actual conflict of interest such that he was entitled to
    appointment of alternative representation outside the public defender's office).

28

would have made a difference in the outcome of the recusal hearing.

Because Petitioner did not demonstrate a conflict of interest or a complete breakdown in communication, Judge Chavez was not required to conduct an inquiry into Petitioner's complaints.  Nevertheless, Petitioner, in his pro per motion and his arguments to the court, adequately informed Judge Chavez of the nature of his relationship with Rosales, making additional inquiry superfluous.

The denial of Petitioner's motions to substitute counsel did not violate Petitioner's Sixth Amendment rights.  The state court's decision was neither contrary to nor an unreasonable application of clearly established federal law; nor was the decision based on an unreasonable determination of the facts.

Moreover, even assuming the trial court erred in failing to grant Petitioner's motions for substitution of counsel, Petitioner's claim fails because he cannot show he was prejudiced as a result.  *See Brecht v. Abrahamson,* 507 U.S. at 637-38 (trial error is not grounds for granting a habeas petition unless it had a "substantial and injurious effect or influence in determining the jury's verdict"); *see also Brown*, 424 F.2d at 1170.  As discussed below, the allegations of bias on the part of Judge Conn were unpersuasive, and Petitioner has not suggested what additional evidence a different attorney would or could have presented in support if the motion for substitute counsel had been granted.

**B.    Denial of continuance**

Petitioner alleges that his right to represent himself was violated by Judge Chavez's refusal to grant him "the time and other means necessary to prepare" for the hearing on the recusal motion.  (Dkt. 154 at 121.)  In rejecting this claim on appeal, the Arizona Supreme Court focused on whether Petitioner in fact invoked his rights under *Faretta* and concluded that Petitioner did not unequivocally waive his right to counsel:

> A defendant has a constitutionally protected right to proceed without counsel. *Faretta,* 422 U.S. 806, 95 S.Ct. 2525.  In order to successfully invoke this right, however, the accused must make an unequivocal request to represent himself. *State v. Rickman*, 148 Ariz. 499, 503, 715 P.2d 752, 756 (1986).  If timely, the request ordinarily should be granted, *see State v. De Nistor,* 143

1      Ariz. 407, 412, 694 P.2d 237, 242 (1985), provided it is made knowingly,
       intelligently, and voluntarily. *Edwards v. Arizona,* 451 U.S. 477, 482, 101
2      S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

3              The "unequivocal request" requirement serves two purposes. First, it
       acts as a safety net, ensuring that a defendant does not inadvertently waive
4      counsel while thinking aloud about the benefits and pitfalls of self-
       representation. *Adams v. Carroll,* 875 F.2d 1441, 1444 (9th Cir. 1989).
5      Second, the requirement prevents a defendant from "taking advantage of the
       mutual exclusivity of the rights to counsel and self-representation." *Id.* If the
6      court were to permit self-representation on an ambiguous request, a defendant
       might later be able to claim that the right to counsel was improperly denied.
7      *See State v. Hanson*, 138 Ariz. 296, 300, 674 P.2d 850, 854 (App. 1983)(citing
       *Meeks v. Craven,* 482 F.2d 465, 467 (9th Cir. 1973)).
8
               In the present case, defendant never made an unequivocal request to
9      proceed *in propria persona.* The closest he came was when he asked, "[w]ill
       your Honor give me a reasonable continuance to try to work with Mr. Rosales
10     and Mr. Freeman in some capacity to get the witnesses and the documents and
       records that I feel I need for a defense if I agree to relinquish my right to
11     counsel?" We believe this statement is more akin to "thinking aloud" than to
       making a request. At best, defendant was negotiating with the court. Had the
12     judge responded affirmatively, defendant still would not have been committed
       to waiving his right to a lawyer. Moreover, if the court had permitted self-
13     representation at this point in their colloquy, defendant might later have had
       a compelling argument that he never made a genuine waiver of counsel. There
14     was no error.

15     *Henry II*, 189 Ariz. at 548, 944 P.2d at 63.

16             Petitioner contends that the Arizona Supreme Court, in finding that his request to

17     waive counsel was equivocal, made an unreasonable factual determination and unreasonably

18     applied clearly established federal law. The Court disagrees.

19             As previously noted, in *Faretta* the Supreme Court held that a criminal defendant has

20     the right to waive counsel and represent himself. 422 U.S. at 834-35. The waiver must be

21     "knowing, voluntary, and intelligent," *Tovar*, 541 U.S. at 88, as well as "unequivocal, timely,

22     and not for the purposes of delay," *Stenson*, 504 F.3d at 882. "A defendant must make an

23     explicit choice between exercising the right to counsel and the right to self-representation so

24     that a court may be reasonably certain that the defendant wishes to represent himself."

25     *United States v. Hernandez*, 203 F.3d 614, 621 (9th Cir. 2000) (quoting *United States v. Arlt*,

26     41 F.3d 516, 519 (9th Cir. 1994)). In *Stenson*, the Ninth Circuit explained that courts

27     consider three factors in determining whether a defendant's request to represent himself was

28
                                          - 64 -

1   unequivocal, the timing and manner of the request and whether the request was made

2   repeatedly. 504 F.3d at 882. "In applying these factors, federal courts must give significant

3   deference to the trial court's factual findings." *Id.* (citing 28 U.S.C. § 2254(e)(1)).

4        To the extent Petitioner made a request to waive counsel, the timing and manner of

5   the request indicate that the waiver was ambiguous. Prior to the hearing on his motion to

6   remove Judge Conn, Petitioner filed a motion seeking substitute counsel; he did not move

7   to waive counsel and represent himself. (ROA II 11.) Only after Judge Chavez explained

8   that Petitioner could represent himself or proceed with Rosales, did Petitioner suggest that

9   he might prefer to represent himself rather than be forced to go forward with Rosales. (RT

10   9/13/94 at 10.) Thus, Petitioner's *Faretta* request appears to have been "an impulsive

11   response to the trial court's denial of his request for substitute counsel." *Jackson v. Ylst*, 921

12   F.2d 882, 888 (9th Cir. 1990) (finding impulsive request equivocal). Despite a lengthy

13   dialogue with Judge Chavez, Petitioner refused to choose between the two options and the

14   court appropriately proceeded with counsel (*see* RT 9/13/94 at 22). *See Fischetti v. Johnson*,

15   384 F.3d 140, 147 (3d Cir. 2004) ("If a defendant refuses to proceed with counsel and also

16   refuses to proceed pro se, the proper course is to move forward with existing counsel.").

17   Petitioner never abandoned his request for substitute counsel even while debating with Judge

18   Chavez over the possibility of self-representation; thus, his request was not unequivocal. *See*

19   *Stenson*, 504 F.3d at 883-84 (defendant's "clear preference for receiving new counsel over

20   representing oneself" may suggest that his request to represent himself is equivocal).

21   Further, the fact that Petitioner expressed an interest in retaining advisory counsel also

22   supports a finding that his waiver of counsel was not unequivocal. *See United States v.*

23   *Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994).

24        Petitioner cites *Hernandez*, 203 F.3d at 622, and *Adams v. Carroll*, 875 F.2d 1441,

25   1444-45 (9th Cir. 1989), for the proposition that his waiver of counsel, while "conditional,"

26   was nonetheless unequivocal. Both *Adams* and *Hernandez* are readily distinguishable from

27   Petitioner's case. In *Adams*, the defendant's "preference [was] clear from the start: He

28

wanted to represent himself if the only alternative was representation by [appointed counsel]."  875 F.2d at 1445.  In contrast to Petitioner, Adams maintained this "one consistent position."  *Id.*  To the extent Petitioner indicated an intent to waive counsel, the waiver was conditioned not solely on the court's refusal to replace present counsel, as was the case in *Adams*, but upon the fulfillment of Petitioner's other demands.  In *Hernandez*, the defendant made a "sincere and unambiguous request" to represent himself if the court would not replace his current attorney.  203 F.3d at 621.  Again, although he complained about Rosales and discussed the conditions under which he would waive counsel, Petitioner never made an affirmative request to represent himself, let alone a sincere and unambiguous one.

The Arizona Supreme Court found that Petitioner's request was not unequivocal. This determination was not based on an unreasonable determination of the facts, nor did the court unreasonably apply clearly established federal law.

### C.    Refusal to allow Petitioner to testify

At the hearing on Petitioner's motion to disqualify Judge Conn, Rosales called the judge as his only witness.  After Judge Conn's testimony, the court asked Rosales whether he wished to offer any further evidence.  The following exchange ensued:

Rosales:       No, Your Honor.

Defendant:    Yes, he does.  I wish to testify, Your Honor.  Don't I have a legal right to testify?

The Court:     Mr. Rosales, do you wish to call him?

Rosales:       No, Your Honor.

(RT 9/13/94 at 68.)  The court then called a recess before reconvening for closing arguments.

On appeal, Petitioner asserted that his right to testify at the recusal hearing was violated because his testimony was "necessary to the court fully understanding the factual basis for the motion to recuse"; he could have testified, for instance, about the trial judge's "refusal – as well as his voice tone, facial expressions and general demeanor at that time and throughout the proceedings in this case – to view photographs."  (Opening Br. II at 6.)

- 66 -

The Arizona Supreme Court held that Petitioner was not entitled to relief on this claim. *Henry II*, 189 Ariz. at 545-46, 944 P.2d at 60-61.  The court explained that Petitioner had failed to support his allegations of judicial bias and therefore could not show that he was prejudiced by Judge Chavez's denial of his request to testify:

> The defense has failed to provide any support in the record for its underlying claims.  No specific evidence of the alleged judicial misconduct is referenced in the transcript, nor has our independent review disclosed any.  The photographs have not been identified either by exhibit number or in any other appropriate manner, nor are they attached to the briefs.  We possess nothing more than appellate counsel's exceedingly general description of what the defendant "could" have said if permitted to testify.   Under such circumstances, we must conclude that the trial court's actions either did not occur as described or were justified.

> A trial judge is presumed to be free from bias. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Liteky v. United States,* 510 U.S. 540, 555-56, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).  The trial court's refusal to examine photographs, if true, would not alone demonstrate such profound antagonism.  Additionally, defendant's subjective observations of the judge's tone of voice and expressions would add little, if anything, to his claim.  *See Liteky,* 510 U.S. at 555, 114 S.Ct. at 1157 ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display.").  Thus, even assuming defendant's unsubstantiated claims are accurate and that he had a right to testify at this judicial disqualification proceeding, we find no prejudice.  *See Harrington v. California,* 395 U.S. 250, 251-54, 89 S.Ct. 1726, 1727-28, 23 L.Ed.2d 284 (1969) (confrontation clause violation held harmless error).

*Id.* (citations omitted).

Petitioner contends that any denial of the right to testify constitutes structural error; therefore, the Arizona Supreme Court, in reviewing the claim for prejudice, improperly applied a harmless error test. (Dkt. 173 at 94-95.)  Respondents counter that the right to testify is limited to the evidence-taking stage of trial and that there is no clearly established federal law establishing a defendant's right to testify at a pretrial proceeding. (Dkt. 167 at 91-92.)

A criminal defendant has a constitutional right to testify. *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987).  Counsel may not waive this right on his client's behalf. *See Jones v.*

- 67 -

*Barnes*, 463 U.S. 745, 751 (1983).  However, the Court agrees with Respondents that it is not clear that the constitutional right to testify at trial also applies to a pretrial hearing.  *See Parker v. Ercole*, 582 F. Supp. 2d 273, 296 (N.D.N.Y. 2008).  ("The Supreme Court has not, however, decided that defendants have a constitutional right to testify at pre-trial suppression hearings."); *see also Hemingway v. Henderson*, 754 F. Supp. 296, 302 (E.D.N.Y. 1991) (noting the difference between testimony at a pretrial hearing and "testifying at a trial that involves a determination of guilt or innocence").  Thus, to the extent Petitioner's claim is premised upon a constitutional right to testify at the recusal hearing, the state court's denial of that claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  *See Musladin*, 549 U.S. at 77.

Assuming that the right to testify applied to the recusal hearing before Judge Chavez, Petitioner would not be entitled to relief.  To support his assertion that the denial of a defendant's right to testify is a structural defect classified as "inevitably harmful" and, as such, "is not amenable to harmless error analysis," Petitioner relies on *Arizona v. Fulminante*, 499 U.S. 279 (1991).  (Dkt. 173 at 94-95.)  *Fulminante*, however, does not remove from the list of trial errors subject to harmless error analysis the violation of a defendant's right to testify, *id.* at 306-07, and some lower courts have held that the harmless error standard applies to such violations.[20]  *See Ortega v. O'Leary*, 843 F.2d 258, 261-62 (7th Cir. 1988); *Wright v. Estelle*, 572 F.2d 1071 (5th Cir. 1978) (en banc); *see also Solomon v. Curtis*, 21 F. App'x 360, 363 (6th Cir. 2001).  As the Supreme Court explained in *Rose v. Clark*, 478 U.S. 570, 578-579 (1986):

> We have emphasized . . . that while there are some errors to which *Chapman* [harmless error analysis] does not apply, they are the exception and not the rule.  *United States v. Hasting,* 461 U.S. at 509, 103 S.Ct. at 1980. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have

---

[20]     Other courts have held that the analytical framework set forth in *Strickland* applies when counsel prevents a defendant from testifying at trial. *See Brown v. Artuz*, 124 F.3d 73, 77-80 (2d Cir. 1997); *Nichols v. Butler*, 953 F.2d 1550, 1552 (11th Cir. 1992).

occurred are subject to harmless-error analysis. . . .  As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436; *United States v. Hasting,* 461 U.S. at 508-509, 103 S.Ct. at 1980.

Because there is no clearly established Supreme Court precedent classifying as structural error the denial of a defendant's right to testify, Petitioner cannot obtain relief on that basis. *See Musladin*, 549 U.S. at 77.

Applying harmless error analysis, this Court agrees with the Arizona Supreme Court that Petitioner was not prejudiced when Judge Chavez disallowed his testimony at the recusal hearing.  The only specific allegations of bias against Judge Conn were that he refused to view certain crime scene photographs provided to him by Petitioner during the PCR proceedings and that he had ex parte contact with jail personnel.  In *Van Arsdall*, the Supreme Court set out the factors to consider in determining whether erroneous restrictions on witness testimony were harmless, including the importance of the witness's testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating the testimony, and the overall strength of the case.  475 U.S. at 684.

Petitioner's omitted testimony falls short with respect to these criteria.  Petitioner could have offered no relevant testimony concerning Judge Conn's ex parte contact with jail personnel, an occurrence which the judge acknowledged in his testimony at the recusal hearing.  (RT 9/13/94 at 38-41.)  That leaves Judge Conn's alleged refusal to view certain photographs of the crime scene.  Judge Conn testified that he did not remember Petitioner handing him photos and that, because Petitioner was represented by counsel at the time, he would not have accepted them from Petitioner in any event.  (*Id.* at 60-61.)  As the Arizona Supreme Court noted, Petitioner's testimony about his perceptions of the judge's attitude during this transaction would not have revealed "a deep-seated favoritism or antagonism" on Judge Conn's part "that would make fair judgment impossible."  *Liteky v. United States,* 510 U.S. 540, 555-56 (1994).  There is no likelihood that Petitioner's testimony would have altered Judge Chavez's decision to deny the recusal motion.  The Arizona Supreme Court,

in holding that Petitioner was not prejudiced and that any potential error was harmless, did not make an unreasonable determination of the facts or unreasonably apply clearly established federal law.

**Claim 12      Right to Counsel at Resentencing**

Petitioner alleges that his right to counsel at resentencing was violated when the trial court denied his motion for substitute counsel without inquiring into the basis of his dissatisfaction with his attorney.  (Dkt. 154 at 126-30.)

Background

Two days before the resentencing hearing, Gavin moved to withdraw, submitting as an exhibit Petitioner's pro per motion for new counsel.  (RT 2/21/95 at 2-3.)  In support of his motion to withdraw, Gavin informed the court:

> Basically, Judge, the relationship between myself and Mr. Henry has deteriorated significantly.  It is my intention to try to help Mr. Henry as much as possible.  The ties between myself and Mr. Everett and Mr. Rosales I think were known by everybody from the beginning including my client.  The Court already ruled on the first motion that was filed by my client to have me removed in the negative not seeing any conflict.

> I have attempted basically to provide Mr. Henry with the best services I can.  I am not F. Lee Bailey.  I am not Johnny Cochran but I am trying to do the best possible job I can on this case.

> It is certainly not my intent to see him sentenced to death again.  I hope he is not.  If I remain on the case I will try to do my best to make sure that does not happen but my client has bucked me every step of the way.

> Everything that I do he files pro se motions on disagreeing with me.  He does not agree with my strategy or everything else. All this is contained in my motion.  I won't go through it for the Court's sake but, the relationship at this point has bottomed out.

> I will certainly remain on the case if this Court orders me to do so.  My hope is that this Court does not order me to do so.

(*Id.* at 3-4.)  The following exchange then occurred:

Defendant:      May I respond?

The Court:      No, you may not.  Not yet.  Mr. Zack, what is the State's position?

Mr. Zack:       Your Honor, the State, of course, traditionally takes no position

|   |   |   |
|---|---|---|
| 1 | | concerning who or how a defendant is represented. The State |
| 2 | | would point out it is obvious that Mr. Henry has engaged in |
|   | | these same tactics with several lawyers who have been |
| 3 | | appointed for him. There is no lawyer who the Court could |
|   | | appoint that would not have the same problems as Mr. Gavin or |
| 4 | | any other lawyer. It would appear certainly there is two – |
| 5 | Defendant: | Objection. |
| 6 | The Court: | Mr. Henry, Mr. Henry, you are not representing yourself. That |
|   | | option may become available to you but you do not have the |
| 7 | | right to argue this motion. I am aware that you want to fire Mr. |
|   | | Gavin. Proceed, Mr. Zack. |
| 8 | Defendant: | I object to the State being made a party to this argument. |

1  
2  
3  
4
concerning who or how a defendant is represented. The State would point out it is obvious that Mr. Henry has engaged in these same tactics with several lawyers who have been appointed for him. There is no lawyer who the Court could appoint that would not have the same problems as Mr. Gavin or any other lawyer. It would appear certainly there is two –

5 **Defendant:** Objection.

6  
7 **The Court:** Mr. Henry, Mr. Henry, you are not representing yourself. That option may become available to you but you do not have the right to argue this motion. I am aware that you want to fire Mr. Gavin. Proceed, Mr. Zack.

8 **Defendant:** I object to the State being made a party to this argument.

9  
10 **The Court:** Mr. Henry, if you want to be present at this hearing, please refrain from interrupting. Go ahead, Mr. Zack.

11  
12  
13  
14 **Mr. Zack:** My point is the Defendant's intent for making these accusations against all his lawyers apparently is to delay the proceedings and build in an error issue on appeal and, again, we have gone through this for over a year now. It is the State's position that we want to get the Defendant resentenced and would desire to do that this Thursday and get this case moving. Beyond that the State I don't believe can get involved in the representation of the Defendant.

15 **The Court:** All right. Mr. Gavin, anything further?

16  
17  
18 **Mr. Gavin:** Just a reminder. Mr. Henry has put my bar license at risk. I think when that happens there is a definite conflict. Given the other exhibits I filed I would ask the Court to let me off for the reasons already cited.

19  
20  
21 **The Court:** Well, we have reached the point in this case that I anticipated that we would reach at some point; the only question being how long it would take us to get here. It is the same point that we reached with every other attorney that has ever represented the Defendant in this case.

22  
23  
24  
25  
26 I can certainly appreciate the dilemma that Mr. Gavin is in. My concern is that I feel deep down in my heart that no matter who I appoint to represent the Defendant in this case, we will be having an identical hearing at some point down the road and I say that just because I am aware of the people that have been appointed to represent Defendant in the past. Some of them probably are not among the greatest trial attorneys that I have ever seen. Some of them are, in my opinion, cream of the crop that is available around here.

27 And I am just not willing to give the Defendant the right to

28

1

2

3

> get a new attorney any time that he wants simply by filing a bar complaint or threatening to file a bar complaint. And I am just absolutely convinced that if I grant this request, we are just guaranteeing that we are going to have this same conversation with some other lawyer somewhere down the line.

4

(*Id.* at 6-7.)

5          On appeal, the Arizona Supreme Court held that there was no violation of Petitioner's

6   right to counsel. *Henry II*, 189 Ariz. at 549-50, 944 P.2d at 64-65. First, the court noted that

7   even without an oral inquiry Judge Conn was fully informed of Petitioner's criticisms of

8   Gavin's performance:

9

10

11

12

13

14

15

16

> Defendant argues that "the trial court's failure to inquire into why [he] was seeking substitute counsel and . . . to determine the nature and extent of the conflict between Mr. Henry and his counsel ran afoul of the Sixth Amendment to the United States Constitution and Ariz. Const., art. 2, § § 4, 8, 13, 15, and 24. . . ." We disagree. Further inquiry was unnecessary because the court had already amassed sufficient information on which to base its decision. Prior to the hearing, the judge had reviewed defendant's *pro per* motion for new counsel, which detailed the nature and extent of the "conflict." That pleading thoroughly set forth defendant's contentions that Gavin refused to acquire mitigation evidence, that he was too busy to prepare an adequate defense, and that he was improperly influenced by one of his predecessors. (We note the striking similarity between these claims and those against Rosales. The merits of these charges, however, are not properly before us, since they would appropriately be the subject of post-conviction relief proceedings pursuant to Rule 32, Ariz.R.Crim.P.)

17   *Id.* at 549, 944 P.2d at 64.

18          The court next considered the nature of the conflict between Petitioner and Gavin:

19

20

21

22

> Defendant also contends that an irreconcilable conflict arose after he filed a bar complaint against his counsel. Again, we cannot agree. "As a matter of public policy, a defendant's filing of a bar complaint against his attorney should not mandate removal of that attorney." *State v. Michael*, 161 Ariz. 382, 385, 778 P.2d 1278, 1281 (App.1989). A rule to the contrary would encourage the filing of such complaints solely for purposes of delay.

23

24

25

> Defendant's penchant for changing counsel once more reinforces the court's ruling. He was represented by six different attorneys before his second petition for review to this court. In all, he moved to substitute counsel ten separate times. Although a defendant is entitled to competent counsel, we agree that the trial court need not have embarked on "the search for the ideal Graham Henry attorney."

26   *Id.*

27

28

1          Analysis

2          As the Arizona Supreme Court noted, Judge Conn was well apprised of the causes of

3   Petitioner's dissatisfaction with counsel, having read "in its entirety" Petitioner's eleven-page

4   pro per motion for substitute counsel.  (RT 2/21/95 at 3; *see* ROA II 39.)  In his motion,

5   Petitioner accused Gavin of "divided loyalties" based on his acquaintance with Petitioner's

6   previous attorneys.  (ROA II 39 at 3-6.)  He also claimed that Gavin lacked the resources to

7   defend him; failed to communicate with him and engaged in "stall tactics" instead of

8   preparing a defense; and filed motions "that have nothing to do with disproving the States's

9   aggravating factors," which, according to Petitioner, was "the only plausible, effective,

10  adequate defense ultimately available."  (*Id.* at 9.)  He also indicated that he was preparing

11  a bar complaint against Gavin.  (*Id.* at 7.)  Further oral inquiry into the matter would have

12  served no purpose.

13         As discussed with respect to Claim 4(A), not every conflict between a defendant and

14  counsel implicates a defendant's Sixth Amendment rights, and the mere existence of a

15  conflict does not entitle a defendant to substitute counsel.  *Schell*, 218 F.3d at 1027.  The

16  gravamen of Petitioner's criticism of Gavin, which did not differ substantially from the

17  complaints Petitioner raised against all of his attorneys, consisted of counsel's alleged lack

18  of investigation and a disagreement as to strategy.[21]  A personality conflict or a disagreement

19  regarding trial strategy does not result in a violation of a defendant's right to counsel.  *Id.* at

20  1026.

21         Contrary to Petitioner's contention, the Arizona Supreme Court accurately recounted

22  his difficult relationship with each of his attorneys and his "penchant" for requesting new

23  counsel.  It is evident that Petitioner deliberately undermined his relationship with Gavin, as

24  he did with each of his previous attorneys.  Difficulties in the attorney-client relationship that

25

26  _____

27         [21]     The Court will consider the merits of Petitioner's attack on counsel's
    preparation and performance at resentencing in Claim 13 below.

28                                              - 73 -

were of Petitioner's making do not constitute a constructive denial of his Sixth Amendment rights. *Id.* at 1027; *cf. United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (conflict of interest could not be based solely on the defendant's filing of a state bar grievance petition); *United States v. Holman*, 314 F.3d 837, 845 (7th Cir. 2002) (fact that defendant initiated a disciplinary inquiry against his attorney was not enough to establish conflict of interest).

In sum, Petitioner's complaints, even if taken at face value, do not describe an irreconcilable conflict or total breakdown in communication such that substitution of counsel was mandated. Petitioner was not entitled to substitute counsel at resentencing. The Arizona Supreme Court's rejection of this claim was not objectively unreasonable. Claim 12 is therefore denied.

**Claim 5          Fifth Amendment Violation**

Petitioner alleges that the trial court violated his right against self incrimination by permitting the introduction of statements taken without a valid waiver pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (Dkt. 154 at 88-93.) Specifically, Petitioner claims that his rights were violated when the State was allowed to elicit testimony that Petitioner did not report the murder when he was initially stopped by police officers. (*Id.*)

Background

Prior to trial, the State requested that it be allowed to elicit evidence that Petitioner did not tell Officer Racine about the murder when Racine questioned him on the highway after the traffic stop. (RT 11/23/87 at 54.) Petitioner opposed the State's request on the grounds that such evidence would violate his constitutional right to remain silent. (*Id.* at 58.) The trial court ruled that the testimony was admissible because it did not constitute a comment on Petitioner's right to remain silent and would not result in prejudice given the admissibility of Petitioner's subsequent statement in which he again made no mention of the murder. (*Id.* at 59-60.)

During the State's case-in-chief, the prosecutor elicited evidence of Petitioner's failure to mention the murder to Officer Racine.  (RT 11/25/87 at 15-16.)   The prosecutor emphasized Petitioner's silence during his closing argument:

> The judge is going to instruct you to look at all the evidence; to consider everything in making your decision and look at the big picture.  The fact that the Defendant said absolutely nothing after he was picked up 20 minutes after he murdered somebody and trying to play the straight man.  I didn't do anything.  I didn't do anything wrong.  By not telling the authorities, if he really is innocent, that big picture doesn't make sense.

(RT 12/8/87 at 144.)

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim that the evidence and the prosecutor's argument violated his right to remain silent:

> The state cannot impeach a testifying defendant with his post-arrest silence if it was or could have been in response to *Miranda* warnings. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 98 (1976) (violation of defendant's due process rights); *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) (silence following *Miranda* warnings ordinarily so ambiguous as to have little probative value).  When a defendant is not induced into silence by *Miranda* warnings, however, or waives his rights by answering questions after such warnings are given, due process is not implicated. *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (silence not induced by *Miranda* warnings); *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (rights waived by post-arrest statement).
>
> Here, Henry's due process rights were not violated.  This case does not involve "silence" induced by *Miranda* warnings.  At no time, either before or after having been given such warnings, did Henry choose to remain silent, or otherwise invoke his constitutional right to do so.  On the contrary, he talked freely.  The stories he told, however, were vastly different from one another.  At the scene of the traffic stop, and before any *Miranda* warnings were given, Henry volunteered information about the items in the back of the truck.  He stated that he had paid the owner $50 to borrow the truck and that he had to return it by 9:00 that night.  He also gave a false name.  Later, after having been told of his right to remain silent, he repeated the same basic story at the DPS office.
>
> Once confronted with his true identity, however, he gave a totally different version of the facts, including details about how Foote allegedly committed the killing.  This was the first time he mentioned the murder.  It is also the story he repeated at trial.
>
> The fact that Henry was "silent" *about the murder* during the early versions he gave the police does not mean that his constitutional right to remain silent was violated by the later mention of those statements, which

were clearly inconsistent with what he said at trial.  As the United States Supreme Court stated in *Anderson*, "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version.  But *Doyle* [*v. Ohio*] does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case."  447 U.S. at 409, 100 S.Ct. at 2182, 65 L.Ed.2d at 227.

There are no constitutional implications here.  Thus, this issue becomes one of state evidentiary law.  *Fletcher*, 455 U.S. at 607, 102 S.Ct. at 1312, 71 L.Ed.2d at 494.  We find no error under the facts as presented.

Because the evidence was relevant only as impeachment, the state should not have elicited the testimony in its case-in-chief.  Since it could have done so on cross-examination, however, and did do so on rebuttal, the error does not require reversal.

*Henry I*, 176 Ariz. at 579-80, 863 P.2d at 871-72 (citations omitted).

<u>Analysis</u>

The Arizona Supreme Court's rejection of this claim was a reasonable application of clearly established federal law.  The State may not use a defendant's post-arrest, post-*Miranda* silence either to impeach the defendant's testimony at trial, *see Doyle v. Ohio*, 426 U.S. 610, 619 (1976), or as evidence of guilt during the State's case-in-chief, *see Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986).  Reference to the accused's post-*Miranda* silence is impermissible because it is fundamentally unfair for the government to induce silence through *Miranda* warnings and then later use that silence against the accused.  *See Doyle*, 426 U.S. at 617-18.  However, when the accused waives his right to remain silent and agrees to questioning, no such inducement has occurred.  *Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam) ("a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent").  As the Ninth Circuit explained in *Leavitt v. Arave*, 383 F.3d 809, 827 (9th Cir. 2004) (per curiam):

A defendant who has received *Miranda* warnings can, thereafter, remain silent without running the risk that the prosecutor will comment upon that fact. *See Doyle v. Ohio*, 426 U.S. 610, 617-18, 96 S.Ct. 2240, 2244-45, 49 L.Ed.2d 91 (1976).  That part of the canon stated, however, it must be added that talking is not silence. Thus, when a defendant chooses to speak, the prosecutor can, surely, explore that speech and its implications. *See Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (per curiam). In that event, as the Supreme Court bluntly put it, "the defendant has not remained silent at all." *Id.*

Thus, the prosecutor may point out inconsistencies. *See United States v. Ochoa-Sanchez,* 676 F.2d 1283, 1286 (9th Cir.1982). The omission of critical details may also be explored. *See id.*; *see also United States v. Makhlouta*, 790 F.2d 1400, 1404 (9th Cir.1986). Similarly, when the defendant seeks to convey the impression that he cooperated with the police, the prosecutor can explore facts which suggest that the defendant did not do so. *See McMillan v. Gomez*, 19 F.3d 465, 469-70 (9th Cir.1994).

Petitioner, when questioned during the traffic stop, willingly spoke with Officer Racine about his identity and the ownership of the truck and the items found inside. (RT 4/24/87 at 22-24, 31.) Subsequently, after being given *Miranda* warnings, Petitioner voluntarily waived his right to remain silent and again freely conversed with the police. During these interviews, on June 6 and 7, 1986, Petitioner did not mention that Estes had been stabbed to death in the desert, notwithstanding his later claim, when confronted on June 8 with his real identity, that Foote had acted alone; that he, Petitioner, had attempted to save the victim; that he was furious with Foote and appalled by his actions; and that he wished to cooperate with the police in locating the crime scene. (*See id.* at 37, 59-61, 65; RT 11/25/87 at 101-04.)

While Petitioner did not initially divulge the truth about the crimes, he did not remain silent but willingly provided the police a false story in order to conceal his involvement in the events that led to Estes's death. His rights were not violated by the State's use of this story and its implications to impeach his testimony. *See Jenkins v. Anderson*, 447 U.S. 231, 238 (1980) ("impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial").

In arguing that the Arizona Supreme Court unreasonably applied clearly established federal law, Petitioner relies on the fact that the State raised the issue of Petitioner's silence about the murder in its case-in-chief, prior to Petitioner's decision to testify, so that Officer Racine's testimony was not admissible as impeachment of an inconsistent statement. (Dkt. 154 at 91.) This argument fails because Petitioner did not remain silent and the prosecutor made no comment and offered no evidence that Petitioner had invoked his right to remain silent. *Cf. Scarborough v. Arizona*, 531 F.2d 959, 960-61 (9th Cir. 1976) (fundamental error

where prosecutor commented in opening statement on defendant's post-arrest silence). Instead, the State presented testimony concerning the story Petitioner originally told to the police, which did not include any mention of Estes's fate.  Finally, as the Arizona Supreme Court found, no prejudice resulted from the State's use of the evidence in its case-in-chief, because the testimony could have been elicited in cross-examining Petitioner or on rebuttal. Moreover, evidence that Petitioner was not truthful in his initial contact with the police was properly before the jury in the form of Petitioner's subsequent statements, in which he acknowledged that he had been unwilling to come forward with information about Estes's death until his identity became known.

For the reasons set forth above, the Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to relief on Claim 5.

**Claim 6        Failure to Allow Surrebuttal Testimony**

Petitioner contends that the trial court's denial of his request to testify in surrebuttal violated his right to present evidence under the Sixth and Fourteenth Amendments.  (Dkt. 154 at 93-96.)  Respondents counter that the claim is procedurally barred and meritless.

Background

During the defense case, Petitioner testified that the State had confused some of his boot prints with those of Detective Patterson.  (RT 12/4/87 at 192-200, 12/7/87 at 71.)  In its rebuttal case, the prosecution recalled Bernell Lawrence, the tracking expert, and entered into evidence a photograph, Exhibit 50.  (RT 12/7/87 at 131-35.)  According to Lawrence, the photograph showed the track of a coyote or other small animal on top of a heeled boot print that Petitioner claimed was made by Detective Patterson.  (*Id*. at 134-35.)

Following the State's rebuttal case, defense counsel requested that Petitioner be allowed to testify on surrebuttal "in regards to the measurements that he knows or with Evan Williams in regard to visits to the scene regarding the distance up that bank feet-wise and

regarding footprints and dent marks up that bank." (RT 12/8/87 at 38.) The court denied the

request, explaining:

> I feel that this is not a new area that was developed on the State's rebuttal case.
> My feeling is that the right of the Defense to call surrebuttal witnesses should
> be limited to new matters that are raised in the State's rebuttal case. I believe
> that these matters have been covered in every portion of the case beginning
> with the cross-examination and even direct examination of State's witnesses
> so I don't believe that that would be a proper area for surrebuttal and I will not
> allow you to put on that evidence.

(*Id.* at 38-39).

The Arizona Supreme Court held that the trial court did not abuse its discretion by

disallowing surrebuttal testimony from Petitioner:

> The tracker testified on direct examination that two sets of footprints, matching
> those of Henry and Foote, were photographically depicted along the drag
> marks from the berm to the bush. He also said that a coyote print was located
> on *top* of one of the boot prints on the berm, indicating that the boot print was
> placed there *before* the photographs were taken by investigators (i.e., an
> investigator most probably could not have made the print). Henry testified that
> Foote dragged the victim *backwards* up the berm. On rebuttal, the tracker
> testified that the footprints were facing forward, and repeated that one heeled
> footprint in the area had a coyote print in it. There was nothing new about this
> evidence, and no need for surrebuttal.

*Henry I*, 176 Ariz. at 581, 863 P.2d at 873.

Analysis

Respondents contend that Petitioner did not fairly present the federal basis of Claim

6 in state court. On direct appeal, Petitioner alleged a violation of his "right to present

evidence in his own behalf as guaranteed by the Sixth and Fourteenth Amendments to the

United States Constitution." (Opening Br. I at 55.) This reference to a "specific[] provision

of the federal constitution" is sufficient to fairly present the claim, *Lyons*, 232 F.3d at 670,

and the Court will consider its merits.

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to

present a defense; this right is "a fundamental element of due process of law." *Washington

v. Texas*, 388 U.S. 14, 19 (1967); *see Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("the

Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete

defense'") (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)).  That right is not unlimited, however, and the exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it "infringed upon a weighty interest of the accused" or "undermined fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 308, 513 (1998); *see Crane*, 476 U.S. at 689-91 ("the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice [or] confusion of the issues'") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). In addition, a state court's evidentiary ruling only rises to the level of a due process violation warranting federal habeas relief if it renders the state proceedings fundamentally unfair. *Estelle v. McGuire*, 502 U.S. at 72; *see Montana v. Egelhoff*, 518 U.S. 37, 53 (1996).

In response to the conclusion reached by the trial court and the Arizona Supreme Court that no new information was elicited during Lawrence's rebuttal testimony, Petitioner contends that Exhibit 50 itself constituted new evidence warranting an opportunity for surrebuttal.  While the exhibit had not been introduced previously, its content was not new; it depicted prints seen in other photographs that had been the subject of Lawrence's earlier testimony.  During the State's case-in-chief, Lawrence testified on cross-examination about the "coyote or fox" track over the heeled boot print on the berm; he could not positively identify the maker of the boot print.  (RT 12/2/87 at 87-88.)  In substance this testimony did not differ from the testimony he offered on rebuttal.  Petitioner complains that Lawrence's rebuttal testimony created the inference that the print was Petitioner's.  (Dkt. 173 at 66.) However, that inference resulted not from new evidence but from the contrast between Petitioner's testimony, in which he insisted that the State had mis-identified the prints, and the photographic evidence that cast doubt on Petitioner's version of events.

Under these circumstances, the trial court's denial of surrebuttal did not violate Petitioner's right to present evidence or rise to the level of a due process violation.  The Arizona Supreme Court's denial of the claim was not contrary to or an unreasonable

1    application of clearly established federal law, nor was it based on an unreasonable

2    determination of the facts.  Therefore, Petitioner is not entitled to relief on Claim 6.

3    **Claim 7        Ineffective Assistance of Counsel at Trial**

4           Petitioner alleges that counsel performed ineffectively during the guilt stage of trial

5    in violation of his Sixth Amendment rights.  (Dkt. 154 at 96-106.)  Specifically, Petitioner

6    contends that counsel failed to (A) investigate and preserve evidence, (B) properly represent

7    the crime scene, and (C) preserve items in Petitioner's truck.

8           Following his conviction and sentence, but prior to his direct appeal, Petitioner filed

9    a PCR petition alleging ineffective assistance of counsel.  (PCR 1, 7/16/90.)  Judge Conn,

10   who had presided over Petitioner's trial and sentencing, held a six-day evidentiary hearing.

11   (RT 11/28/90-11/30/90, 1/22/91-1/24/91.)  Wayne Yehling, Petitioner's appellate and post-

12   conviction counsel, called as witnesses defense counsel Joseph Wilkinson and Ken Everett;

13   Evan Williams, the defense investigator at trial; Jim O'Brien, an expert tracker; and Blair

14   Abbot, Petitioner's investigator for the PCR proceedings.  Petitioner also testified.

15          At the conclusion of the hearing, the court ruled that Petitioner had established neither

16   deficient performance nor prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).

17   (RT 1/25/91 at 129.)  In discussing his decision, the judge first made a credibility finding

18   with respect to the witnesses, describing Petitioner as "probably the least credible person that

19   I can think of ever having been exposed to in the criminal system."  (*Id.* at 122.)  The judge

20   then offered the following characterization of trial counsel's performance:

> Mr. Henry received as close to top-level representation in this case, top-level
> defense and trial of the case at trial that I think is possible.  And I say that with
> regard to what I have seen other attorneys do in Mohave County trying cases,
> the level of investigation I have seen done in criminal cases, and I feel that I
> can say straight across the board that Mr. Henry was simply not denied
> effective assistance of counsel.  I cannot think of one of the areas that has been
> suggested or raised in the pleading in which I am even willing to make the
> initial finding that Mr. Everett's performance was ineffective, and because of
> that I haven't found myself in the position of saying, well, let's assume this is
> ineffective, did it have any effect on the outcome of the case, was the
> defendant prejudiced, would the outcome of the case have been different . . .
> but for this ineffectiveness?

1

(*Id.* at 123-24.)

2

The Arizona Supreme Court, applying *Strickland*, upheld the PCR court's rulings.

3

*Henry I*, 176 Ariz. at 585-86, 863 P.2d at 877-78.

4

The applicable law is set forth in *Strickland*, which holds that in order to prevail on

5

an ineffective assistance of counsel claim, a petitioner must show that counsel's

6

representation fell below an objective standard of reasonableness and that the deficiency

7

prejudiced the defense. 466 U.S. at 687-88. The inquiry is highly deferential, and "every

8

effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the

9

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

10

perspective at the time." *Id.* at 689.

11

To satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome

12

"the presumption that, under the circumstances, the challenged action might be considered

13

sound trial strategy." *Id.* For example, while trial counsel has "a duty to make reasonable

14

investigations or to make a reasonable decision that makes particular investigations

15

unnecessary, . . . a particular decision not to investigate must be directly assessed for

16

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

17

judgments." *Id.* at 691. To determine whether the investigation was reasonable, the court

18

"must conduct an objective review of [counsel's] performance, measured for reasonableness

19

under prevailing professional norms, which includes a context-dependent consideration of

20

the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*,

21

539 U.S. 510, 523 (2003) (citation and quotation marks omitted); *Rompilla v. Beard*, 545

22

U.S. 374, 381 (2005).

23

Because an ineffective assistance claim must satisfy both prongs of *Strickland*, the

24

reviewing court "need not determine whether counsel's performance was deficient before

25

examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

26

*Strickland*, 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the

27

28

ground of lack of sufficient prejudice . . . that course should be followed"). A petitioner must affirmatively prove prejudice. *Id.* at 693. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The calculus involved in assessing prejudice "should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695.

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

### A.    Failure to investigate

Petitioner contends that his first attorney, Claude Keller,[22] failed to direct the defense investigator, Evan Williams, to perform any investigative work beyond photographing the crime scene. Petitioner also alleges that his second attorney, Joseph Wilkinson, failed to pursue investigative leads suggested by Petitioner, did not respond to Petitioner's letters or calls, failed to have his investigator interview witnesses from a fast food restaurant Petitioner and Foote visited prior to arriving in Las Vegas, and failed to inventory items found in Petitioner's truck.

At the PCR evidentiary hearing, Wilkinson testified that he and his investigator, John Coleman, traveled to Las Vegas where they located, inspected, and photographed Petitioner's truck and interviewed witnesses from the bar where Petitioner left the vehicle and the victim's apartment complex. (RT 11/28/90 at 34-44, 1/22/91 at 8-9.)

Everett testified that he followed up on some of Petitioner's suggested leads by attempting to contact witnesses in Sacramento; of the individuals Everett was able to locate,

---

[22]    Mr. Keller had passed away by the time of the PCR proceedings.

none had favorable information to provide.  (RT 11/29/90 at 73-80, 85.)  With respect to the investigative avenues suggested by Petitioner, Everett explained that what he "was trying to do was everything Graham Henry asked me to do," regardless of his personal belief in the potential value of the information.  (*Id.* at 78.)  For example, following Petitioner's instructions, Everett allowed investigator Williams to travel to the Las Vegas area to attempt to locate witnesses who might have seen Foote carrying the knife; Williams also interviewed individuals at a fast food restaurant and a bar and attempted to locate other potential witnesses.  (RT 11/30/90 at 48, 75-77.)  Everett admitted that he did not pursue some leads, particularly those arising from events before Petitioner's arrival in Las Vegas, because he believed they were stale and that investigative resources "could have been better executed in other areas."  (*Id.* at 80; *see* RT 1/22/91 at 89-109.)

The PCR court rejected Petitioner's contention that defense counsel's failure to pursue certain investigative leads amounted to ineffective performance.  The court explained that counsel's investigation led to valuable evidence and that any limits on the scope of the investigation did not work to Petitioner's detriment:

> I still maintain that the events leading up to Las Vegas were not relevant; I don't believe it was ineffective on the part of Mr. Everett to not pursue those leads.  I think that it would have proven nothing to show that Mr. Foote had a knife in his possession at some time prior to getting to Las Vegas.  As far as what happened after they got to Las Vegas, I thought Mr. Everett did get witnesses who as I recall were very beneficial to the defense theory at the time of the trial. . . . I think the likelihood of getting any beneficial leads from anyone that arguably might have seen the Defendant after contacting the victim – it sounds to me as if Mr. Everett made a legitimate attempt to locate people in Las Vegas; he did find some of them, and some of those people did testify.

(RT 1/25/91 at 124-25.)

The Arizona Supreme Court agreed with Judge Conn's analysis:

> Henry argues that his lawyers were ineffective for failing to locate various witnesses in California and Nevada who allegedly saw Foote with a knife within a day of the murder or who saw the victim with Henry and Foote.  His trial lawyer and a defense investigator both testified at the Rule 32 hearing that the witnesses either had nothing relevant to offer, or were unfavorable.  The defense did not demonstrate otherwise.  More importantly, Henry fails to

show that the asserted testimony of these witnesses would likely have affected the outcome of this case.   Our review of the record demonstrates no incompetence or prejudice in defense counsel's failure to secure witnesses.

*Henry I*, 176 Ariz. at 585, 863 P.2d at 877.

When an ineffective assistance claim centers on a failure to investigate and elicit testimony from witnesses, the petitioner must "demonstrate, with some precision, the content of the testimony they would have given at trial." *Lawrence v. Armontrout,* 900 F.2d 127, 130 (8th Cir. 1990) (an affirmative proof of prejudice requires showing that witnesses would have testified and it would have been favorable) (quoting *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1014-15 (7th Cir. 1987)); *see Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (counsel's failure to interview or call an alleged alibi witness did not constitute ineffective performance where "there is no evidence in the record that this witness actually exists, other than from [the petitioner's] self-serving affidavit" and "no evidence that this witness would have provided helpful testimony for the defense"); *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991) ("habeas court cannot even begin to apply *Strickland*'s standards to . . . a [missing witness] claim unless and until the petitioner makes a specific, affirmative showing as to what the missing evidence or testimony would have been.") (citation and internal quotation marks omitted).   As the Arizona Supreme Court observed, Petitioner does not identify or explain the import of any of the evidence allegedly lost due to trial counsel's failings.   Thus, he has failed to demonstrate that he was prejudiced by counsel's investigation of potential witnesses.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").   The Arizona Supreme Court did not unreasonably apply *Strickland* in rejecting this claim.

## B.    Failure to properly represent the crime scene

Petitioner contends that trial counsel performed ineffectively by neglecting to create a complete photographic layout of the crime scene and by failing to retain experts to rebut

1   testimony from the State's tracking expert.  Petitioner asserts that these steps, if taken, would

2   have undermined the State's theory of the crime and corroborated Petitioner's version of

3   events.  The Court disagrees and finds that the state courts' rejection of the claim did not

4   constitute an unreasonable application of *Strickland*.

5        Background

6        Detective Patterson photographed the crime scene on June 8, 1986, two days after the

7   murder.  (RT 11/25/87 at 107-08.)  Petitioner's investigator, Evan Williams, visited the crime

8   scene on June 14, 1986; although some footprints and blood were still visible, the scene was

9   "fairly well decimated."  (RT 11/30/87 at 11, 18.)  Nevertheless, Williams took photos,

10  attempting to capture an overall view of the scene as well as specific details.  (*Id.* at 13-15.)

11  He visited and photographed the scene on several subsequent occasions – once, on February

12  21, 1987, with Detective Patterson.  (*Id.* at 48.)  On that occasion, Williams photographed

13  the area from all sides.  (*Id.* at 52.)  At Everett's direction, Williams measured the distances

14  between certain features of the crime scene.  (*Id.* at 54-55.)  Williams also prepared a sketch

15  of the location.  (*Id.* at 69.)  Petitioner's counsel, Wilkinson and Everett, also visited the

16  crime scene.  (RT 11/28/90 at 42-43.)

17       At the evidentiary hearing, PCR counsel questioned Everett about his handling of the

18  crime scene evidence.  Everett testified that he was ready to cross-examine the State's

19  tracking expert, Bernell Lawrence.  (RT 11/29/90 at 101.)  Everett had prepared by speaking

20  with other trackers and reviewing "a variety of manuals and treatises on the subject."  (*Id.*

21  at 103.)  The individuals Everett spoke to indicated that they respected Lawrence's expertise

22  but acknowledged that it would be difficult to interpret the activity at a crime scene based

23  solely on photographs (*id.* at 103-04), a point Everett raised in his extensive cross-

24  examination of Lawrence (RT 12/2/87 at 39-40, 56-57).  Everett's strategy was to "make sure

25  that the jury was aware and that Bernie Lawrence admitted that it was hard to tell what

26  happened up there and that there is no way Patterson could tell you whose prints were up

27  there and nobody could because so many people were walking around up there that there's

28

no way to definitely tell what went on.  That's reasonable doubt."  (RT 11/29/90 at 114.)
Under Everett's questioning, Lawrence admitted at trial that the photographs taken by
Patterson could have been better. (RT 12/2/87 at 39.)

In his cross-examination of Detective Patterson at trial, Everett attempted to expose
the inadequacy and incompetence of the crime scene investigation and the resulting
photographs. (RT 11/25/87 at 166-69, 11/30/87 at 45-49.) Patterson admitted that he walked
directly into the crime scene rather than establishing a perimeter and that his investigation
of the scene lasted only ninety minutes, with half of that time taken up by his interview of
Petitioner. (RT 11/25/87 at 164-69.) Defense investigator Evan Williams, who had expertise
in photographing and processing crime scenes (RT 12/3/87 at 86-89), testified that he would
have handled the scene differently than Detective Patterson (*id.* at 136-37).  Williams
testified that in order to preserve evidence he would have processed the scene in a more
methodical way; he would have photographed the footprints from a "straight down" angle
and used a ruler to capture the size and detail of the prints.  (*Id.* at 92-95.)

Finally, at trial, Petitioner provided detailed testimony describing what occurred at the
crime scene.  (RT 12/4/87 at 107-38, 12/7/87 at 61-89.)  His version of events also came
before the jury through the testimony of the officers who interviewed him.  (*See* RT 11/25/87
at 135.)

The PCR court denied counsel's request for funding but allowed a tracking expert,
James O'Brien, to testify.  (RT 1/22/91 at 123-30.)  O'Brien testified that it is inappropriate
for a tracker to interpret crime scene evidence or to draw conclusions based on footprint
evidence without corroborating information.  (RT 1/23/01 at 28-30.)   Blair Abbot,
Petitioner's PCR investigator, testified that photographing a crime scene in a grid pattern is
useful in establishing an accurate record (*id.* at 75-76); he had no opinion, however, whether
a photo layout of the crime scene would have proved or disproved Petitioner's version of the
facts (*id.* at 89-90).  Everett acknowledged at the hearing that he did not have the crime scene
photographed in a grid pattern; by the time he was assigned to the case, little of the footprint

1    evidence remained at the scene.  (RT 11/29/90 at 107, 109.)

2         At the evidentiary hearing, Williams testified that he was not aware of any trackers

3    whose credentials matched Lawrence's.  (RT 11/30/90 at 103.)  Similarly, Everett testified

4    that he did not believe he could have found a tracker with Lawrence's expertise.  (RT 1/22/91

5    at 115-16.)  Abbot testified, however, that it would not have been difficult for Everett to have

6    located a tracking expert such as O'Brien.  (RT 1/23/91 at 86-87.)

7         Citing the lack of substance in O'Brien's criticism of Lawrence's interpretation of the

8    crime scene, the PCR court rejected Petitioner's assertion that defense counsel performed

9    ineffectively by failing to obtain an expert to counter Lawrence's trial testimony.  The court

10   explained:  "I don't think Mr. O'Brien testifying at the trial would have had any effect upon

11   the ultimate conclusion or would have had any effect upon the jury's determination

12   concerning evidence at the crime scene."  (RT 1/25/91 at 125.)

13        The Arizona Supreme Court affirmed the PCR court's analysis:

14        Henry contends that his lawyers were ineffective because they did not
15   obtain a scaled photo layout of the crime scene.  At the Rule 32 hearing, a
     defense expert testified that the crime scene should have been photographed
16   in a grid sequence to show spatial relationships.  The expert, however, had no
     opinion whether such a photo layout would have proved or disproved Henry's
17   version of the facts.  Indeed, he conceded that an accurate depiction of the
     scene might "very possibly" have demonstrated that Henry was lying when he
18   testified.  There was no showing that the absence of such photographs affected
     the result here.

19        Henry also complains that his lawyers did not obtain a tracker to
20   counter the state's expert witness at trial, but he fails to show how this would
     have made a difference.  The tracker who testified for him at the Rule 32
21   hearing did not voice the opinion that Foote dragged the victim up the berm by
     himself or that there was only one set of footprints next to the drag marks
22   rather than two.  He testified only that trackers normally read signs and do not
     interpret them.  He also admitted on cross-examination that he was not saying
23   that no one could interpret what had happened from photos of the scene.
     Defendant again fails to meet the *Strickland* test for ineffective assistance.

24   *Henry I*, 176 Ariz. at 585, 863 P.2d at 877.

25        <u>Analysis</u>

26        Neither the PCR court nor the Arizona Supreme Court unreasonably applied

27   *Strickland* in rejecting this aspect of Petitioner's ineffective assistance claim.  Petitioner has

28
                                    - 88 -

not met his burden of showing that counsel performed deficiently and that he was prejudiced thereby.  To the extent that the manner in which the crime scene was investigated and documented was subject to criticism, counsel thoroughly exposed such shortcomings through the testimony of his investigator and his cross-examination of the detectives and the State's tracker.  *See Bower v. Quarterman*, 497 F.3d 459, 471-72 (5th Cir. 2007) (decision not to call an expert witness to rebut the state's ballistics evidence did not constitute deficient performance where counsel felt that the ballistics evidence was weak and brought out those weaknesses in cross-examination of the state's experts).

With respect to the allegation that counsel performed ineffectively by failing to create a meticulous representation of the crime scene, Petitioner ignores the fact that by the time investigator Williams was able to visit the scene, six days after it had been processed, the footprint evidence had largely deteriorated.  Nevertheless, Williams photographed the area extensively and drew a diagram of the scene.  In addition, both Wilkinson and Everett visited the location.  Petitioner fails to identify what exculpatory information could have been gained if counsel had photographed the scene in a grid pattern.  Presumably, such a method would have created a more thorough and accurate representation of the scene, but there is no evidence that it would have compromised the State's theory of the case or bolstered Petitioner's version of events.

Petitioner likewise fails to demonstrate that counsel was ineffective for failing to retain a tracking expert.  Mr. Everett testified that in preparing to cross-examine Lawrence, he studied treatises and consulted local trackers.  These individuals, while acknowledging Lawrence's expertise, were skeptical that footprint evidence could be properly interpreted based solely on photographs.  Everett emphasized this point, and other alleged shortcomings in the investigation, during his cross-examination of the prosecution's witnesses.  Although Petitioner established that tracking experts were available if defense counsel had sought them out, he did not demonstrate that if counsel had retained such an expert, Lawrence's testimony would have been undermined.  While O'Brien, Petitioner's expert at the evidentiary hearing,

criticized Lawrence's methodology, he was unable to refute Lawrence's interpretation of the footprint evidence.  *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculation as to what expert might say "is insufficient to establish prejudice"); *see Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997).

As discussed in Claim 1, Petitioner attached to his motion for evidentiary development a declaration and report prepared by Joel Hardin, a professional tracker.  (Dkt. 186, Ex. 15.)  In Hardin's opinion, the photographs of the crime scene support Petitioner's version of events, namely that he did not participate in dragging the victim away from the vehicle but instead exited the rear of the truck and leaped up the berm.  (*Id.*)  The Hardin materials do not change the Court's conclusion that the ruling of the Arizona Supreme Court was not unreasonable under *Strickland*.  Petitioner has shown, at most, that in 2008, more than 20 years after his trial and 16 years after the PCR hearing, habeas counsel was able to locate an expert who, using the photos taken by Detective Patterson (which Petitioner then contended were unprofessional and now contends were altered) disagrees with Lawrence's interpretation of the crime scene evidence.  If Everett had been able to obtain an expert opinion consistent with that now offered by Hardin, he would at most have created a "battle of the experts" between the defense expert and Lawrence; he would not have shown that Lawrence, who reviewed all of the photos and visited the crime scene days after the murder, was not a persuasive witness.  *Pinholster v. Ayers*, 525 F.3d 742, 759 (9th Cir. 2008) (petitioner failed to allege colorable claim of ineffective assistance based on counsel's failure to retain independent expert to investigate palm print evidence; declaration by petitioner's expert "does not prove that the State's fingerprint expert was lying or misinformed").

Finally, in his reply brief Petitioner attempts to support his claim of ineffective assistance by drawing an analogy between the tracking evidence in his case and the expert testimony in *Smith v. Mitchell*, 437 F.3d 884, 889 (9th Cir. 2005), *judgment vacated*, 127 S. Ct. 2126 (2007), *judgment reinstated*, 508 F.3d 1256 (9th Cir. 2007).  The comparison is inapposite.  In *Smith*, the Ninth Circuit granted habeas relief on the petitioner's claim that her

conviction for assault on a child resulting in death was not supported by sufficient evidence. 437 F.3d at 890. According to the court, there was no scientific evidence that the infant was violently shaken; even the prosecution's witnesses conceded that no physical evidence supported their conclusion that the child suffered from shaken baby syndrome. *Id.* at 889-90. In addition, the petitioner was the child's grandmother, and nothing in her background suggested that she could be guilty of the crime. *Id.* at 889.

In Petitioner's case, by contrast, Bernell Lawrence, an experienced tracker, offered an interpretation of the crime scene evidence suggesting that two people, one on either side, dragged the victim up the berm; shoe prints consistent with the footwear of Foote and Petitioner were located on either side of the drag marks from the top of the berm to the location where the victim was stabbed to death. In addition to this evidence, which supported the State's theory of the crime and directly contradicted Petitioner's testimony, other facts supported the jury's verdict. Petitioner left California after a warrant had been issued for his arrest on attempted murder charges. His vehicle broke down outside Las Vegas where an eyewitness saw the victim, in obvious distress, entering his truck with two men and being driven away. When stopped while driving the victim's truck away from the crime scene, Petitioner failed to inform the police that his companion Foote had just committed murder and left the victim's body in the desert. Blood spots were present on Petitioner's clothing but not on Foote's. At the time of the arrest, Foote was incapacitated while Petitioner, although impaired, had the presence of mind to use an alias and fabricate an explanation for his presence in Estes's vehicle. Therefore, unlike Smith, Petitioner's conviction was supported by both expert testimony about the crime scene and other inculpatory evidence. The quality and quantity of the evidence against Petitioner clearly distinguishes the case from *Smith*, and supports a finding that he was not prejudiced by counsel's handing of the crime scene evidence.

**C.    Failure to preserve items in Petitioner's truck**

Petitioner contends that counsel performed ineffectively by failing to secure the items

found in his truck in Las Vegas.  According to Petitioner, the defense theory would have been bolstered if counsel had preserved the valuable tools Petitioner had stored in the truck, thereby showing that Petitioner intended to return to the vehicle, did not need the victim's vehicle, and had no motive to kill him.

As previously noted, Wilkinson located Petitioner's truck and took photos. Subsequently, Everett and investigator Williams located the truck in a tow yard and took photographs of the truck's contents; Everett introduced both sets of photos into evidence at the trial.  (RT 11/29/90 at 44-51, 63, 11/30/90 at 49, 1/22/91 at 78.)  At trial Everett called the tow truck driver, Lewis Hansen, who testified that he observed tools in the back of Petitioner's truck which he estimated to be worth $2,000, with the truck itself worth about $800.  (RT 12/1/87 at 93-94; *see* RT 11/29/90 at 61-65, 1/22/91 at 78.)  Petitioner provided detailed testimony regarding the value of his tools and their importance to his livelihood. (RT 12/4/87 at 32-35, 74, 89, 166-67, 12/7/87 at 97, 121; *see also* RT 11/30/87 at 25.)

The PCR judge rejected Petitioner's arguments that counsel's performance was ineffective, noting that "there was proof at trial that established everything that the Defendant wanted to establish, and that is that he had valuables in the truck that would have given him an incentive to come back."  (RT 1/25/91 at 124.)  The Arizona Supreme Court agreed, holding that Petitioner had not demonstrated that he was prejudiced by counsel's failure to secure the vehicle and its contents.  *Henry I*, 176 Ariz. at 585-86, 863 P.2d at 877-78.  *See infra* Claim 10.

In finding that Petitioner failed to demonstrate prejudice based on counsel's performance with respect to the truck, the Arizona Supreme Court did not unreasonably apply *Strickland*.  Defense counsel presented evidence – which the State did not dispute – that Petitioner's truck contained valuable tools.  Counsel argued that the presence of the tools in the truck indicated that Petitioner intended to return to his vehicle and countered the State's theory that Petitioner and Foote kidnapped Estes to gain access to his vehicle and

continue Petitioner's flight from California.  (RT 11/24/87 at 142-43, 12/8/87 at 157.)  In these circumstances, Petitioner cannot show that he was prejudiced by counsel's failure to secure the truck or perform a "full inventory"of its contents.  Such actions would simply have produced information cumulative to the undisputed evidence that counsel did present.  There is not a reasonable probability that the verdict would have been different if counsel had taken the steps Petitioner now advocates.

###    D.    Conclusion

After a lengthy evidentiary hearing the PCR court, applying *Strickland*, denied Petitioner's claims of ineffective assistance of counsel.  As the judge who presided over Petitioner's trial, Judge Conn "was in an unusually good position to evaluate [Everett's] actual performance and [Petitioner's] credibility." *Dows v. Wood*, 211 F.3d at 487 (according "substantial weight" to judge's "conclusion that [counsel's] performance was objectively reasonable").   The Arizona Supreme Court likewise rejected Petitioner's ineffective assistance claims, specifically holding that he had failed to demonstrate that he was prejudiced by the challenged aspects of counsel's performance.  These rulings were not an unreasonable application of *Strickland*.  Therefore, Claim 7 is denied.

**Claim 8        Erroneous Jury Instruction**

Petitioner contends that his due process rights were violated when the trial court failed to instruct the jury that theft of property from a dead person is not robbery unless the intent to steal the property co-existed with the acts leading to the victim's death, and that Petitioner could not be found guilty of robbery as an accomplice if he merely aided Foote in leaving the scene.  (Dkt. 154 at 106-10.)

Background

At the close of trial, the trial court provided the following instruction:

The crime of Armed Robbery has six elements.  In order to determine that the Defendant committed the crime of Armed Robbery, you must find that:
Number one, the Defendant took the property of another person – and

that refers to the property of Roy Estes – and, number two, that the Defendant took the property from the other's person or immediate presence; and, number three, the Defendant did so against the other person's will; and, number four, in doing so the Defendant threatened or used force against any person; and, number five, the Defendant threatened or used force with the intent either to coerce the surrender of the property or to prevent resistance to his taking or retaining the property; and, number six, in the course of doing so the Defendant or an accomplice used or threatened to use a dangerous instrument.

(RT 12/8/87 at 197.)  The court further instructed the jury: "The phrase in the course of in the elements for the offense of Armed Robbery includes any of the Defendant's acts beginning with the initiation of and extending through the flight from a robbery."  (*Id.* at 199.)

Because Petitioner did not object to the instruction, the Arizona Supreme Court reviewed it for harmless error and found none.  *Henry I*, 176 Ariz. at 582-83, 863 P.2d at 874-75.  The court explained that the robbery instruction was adequate:  "Element number five . . . adequately informed the jurors of the co-existence requirement.  Moreover, we have found sufficient evidence to support his robbery conviction as a principal.  Henry was not denied a fair trial on this basis."  *Id.*

Analysis

A challenge to jury instructions does not generally state a federal constitutional claim. *See Engle v. Isaac*, 456 U.S. at 119; *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  To warrant federal habeas relief, an error in jury instructions "cannot be merely 'undesirable, erroneous, or even universally condemned,' but must violate some due process right guaranteed by the fourteenth amendment." *Prantil v. State of California,* 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  To prevail on this claim, therefore, Petitioner must demonstrate that the instruction provided by the trial court "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

"It is well established that the instruction 'may not be judged in artificial isolation,'

1    but must be considered in the context of the instructions as a whole and the trial record."

2    *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).  In reviewing an ambiguous

3    instruction, a reviewing court inquires "whether there is a reasonable likelihood that the jury

4    has applied the challenged instruction in a way" that violates the Constitution.  *Id.* at 72-73

5    (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

6          Petitioner alleges that the instruction provided by the trial court lowered the State's

7    burden of proof with respect to the "co-existence" requirement.  It appears his argument is

8    not that the instruction itself was erroneous with respect to the elements of armed robbery,

9    but that, combined with the "weak" evidence of an armed robbery, it allowed the jury to

10   convict Petitioner without finding that his intent to use force co-existed with an intent to steal

11   Estes's vehicle.  For this proposition he cites *State v. Lopez*, 158 Ariz. 258, 762 P.2d 545

12   (1988).  In *Lopez*, the victim was killed during a fight with the defendant, after which the

13   defendant disposed of the victim's body, took his vehicle, and left the scene, later disposing

14   of items from the vehicle.  *Id.* at 261, 762 P.2d at 548.  The vehicle was found several blocks

15   from the defendant's home, where it had been set on fire.  *Id.*  There was no evidence that

16   the defendant had the intent to commit robbery at the time he used force on the victim;

17   specifically, there was no evidence to support the prosecution's theory that the defendant had

18   "lured" the victim to the crime scene so that he could be robbed.  *Id.* at 264, 762 P.2d at 551.

19         By contrast, the evidence in Petitioner's case supported a finding that the intent to

20   commit robbery did not, as Petitioner contends, arise only after Estes was killed.  The

21   evidence showed that Petitioner, aware that there was a warrant for his arrest, left California

22   with Foote.  After Petitioner's truck broke down, he and Foote encountered the victim and

23   commandeered his vehicle.  They drove to a remote location off the highway where the

24   victim was removed from the truck, dragged by two people into the desert, and stabbed to

25   death.  Petitioner then drove Estes's truck away from the scene.  Although he later claimed

26   that Estes had voluntarily accompanied him and Foote, that Foote had already taken Estes

27

28

from the vehicle and stabbed him before he was aware of what was happening, and that he drove off in the victim's truck only to escape the crime scene, Petitioner, when stopped by the police, provided a false name and disclosed nothing about Estes's actual fate.

The trial court instructed the jury that one of the elements of armed robbery is that "the Defendant threatened or used force with the intent either to coerce the surrender of the property or to prevent resistance to his taking or retaining the property." This instruction, along with the evidence presented at trial, ensured that the jury did not apply the challenged instruction in a way that reduced the State's burden of proof with respect to the elements of the armed robbery count. Therefore, there was no likelihood that the jury applied the instruction in a manner that violated Petitioner's due process rights. Accordingly, Claim 8 is denied.

**Claim 9          Failure to Provide Duress Instruction**

Petitioner contends that his due process rights were violated when the trial court failed to provide a jury instruction on duress as a defense to the charge of robbery. (Dkt. 154 at 110-12.)

On direct appeal, the Arizona Supreme Court found that Petitioner was precluded from arguing that he was entitled to such an instruction because he did not do so at trial. *Henry I*, 176 Ariz. at 583, 863 P.2d at 875. The court also held that "the record here would not support such an instruction in any event." *Id.*

As stated above, in order to be entitled to habeas relief, Petitioner must show that the lack of a duress instruction impugned the fundamental fairness of his trial. *Henderson v. Kibbe*, 431 U.S. at 154-55 (noting that a habeas petitioner whose claim involves a failure to give a particular instruction, rather than an erroneous instruction, bears an "especially heavy" burden). The starting point for this due process analysis is whether the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law. *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001); *see Barker v. Yukins*, 199 F.3d 867, 876 (6th Cir.

1999).

Under Arizona law, the duress defense "is unavailable for offenses involving homicide or serious physical injury."  A.R.S. § 13-412(C); *see Clabourne v. Lewis*, 64 F.3d 1373, 1383 (9th Cir. 1995) ("Duress is not a defense to either premeditated or felony murder.").  The victim here was stabbed to death.  The duress defense was not available, and Petitioner was not entitled to such an instruction.  Moreover, the record does not support a finding, under A.R.S. § 13-412(A), that Petitioner was "compelled to engage in the proscribed conduct by the threat or use of immediate physical force against his person or the person of another which resulted or could result in serious physical injury which a reasonable person in the situation would not have resisted."  To the contrary, Petitioner's defense was that he did not participate in the proscribed conduct, not that he was compelled to do so by his fear of Foote.

Petitioner is not entitled to relief on Claim 9.

**Claim 10        Failure to Provide *Willits* Instruction**

Petitioner alleges that his due process rights were violated when the trial court failed to provide a jury instruction, pursuant to *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), stating that if the State destroys material evidence, the jury may infer that the facts are against the State's interest. (Dkt. 154 at 112-14.) Petitioner contends that valuable tools in his truck were potentially helpful because they established a motive for him to return to Las Vegas.

The trial court refused Petitioner's request for a *Willits* instruction with respect to the State's alleged failure to secure his truck, finding that during the trial Petitioner "had sufficient opportunity to show the value of these tools."  (RT 12/6/87 at 68.)  The Arizona Supreme Court agreed:

> To be entitled to a *Willits* instruction, a defendant must show (1) that the state failed to preserve material and reasonably accessible evidence having a tendency to exonerate him, and (2) that this failure resulted in prejudice. That burden has not been carried here.   Henry offered, and the court admitted, photographs of his truck and its contents.  He testified to the valuable tools left behind.  The tow truck driver verified that he saw many tools worth "a couple

> thousand dollars" in the back of Henry's truck.  In closing, defense counsel argued that his client would not have killed the victim for a vehicle because his own truck, containing these valuable possessions, was in Las Vegas.  Beyond this, the truck had no material exculpatory value.

*Henry I*, 176 Ariz. at 583, 863 P.2d at 875 (citation omitted).

 Petitioner has not met the "heavy burden" of showing that the omission of a *Willits* instruction deprived him of a fair trial.  *Henderson v. Kibbe,* 431 U.S. at 154-55.  As the state courts correctly observed, and as discussed above with respect to Claim 7(C), the defense thoroughly exploited the truck and its contents for whatever exculpatory potential they possessed, thereby rendering a *Willits* instruction unnecessary.  Evidence relating to the value of the truck and the tools was uncontradicted; there could have been no doubt in the jury's mind regarding the role such evidence played in the defense theory.  Photographs of additional tools, or the presentation of the tools themselves, would have been cumulative to the evidence already produced.

Because Petitioner cannot show that the trial court's failure to provide a *Willits* instruction rendered his trial unfair, he is not entitled to relief on Claim 10.

**Claim 13       Ineffective Assistance of Counsel at Resentencing**

Petitioner contends that resentencing counsel performed at a constitutionally ineffective level by failing to investigate and present a thorough mitigation case.  (Dkt. 154 at 131-38.)  Petitioner specifically alleges that counsel failed to offer evidence that Petitioner had been the victim of sexual and physical abuse as a child and suffered from "significant mental health issues."  (*Id.* at 134.)

Background

*Initial sentencing*

Prior to the sentencing hearing, Everett submitted to the court copies of Petitioner's juvenile records and records from his prior convictions.  (ROA 183.)  In addition, the court had a report from Dr. Walter Fox, a court-appointed psychiatrist.  (ROA 210; *see* RT 3/16/88 at 120.)  Dr. Fox, who had reviewed Petitioner's juvenile and criminal records and performed

a mental health examination, diagnosed Petitioner with "Antisocial Personality with Histrionic Features"; although this condition predated Petitioner's alcohol problems, Petitioner's criminal activities and alcohol abuse were "so intertwined with each other that one should consider them as existing together to both predict and explain [Petitioner's] behavior." (ROA 210d.) Dr. Fox concluded that Petitioner was "competent" and "not psychotic" at the time of the exam. (*Id.*) He also stated that Petitioner's high level of intoxication at the time of the crime "would not be expected to significantly change his usual perceptions of reality or his typical reactions to this reality." (ROA 210e; *see* ROA 208.) A presentence investigation report provided further details of Petitioner's troubled family background and mental health issues. (ROA 209.) The report quoted Petitioner's mother as stating that Petitioner exhibited signs of schizophrenic behavior as a child but that the family could not afford treatment. (ROA 209f.) Petitioner's mother also indicated that both his father and grandfather displayed symptoms of schizophrenia and that Petitioner may have inherited the condition. (*Id.*) The report also stated that Petitioner engaged in a homosexual relationship with his father. (ROA 209g.)

At the sentencing hearing, Everett called Petitioner as his only witness. His testimony addressed several mitigating and aggravating factors. Petitioner first described his childhood. His parents had divorced when he was a child, and he had a difficult relationship with his mother. (RT 3/16/88 at 58-62.) She was "very hysterical, overbearing." (*Id.* at 59.) She hated Petitioner's father and prevented him from having contact with his sons. (*Id.* at 59-60.) Petitioner ran away from home at age fifteen and subsequently was placed with foster parents. (*Id.* at 59-61.) Petitioner testified that he had been examined by a psychologist as a juvenile. (*Id.* at 91.) He testified that when he was an adolescent his mother made untrue allegations against him, accusing him of having improper sexual conduct with another minor. (*Id.* at 60.) Petitioner had not seen his mother since he was fifteen. (*Id.* at 63.)

Petitioner then testified about his history of alcohol abuse and his state of intoxication

at the time of the crimes.  Petitioner began drinking heavily in 1967 and continued when he got out of prison in 1981 or 1982.  (*Id.* at 64-66.)  He testified that he was drunk at the time of the crime.  (*Id.* at 65.)  He had been drinking steadily for a week prior to June 6, consuming as much as a pint of whisky in the morning and then continuing to drink all day. (*Id.*)  He estimated that his blood alcohol level at the time of the crime was three times the legal limit. (*Id.* at 74.)  Petitioner had experienced frequent blackouts in the year prior to the crime; during the blackouts he would "get stupid," over-react, and do things he would not normally do.  (*Id.* at 69-70.)  Initially he was "foggy" about details of the crime, but his recollection had cleared up two days later when he took officers to the scene.  (*Id.* at 69, 72.) Petitioner testified that his state of intoxication affected his decision not to tell the officers about the killing.  (*Id.* at 72.)

Petitioner also testified about his employment history.  He put himself through college working at a convalescent home.  (*Id.* at 76.)  He also worked at a utility company with his father and worked for American Airlines and the City of Redwood, California, before he went to prison for five years on an armed robbery conviction.  (*Id.* at 75-77.)  When he was released in 1974 he worked in Sacramento as a ski service manager.  (*Id.* at 77.)  He had taken vocational classes while incarcerated and became a mechanic; he got a job as the lead mechanic with British Motors in Sacramento, then he worked as a body man for a Chevrolet dealership and built inlaid furniture before returning to prison in 1978.  (*Id.* at 78-79.)  When he was paroled in 1981 or 1982, he found employment as a repairman and installer of mobile homes and at a truck repair shop.  (*Id.* at 84-85.)

Petitioner next recounted the details of his prior convictions.  He explained that the victim in his involuntary homicide conviction died as the result of an accident; she ran at him, tripped over a dog, fell, and hit her head.  (*Id.* at 79-84.)  Petitioner tried to revive her but was too drunk to realize how badly she was hurt.  (*Id.* at 81-82.)  There was no violence or weapon involved.  (*Id.* at 83.)  With respect to his armed robbery conviction, Petitioner

1    testified that he was drunk and stole a small amount of petty cash from the restaurant where
2    he worked.  (*Id.* at 89-90.)

3        Petitioner further testified that he had been involved in several incidents in which he
4    had saved lives, rescuing people from car wrecks and reviving a woman who had been
5    strangled.  (*Id.* at 85-89.)  He also fought a number of forest fires while an inmate in
6    California. (*Id.* at 88.)  In prison he always did "clean time" and had no disciplinary write-
7    ups.  (*Id.* at 89.)

8        Finally, Petitioner again testified that he had witnessed but did not participate in the
9    killing of Estes and that he had never planned to kill or rob the victim.  (*Id.* at 93-94.)

10       In his closing argument, defense counsel Everett discussed the mitigating factors that
11   applied to Petitioner's sentence.  (RT 4/1/88 at 30-39.)   These included his level of
12   intoxication at the time of the crime which, pursuant to A.R.S. §13-703(G)(1), significantly
13   impaired his capacity to appreciate the wrongfulness of his conduct or conform his conduct
14   to the requirements of the law.  (*Id.* at 31-33.)  Everett also cited Petitioner's history of
15   alcoholism, his intelligence and ability to contribute to society, and his compassionate nature
16   and good works.  (*Id.* at 34-37.)  Everett asked the court to consider as a mitigating
17   circumstance Petitioner's "very troubled, traumatic upbringing," including the damage
18   caused by his mother's interference with his relationship with his father. (*Id.* at 36.) Citing
19   Dr. Fox's report, Everett explained that the dispute between Petitioner's mother and father
20   caused profound "trauma and psychological problems," and that the "psychological and
21   mental problems [Petitioner] continues to have are mitigators." (*Id.* at 37.)

22       In sentencing Petitioner, the court found that his level of intoxication at the time of
23   the crime constituted a statutory aggravating factor under §13-703(G)(1). (RT 4/1/88 at 113.)
24   The court determined that Petitioner had proved no additional statutory or nonstatutory
25   mitigating circumstances, and that the single mitigating factor was not sufficient to call for
26   leniency when weighed against the aggravators.  (*Id.* at 113-21.)

27

28

1          *Resentencing on remand*

2          At the outset of the resentencing proceedings, the court indicated that it would

3    consider all the evidence presented for the initial sentencing and would place no restrictions

4    on the presentation of new evidence.  (RT 10/5/94 at 7.)  Resentencing counsel Gavin filed

5    motions challenging the aggravating factors, seeking to preclude argument by the State

6    concerning Petitioner's lack of remorse, asking the court not to impose the death sentence

7    based on co-defendant Foote's fifteen-year sentence, requesting a jury determination of the

8    sentence, and challenging the constitutionality of the death sentence on Eighth Amendment

9    grounds.  (ROA II 26, 27, 29, 34, 35.)  Petitioner filed a pro per notice, which challenged the

10   factual basis for the aggravating factors found at the initial sentencing and affirmed by the

11   Arizona Supreme Court, and asserted or reasserted a number of mitigating circumstances,

12   including duress, impairment under A.R.S. § 13-703(G)(1), impaired judgment and

13   impulsivity caused by alcohol abuse and depression, a record of good conduct while

14   incarcerated, legal assistance provided to fellow inmates, and sentencing disparity.  (ROA

15   II 33.)

16          Gavin filed a motion seeking the appointment of "expert witnesses to assist in

17   presenting capital mitigation evidence."  (ROA II 28.)  The motion did not specify what type

18   of experts counsel requested, but at a hearing on the motion Gavin explained that one of the

19   experts he sought was another attorney to assist him on resentencing.  (RT 2/6/95 at 14.)

20   Gavin indicated that the second expert would review Petitioner's records and testify in

21   support of various mitigating factors; this expert would "do at least a sociological

22   background" of Petitioner to establish the causes of his psychological problems.  (*Id.* at 15-

23   16.)  The court denied both requests, explaining, with respect to the appointment of a

24   mitigation expert:

25               And as far as the request for another expert, I'd feel better about this if
26          I understood exactly what this person was going to do.  It almost sounds to me
             . . . as if you want somebody to do in essence what I have to do in this case and
27          that is just to absorb all of this information about Mr. Henry and then make a

28
                                            - 102 -

decision as to whether he ought to get the death penalty or not.

. . .

If you were asking for a psychological evaluation I might feel that would be appropriate although I don't know whether you have a client that would be willing to participate in any procedure that even suggests that he is anything other than psychologically sound and I mention that just because I remember the uproar that we had in this case initially any time any sort of Rule 11 proceedings was [sic] even suggested.

But I could justify the expenditure of an expert to do a psychological evaluation.  I could justify the expenditure of an investigator to go out and try to find mitigation that could be presented to the Court but as far as having an expert just to synopsize things and present it to me in a way that I can understand, I don't need to pay someone to do that.  That's what I do.

So, it is ordered denying the request for the other expert.  I am just calling it the other expert because I still don't really understand what this expert is supposed to do.

I am not ruling out the possibility of granting a request for the appointment of a specific expert to do a specific thing although the closer we get to the time of sentencing, the probably more likely I would be to deny such a request as untimely.

(RT 2/6/95 at 21-22.)

During the resentencing hearing, the court reiterated that it would "consider[] as part of the record everything that has been presented up until today's date" and would place no limits on the evidence or arguments the defense could present at the hearing.  (RT 2/23/95 at 21-22.)  Gavin opined that he believed Everett, at the initial sentencing proceeding, "obviously made I think a pretty outstanding argument up to the point of Mr. Henry's incarceration." (*Id.* at 22.) He then called his first witness, a corrections officer who testified that Petitioner was an average inmate who had never acted violently while on death row and had been assigned the lowest risk classification.  (*Id.* at 31-34.)  Gavin also called three inmates for whom Petitioner had done legal work.  (*Id.* at 42-67.)

Petitioner was the final witness.  He testified about the quantity and quality of legal work he had performed for other inmates and his role in establishing a law library.  (*Id.* at 68-74, 85-86.)  Next, he testified about the factual bases of his prior convictions, challenging their applicability as aggravating factors.  (*Id.* at 76-82.)  Gavin questioned Petitioner about

the issues Petitioner had raised in his pro per sentencing memorandum, including the finding that he was a "major participant" in the crime and the application of various aggravating factors. (*Id.* at 89-96.) Petitioner testified that he was an alcoholic and suffered from clinical depression. (*Id.* at 83, 88-89.) Petitioner also testified that when he left Sacramento he was "under duress" due to police harassment and his alcohol problems and stated that he could not have foreseen Foote's conduct in killing Estes. (*Id.* at 103-04.) He again challenged the footprint evidence indicating that he participated in the killing. (*Id.*) Finally, he testified that he had saved the lives of four people. (*Id.* at 106-07.)

Gavin presented his closing argument, in which he adopted the arguments made by Everett on Petitioner's behalf at the first sentencing and emphasized the disparity in sentences between Petitioner and Foote. (*Id.* at 116-21.) Petitioner then exercised his right of allocution, offering his version of the crime and of the misconduct by the State which led to his conviction. (*Id.* at 122-28.) The court again sentenced Petitioner to death. (*Id.* at 146.)

*PCR proceedings*

Petitioner raised this claim in his third PCR petition, arguing that resentencing counsel performed ineffectively by failing to obtain Petitioner's complete life history and failing to present mitigating evidence regarding his mental health; he also requested an evidentiary hearing. (PCR 3, 1/16/01.) Before filing the petition, counsel sought, and the court authorized, funding to retain a forensic psychiatrist, Dr. Gwen Levitt. (ME 8/31/00.) Petitioner did not allow a complete psychiatric assessment, however, and Dr. Levitt did not interview him or perform any tests. (PCR 3, Ex. D.) Dr. Levitt nonetheless submitted a report stating that Petitioner was incompetent to participate in the post-conviction proceedings and "likely suffers from a long standing Depressive Disorder Not Otherwise specified, Alcohol Dependence (in remission), Paranoid Personality Disorder, and Antisocial Personality Disorder." (*Id.* at 2.) Dr. Levitt further opined that a "diagnosis of Rule-out Delusional Disorder should also be considered." (*Id.*) Based on Dr. Levitt's opinion that he

was incompetent, Petitioner sought a stay of the proceedings; the court denied the request, stating that it was unwilling to find Petitioner incompetent based solely on Dr. Levitt's report and "without having a meaningful evaluation of his present mental condition done pursuant to the guidelines of Rule 11." (ME 2/2/01 at 3.)

The court denied Petitioner's claim of ineffective assistance of resentencing counsel. (ME 7/16/01 at 7-9.)   The court further determined that an evidentiary hearing was unnecessary because Petitioner had failed to raise colorable claims of ineffective assistance. (*Id.* at 24.) The court noted that PCR counsel, by relying on the report prepared by Dr. Levitt and failing to seek an independent psychological evaluation of Petitioner, had failed to demonstrate that resentencing counsel's performance was either deficient or prejudicial. (*Id.* at 7.)   The court explained its ruling as follows:

> In order to find that resentencing counsel was ineffective for failing to pursue the mental health issue as a mitigating factor, the Defendant would have to show that his attorney's performance fell below the norm of reasonable professional assistance and that he was prejudiced thereby.
>
> . . .
>
> The Court is unwilling to find that it falls below the norm of professional responsibility for a sentencing attorney in a capital case to fail to present to the court opinion evidence regarding a defendant's mental condition from a mental health expert who never examined or spoke to such defendant. Perhaps more to the point, the Court feels that in its sentencing capacity, rather than its present Rule 32 capacity, it would have been just as skeptical about the validity of a report done without any contact with the subject of the report as it is today.  Even keeping in mind the significantly lower standard for proving mitigation than aggravation at a capital sentencing, the Court can say unequivocally that its resentencing decision in this case would have been the same even if it had been presented with the report of Dr. Levitt.   The Defendant has not met his burden of proving that he was denied effective assistance of counsel upon resentencing because of the failure to investigate and present evidence of the Defendant's mental condition.

(*Id.* at 7-9.)

<u>Analysis</u>

*Clearly established federal law*

The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial."  *Silva v. Woodford*, 279 F.3d

- 105 -

825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision.  466 U.S. at 689-90.  The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'"  *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland,* 466 U.S. at 687).

　　　　With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."  539 U.S. at 534.  The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding."  *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).  Under the AEDPA, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d)(1).  *Bell v. Cone*, 535 U.S. at 698-99.

　　　　In reviewing Petitioner's allegations of ineffective assistance, this Court further notes that the judge who presided over the trial, sentencing, and resentencing also presided over the PCR proceedings.  Thus, in considering Petitioner's ineffective assistance claims, the state court was already familiar with the record and the evidence presented at trial and sentencing.  The judge's familiarity with the record provides this Court with an additional reason to extend deference to the PCR court's ruling.  *See Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998).  As the Ninth Circuit explained in *Smith*, when the judge who governed the post-conviction proceeding is the same as the trial and sentencing judge, the court is

considerably less inclined to order relief; doing so "might at least approach 'a looking-glass exercise in folly.'" *Id.* (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)).

*Evidentiary development*

In his amended petition and traverse, Petitioner contends that he is not required to offer factual support for this claim and that "he will seek factual development and expansion of the record to establish prejudice at the appropriate time." (Dkt. 173 at 98; *see* Dkt. 154 at 134.)  In his motion for evidentiary development, with respect to this claim, Petitioner requests the same discovery sought as to Claim 1 – alleging a *Brady* violation based on Foote's undisclosed notes and the allegedly tampered-with photographic evidence. (Dkt. 178 at 65.)  This evidence is unrelated to the allegation that resentencing counsel performed deficiently in presenting a mitigation case.  Petitioner also requests an evidentiary hearing at which he, resentencing counsel Gavin, and an expert witness on capital representation would testify.  (*Id.* at 66-67.)

Respondents argue that Petitioner's conclusory allegations that Gavin was ineffective do not merit relief and that he is not entitled to an evidentiary hearing because he failed to develop the factual basis of the claim in state court and did not exercise due diligence. (Dkts. 167 at 97, 189 at 41-43.)  Petitioner counters that he was not at fault in failing to develop the factual basis of the claim and exercised due diligence by requesting an evidentiary hearing in his third PCR petition.  (Dkt. 178 at 65-67.)

The Court concludes that Petitioner is not entitled to develop the factual basis of his ineffective assistance claim through an evidentiary hearing before this Court.  A federal district court must hold an evidentiary hearing in a § 2254 case when the facts are in dispute; the petitioner "alleges facts which, if proved, would entitle him to relief"; and the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing." *Townsend,* 372 U.S. at 312-13.

In his amended habeas petition, Petitioner offers the bare allegation that resentencing

counsel failed to discover and present evidence that Petitioner was sexually abused as a child and suffered from significant mental health issues. (Dkt. 154 at 134.) He provides no further support for this allegation in his motion for evidentiary development, beyond a declaration by Gavin that the Mohave County Legal Defender's Office "lacked the resources to properly prepare for a capital sentencing hearing" according to ABA guidelines and that he was without the assistance of a mitigation specialist during Petitioner's resentencing. (Dkt. 178, Ex. 8.)

Petitioner's unsupported allegations that Gavin omitted significant mitigation evidence concerning Petitioner's childhood and mental health are not sufficient to warrant an evidentiary hearing. *See Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) ("However, conclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof do not provide an adequate basis to obtain a federal evidentiary hearing."); *Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006) ("The failure to proffer any additional evidence defeats [petitioner's] argument that he was entitled to an additional evidentiary hearing in federal court."); *Williams v. Bagley*, 380 F.3d 932, 977 (6th Cir. 2004) ("district court did not abuse its discretion in denying Williams's request, given his failure to specify . . . what could be discovered through an evidentiary hearing"); *United States v. Zuno-Acre*, 209 F.3d 1095, 1103 (9th Cir. 2000) (speculation is not a basis for an evidentiary hearing); *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) ("conclusory suggestions that his trial and appellate state counsel provided ineffective assistance fall far short of stating a valid claim of constitutional violation" and did not entitle petitioner to an evidentiary hearing); *Lincecum v. Collins*, 958 F.2d 1271, 1279-80 (5th Cir. 1992) (denying evidentiary hearing "[a]bsent any concrete indication of the substance of the mitigating evidence" the hearing supposedly would provide).

Along with the conclusory nature of Petitioner's allegations, there is a second reason Petitioner is not entitled to an evidentiary hearing on Claim 13. He failed to exercise due

diligence in developing the factual basis of the claim in state court, as required by 28 U.S.C. § 2254(e)(2). The diligence assessment requires a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. When there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to investigate and present the evidence to the state court. *See id.* at 438-39, 442; *Alley v. Bell*, 307 F.3d at 390-91. While Petitioner sought an evidentiary hearing, diligence required him to take additional steps to support his claim that resentencing counsel omitted evidence that he was the victim of childhood sexual abuse and suffered from serious mental health issues. *See Dowthitt v. Johnson,* 230 F.3d at 758 (counsel failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d at 985-86; *McNair v. Campbell*, 416 F.3d at 1299-1300. Here, Petitioner did not obtain a complete mental examination, despite being put on notice by the court that it would consider evidence concerning Petitioner's mental health if it were obtained pursuant to such an examination. (*See* ME 7/16/01 at 3, 7-8.) Petitioner likewise failed to offer any factual support – for instance in the form of affidavits from himself or family members – for the allegation that he had been sexually abused as a child. Under Arizona law, Petitioner had a duty to file affidavits, records, or other evidence available to him to support the allegations raised in his PCR petition. Ariz. R. Crim. P. 32.5. In failing to include such information, Petitioner did not exercise due diligence. His lack of diligence precludes this Court from holding a hearing, and he has not attempted to satisfy the requirements of § 2254(e)(2)(A) & (B).

Petitioner has failed both in state court and in these proceedings to allege specific facts supporting this claim. He "continues to assert he needs [an] evidentiary hearing to factually *develop* his constitutional claims, but he has failed at every level to make a factual *showing*

1   (as opposed to conclusory statements) as to why those claims merit development through the

2   crucible of an official hearing." *Reynolds v. Bagley*, 498 F.3d 549, 555 (6th Cir. 2007).

3   Petitioner's request for evidentiary development is denied.

4   *Application of clearly-established federal law to Claim 13*

5   Without any support for the allegations upon which Claim 13 is based, the Court

6   cannot find that Petitioner was prejudiced by Gavin's failure to present additional mitigating

7   evidence at resentencing.  Petitioner cites recent decisions in which the Supreme Court

8   reviewed claims of ineffective assistance of counsel at sentencing under the provisions of the

9   AEDPA and held that the petitioners were entitled to relief: *Rompilla v. Beard*, 545 U.S.

10  374, *Wiggins v. Smith*, 539 U.S. 510, and *Williams v. Taylor*, 529 U.S. 362.  These cases are

11  readily distinguished from Petitioner's by both the availability and the quality of the

12  mitigating evidence that counsel failed to present at sentencing.

13  In *Rompilla*, the evidence counsel failed to uncover and present – despite the fact that

14  the prosecutors had provided defense counsel with the file containing the information –

15  showed that during Rompilla's childhood he was beaten by his father with fists, straps, belts,

16  and sticks; that his father locked him and his brother in a dog pen filled with excrement; and

17  that he grew up in a home with no indoor plumbing and was not given proper clothing by his

18  parents.  545 U.S. at 391-92.  In *Wiggins*, trial counsel failed to present evidence that

19  Wiggins suffered consistent abuse during the first six years of his life, was the victim of

20  "physical torment, sexual molestation, and repeated rape during his subsequent years in

21  foster care," was homeless for portions of his life, and was deemed to have diminished

22  mental capacities.  539 U.S. at 535.  In *Williams*, sentencing counsel "failed to conduct an

23  investigation that would have uncovered extensive records graphically describing Williams's

24  nightmarish childhood, not because of any strategic calculation but because they incorrectly

25  thought that state law barred access to such records."  529 U.S. at 395.  Counsel failed to

26  present evidence that Williams had been committed at age eleven; documents prepared in

27

28

connection with his commitment detailed dramatic mistreatment and abuse during his early childhood, and included information that he was "borderline mentally retarded," had suffered numerous head injuries, and might have mental impairments organic in origin. *Id.* at 370-71.

The critical failure is that Petitioner has not shown that Gavin's performance at resentencing resulted in the omission of relevant mitigation information, nor mitigating evidence of the quantity and quality at issue in *Rompilla*, *Wiggins*, and *Williams*. He has failed to meet, therefore, his burden of affirmatively demonstrating prejudice. *See Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007) (to establish prejudice the new mitigating evidence that a habeas petitioner presents must differ in a substantial way, in strength and subject matter, from the evidence actually presented at sentencing); *see also Pinholster*, 525 F.3d at 767-73 (distinguishing petitioner's mitigation evidence from that in *Rompilla*, *Wiggins*, and *Williams*, and noting petitioner's mitigation case was limited by his violent past, lack of repentance, and equivocal nature of mental health evidence); *Hall v. Head*, 310 F.3d 683, 704 (11th Cir. 2002) (omitted mental health evidence "plagued with speculation and conjecture").

Petitioner's allegations not only fail to identify the mitigating information omitted at sentencing, they also do not take into account the mitigating evidence that was presented to the trial court. Evidence before the court at sentencing included Petitioner's juvenile record, his own account of his childhood, and Dr. Fox's report, which discussed Petitioner's childhood and mental health. Likewise, the pre-sentence report contained information indicating that Petitioner had a family background of schizophrenia, that as a child he exhibited signs of the condition, and that he had been molested by his father. All of this evidence was presented to Judge Conn, as was evidence of Petitioner's conduct while incarcerated. Therefore, this is not a case where the omitted mitigation evidence was simply "weak," *Schriro v. Landrigan*, 127 S. Ct. at 1944, or "largely cumulative," *Babbitt*, 151 F.3d at 1176. Instead, Petitioner has failed to show that there is any additional mitigation evidence

to be weighed along with the evidence presented at the sentencing proceedings.  The Fourth

Circuit, confronted with similarly unsupported allegations of ineffective sentencing-stage

performance, explained:

> The great failing of the appellant on his claim that other evidence should have been presented during the sentencing phase of his trial is the absence of a proffer of testimony from a witness or witnesses he claims his attorney should have called.  He claims that his counsel conducted an inadequate investigation to discover persons who would testify in his favor, but he does not advise us of what an adequate investigation would have revealed or what these witnesses might have said, if they had been called to testify.  Appellant cannot establish ineffective assistance of counsel under *Strickland v. Washington* on the general claim that additional witnesses should have been called in mitigation.

*Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir. 1990) (citation omitted); *see Beaver*

*v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("an allegation of inadequate investigation

does not warrant habeas relief absent a proffer of what favorable evidence or testimony

would have been produced.").

Petitioner likewise has failed to prove that Gavin's performance was deficient.  While

Petitioner asserts that the omitted evidence of his mental health difficulties and background

of sexual abuse was "near the surface," he does not identify records, such as those regarding

the prior conviction in *Rompilla*, the school and medical records in *Wiggins*, or the

commitment documents in *Williams*, that were readily available for defense counsel's review

and would have disclosed significant new mitigation.  Petitioner refers to the types of mental

health information courts have found mitigating in other cases but fails, as he did during the

PCR proceedings, to identify the evidence omitted in his own case.

While Petitioner faults counsel for failing to obtain family background and mental

health mitigation, he does not disclose such evidence or the source of such evidence to this

Court, or suggest that it was available at the time of resentencing.  His mother contacted the

defense and spoke with the presentence investigator.  (*See* ROA 166b-166c.)  Petitioner

objected vociferously to her input (*see* RT 10/3/86 at 12-15; ROA 89, 166d-166y), and the

information she provided was "double-edged," supporting a history of mental difficulties but

also containing damaging information about Petitioner's conduct as a youth (ROA 166b-166c).

Similarly, Petitioner consistently objected to the presentation of mental health evidence during the proceedings in state court. At trial, Petitioner objected when counsel moved for a Rule 11 examination (RT 10/3/86 at 12-15) and during the PCR proceedings he did not participate in a mental health evaluation, characterizing counsel's request for Dr. Levitt's services as a "frivolous psycho-defense." (Resp. to Pet. for Review, Ex. K.) In his order approving funding for a forensic psychiatrist during the PCR proceedings, Judge Conn noted: "It is the Court's recollection that any past suggestion by a defense attorney that the Defendant had mental problems was generally the sounding of the death knell for that particular relationship." (ME 8/31/00 at 2.) Finally, in denying this claim as presented in the third PCR petition, Judge Conn stated that PCR counsel "faults almost all prior attorneys who have represented the Defendant for allowing themselves to be intimidated by him into not pursuing his mental condition as either competency, defense or mitigation issues." (ME 7/16/01 at 7.) Not surprisingly, Petitioner does not propose calling a mental health expert at the evidentiary hearing he has requested in this Court. (*See* Dkt. 178 at 64.)

The record shows that Petitioner's focus at resentencing was not with Gavin's failure to obtain mental health evidence or evidence of sexual abuse but with his reluctance to pursue Petitioner's strategy of countering the aggravating factors – for example, by presenting crime-scene evidence allegedly supporting the theory that Foote acted alone in attacking Estes. (*See* ROA II 33 at 8, 39 at 2, 9-10; Resp. to Pet. for Review, Ex. K; RT 2/23/95 at 122-28. ) To the extent that Petitioner deliberately limited the scope of counsel's sentencing-stage efforts, he cannot claim that counsel's performance was thereby ineffective. *See Roberts v. Dretke*, 356 F.3d 632, 638-39 (5th Cir. 2004) ("By no measure can [defendant] block his attorney's efforts and later claim the resulting performance was constitutionally deficient."); *Owens v. Guida*, 549 F.3d 399, 412-13 (6th Cir. 2008)

(defendant who interferes with attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence); *Gardner v. Ozmint*, 511 F.3d 420, 427 (4th Cir. 2007) (relying on client's non-cooperation when rejecting ineffective assistance claim based on attorney's failure to investigate mitigation evidence); *Bryan v. Mullin*, 335 F.3d 1207, 1223-24 (10th Cir. 2003) (en banc) (counsel not ineffective for failing to offer mental health evidence when client told counsel not to present such evidence); *cf. Landrigan*, 127 S. Ct. at 1942 ("it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence").

Conclusion

Judge Conn, having presided over Petitioner's trial, sentencing, resentencing, and PCR proceedings, determined that Petitioner did not meet his burden, under either the deficiency or prejudice prong of *Strickland*, of showing that Gavin performed ineffectively by failing to provide additional evidence concerning Petitioner's mental health and family background. Taking into account the circumstances described above, and applying the level of deference mandated by the AEDPA, this Court cannot find that Judge Conn's denial of the claim constituted an "objectively unreasonable" application of *Strickland*. Therefore, Petitioner is not entitled to relief on Claim 13.

**Claim 14          Use of Restraints**

Petitioner alleges that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the court allowed him to appear in physical restraints at the resentencing hearing. (Dkt. 154 at 138-43.)

Background

During resentencing, Petitioner's counsel objected to the fact that Petitioner was shackled, handcuffed, and wearing a stun belt:

| | | |
|---|---|---|
| Gavin: | | Yes, Judge. Thank you. One thing I'd like to state for the record, my client is in shackles and handcuffs. For the record, I'd be asking that he be taken out of those for this hearing and also the shock belt as well. It is my understanding that the State had not requested that. There's nothing that he has done in court that I am aware of that would indicate such measures are necessary. I would ask that you make a ruling on that at this time. |
| Court: | | I will allow the Mohave County Sheriff's Office to take whatever security precautions they feel are appropriate. We don't have a jury here. We don't need to worry about someone making a decision because they see that the sheriff's office perceives him as a dangerous person. I certainly am not going to be more likely to impose the death penalty because they brought the Defendant over here in shackles so I will allow them to continue to use whatever security measures they feel are appropriate. |
| Gavin: | | Judge, for the record, I would ask that I be allowed to make and log an objection to that just for the record so that we are protected on that. |
| Court: | | All right. Your objection is noted. |

(RT 2/23/95 at 19-20.)

At one point during his testimony at the hearing, Petitioner complained, while searching through some documents, that "this is hard with all these restraints they have me in." (*Id.* at 79.)

On appeal, the Arizona Supreme Court held that, given Petitioner's violent criminal history, the trial court did not abuse its discretion by refusing to order the restraints to be removed. *Henry II*, 189 Ariz. at 550, 944 P.2d at 65. The court also held:

the record fails to demonstrate prejudice. There was no jury present during sentencing . . . and nothing indicates that the restraints detracted from defendant's concentration while testifying. In fact, the transcript reflects that defendant was extremely focused in addressing virtually all of the points he had raised in his written notice of mitigating factors.

*Id.* (citation omitted).

<u>Analysis</u>

The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law. There is no clearly established

- 115 -

Supreme Court precedent against shackling a defendant during sentencing when only a judge, not a jury, is present. Although the Supreme Court has reviewed the shackling of a defendant before a sentencing jury, it has not addressed the constitutionality of shackling a defendant before a sentencing judge. *See Deck v. Missouri*, 544 U.S. 622, 629 (2005) ("the Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial") (emphasis added). In fact, the *Deck* dissent pointed out that "many modern courts have concluded that the rule against visible shackling does not apply to sentencing." *Id.* at 651.

The Second Circuit is one of those courts, holding that "the rule that courts may not permit a party to a jury trial to appear in court in physical restraints without first conducting an independent evaluation of the need for these restraints does not apply in the context of a non-jury sentencing hearing." *United States v. Zuber*, 118 F.3d 101, 102 (2d Cir. 1997). The Ninth Circuit recently stated that it "has not decided whether a general policy of shackling a defendant for a proceeding in front of a judge violates due process." *United States v. Howard*, 480 F.3d 1005, 1012 (9th Cir. 2007) (noting that "fear of prejudice is not at issue, as a judge in a pretrial hearing presumably will not be prejudiced by seeing defendants in shackles").

Because there is no clearly established federal law supporting the claim that the use of physical restraints at a sentencing hearing before a judge violates a defendant's rights, Petitioner is not entitled to relief under 28 U.S.C. §2254(d)(1). *Musladin*, 549 U.S. at 77.

Furthermore, even if the imposition of physical restraints at the resentencing hearing violated Petitioner's due process rights, Petitioner has not demonstrated that the error "had substantial and injurious effect or influence in determining the [sentence]." *Larson v. Palmateer*, 515 F.3d 1057, 1064-65 (9th Cir. 2008) (quoting *Brecht v. Abrahamson*, 507 U.S. at 623). There was no jury present, and the judge indicated that his sentencing decision

would not be affected by the fact that Petitioner was wearing restraints.  The only evidence suggestive of prejudice is the fact that at one point Petitioner expressed some difficulty sorting through his paperwork but, as the Arizona Supreme Court noted, the record clearly indicates that Petitioner's ability to testify was not hindered.

For the reasons cited above, Claim 14 is without merit and will be denied.

**Claim 15     *Enmund/Tison* Violation**

Petitioner contends that the trial court's determination that he was eligible for the death penalty under *Tison v. Arizona*, 481 U.S. 137 (1987), violated both the ex post facto clause and his due process rights.  (Dkt. 154 at 143-56.)  Petitioner argues that because the murder occurred before the Supreme Court issued its holding in *Tison*, the state courts' use of the *Tison* standard to determine his death eligibility constituted an ex post facto violation. He also alleges that state courts erred in finding that he was a "major participant" in the crime and therefore death-eligible under *Tison*.

Background

In sentencing Petitioner to death, the trial court found, pursuant to *Enmund v. Florida,* 458 U.S. 782 (1982), that the State had not proven beyond a reasonable doubt that Petitioner himself actually killed, attempted to kill, or intended to kill Estes.  (RT 4/1/88 at 27.)   The court found, however, that under *Tison* the State had proved that Petitioner was a major participant in the robbery and kidnapping and that he showed a reckless indifference to human life.  (*Id.* at 27-28.)  The court repeated these findings in resentencing Petitioner.  (RT 2/23/95 at 129-30.)

In *Henry I*, the Arizona Supreme Court upheld the trial judge's *Tison* finding and found that Petitioner was "an active, intentional participant in the killing."  176 Ariz. at 588, 863 P.2d at 880.  In *Henry II*, the court rejected Petitioner's ex post facto argument, citing its decision in *State v. Salazar,* 173 Ariz. 399, 413, 844 P.2d 566, 580 (1992).  189 Ariz. at 550-51, 944 P.2d at 65-66.  In *Salazar*, the court explained that "*Tison* is one of a continuum

of cases determining who is constitutionally death-eligible.  If *Tison* can be applied to Tison himself in accordance with the Supreme Court's remand, we know of no reason why it cannot also be applied to the defendant here."  173 Ariz. at 413, 844 P.2d at 580.

Analysis

In *Enmund*, the Supreme Court held that the Eight Amendment does not permit the death penalty to be imposed on a defendant who aided and abetted a felony but did not himself kill, attempt to kill, or intend to kill the victim.  458 U.S. at 797.  Subsequently, in *Tison*, the Court elaborated on *Enmund*, holding that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."  481 U.S. at 158.  The Court explained "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."  *Id.* at 157-58.

**A.    Ex post facto violation**

Petitioner contends that *Tison* represented a substantive change in the law.  He asserts that he is entitled to relief because the state courts' application of the *Tison* standard to his sentence violates the constitutional prohibition against ex post facto laws, in that his offense was committed at a time when the law required, pursuant to *Enmund*, a finding that the defendant "killed, intended to kill, or attempted to kill" before the death penalty could be imposed.  Petitioner asserts that the state courts' application of the *Tison* standard changed the "quantum of punishment" attached to his crime.  The Court disagrees.

The United States Constitution provides that "[n]o state shall . . . pass any . . . ex post facto law."  U.S. Const. art. I, § 10, cl. 1.  This clause prohibits the states from enacting "any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  *Weaver v. Graham*,

- 118 -

450 U.S. 24, 28 (1981) (internal quotation omitted).  While the Ex Post Facto Clause, by its own terms, applies only to changes in the law resulting from legislative or executive action, the Supreme Court has extended similar principles to the Due Process Clause to cover the "unforeseeable [judicial] construction of a criminal statute." *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964); *see Rogers v. Tennessee*, 532 U.S. 451, 459 (2001); *Marks v. United States*, 430 U.S. 188, 191 (1977).  Thus, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the federal due process right to fair warning of what constitutes criminal conduct.  *See Rogers*, 532 U.S. at 458-60; *Marks*, 430 U.S. at 191-92; *Bouie,* 378 U.S. at 353; *Clark v. Brown*, 450 F.3d 898, 911-12 (9th Cir. 2006); *LaGrand*, 133 F.3d at 1260.  However, *Bouie* is violated only if the judicial construction "represents a 'radical and unforeseen departure from former law.'" *Webster v. Woodford*, 369 F.3d 1062, 1069 (9th Cir. 2004) (quoting *Hayes v. Woodford*, 301 F.3d 1054, 1088 (9th Cir. 2002)).  Finally, in *Rogers* the Supreme Court noted that there exists in common law an "incremental and reasoned development of precedent" that "presupposes a measure of evolution that is incompatible with stringent application of *ex post facto* principles."  532 U.S. at 461.  Therefore, the Court explained, "judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'"  *Id.* at 462 (quoting *Bouie*, 378 U.S. at 354).

The Supreme Court's decision in *Tison* did not represent a radical, unforeseeable, unexpected, or indefensible alteration of its holding in *Enmund*.  To the contrary, in *Enmund* the Court "explicitly dealt with two distinct subsets of all felony murders." *Tison*, 481 U.S. at 149.  "At one pole was Enmund himself; the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." *Id.* The *Enmund* Court held that capital punishment was disproportional in such cases and thus violative of the Eighth Amendment.  458 U.S. at 797.  At the other pole was "the felony

1    murderer who actually killed, attempted to kill, or intended to kill," for which the Eighth

2    Amendment did not prohibit the imposition of capital punishment. *Tison*, 481 U.S. at 150.

3        Five years later, in *Tison*, the Court applied the constitutional principles it had set

4    forth in *Enmund* to a third category of felony murders.  These "midrange felony-murder

5    cases" consist of offenses where the defendant did not intend to kill the victim but where he

6    was a major participant in the crime and the likelihood of killing was so substantial as to raise

7    an inference of extreme recklessness.  *Id.* at 154.  The Court noted that "the majority of

8    American jurisdictions clearly authorize capital punishment" in such cases and that

9    "American courts have not been nearly so reluctant to impose death [in midrange felony

10   murder cases] as they are in case of felony murder *simplicter*," *id.* at 155, while "[o]nly a

11   small minority of those jurisdictions imposing capital punishment for felony murder have

12   rejected the possibility of a capital sentence absent an intent to kill," *id.* at 158.  The Court

13   also rejected the argument that the Arizona Supreme Court "ordinarily has considered major

14   participation in a violent felony resulting in death combined with a reckless indifference

15   toward human life insufficient to support a capital sentence."  *Id.* at 155 n.11.  The Court then

16   concluded that *Enmund* was satisfied in Tison's case.

17       From this review of the cases, it is plain that the *Tison* decision did not alter *Enmund*

18   in an unforeseeable manner or in a way indefensible by reference to the law set forth therein.

19   Instead, the Supreme Court applied *Enmund* to a different factual scenario, a subset of felony

20   murder involving a greater degree of culpability on the part of the defendants than that in

21   *Enmund*.  *Id.* at 155.  Moreover, the *Tison* opinion included an overview of state law with

22   respect to capital punishment in felony murder cases, revealing that a majority of

23   jurisdictions permitted imposition of the death penalty in cases where the defendant did not

24   intend to kill the victim.  *Id.*; *see Rogers*, 532 U.S. at 464 (review of law in other jurisdictions

25   relevant to determining whether judicial construction was not unexpected and indefensible).

26   The Court also explained that its holding was not inconsistent with the law regarding

sentencing for felony murders as it had been applied by the Arizona Supreme Court.  *Id.* at 155 n.11; *see Rogers*, 532 U.S. at 465 (state court's judicial abandonment of rule not unexpected and indefensible where rule had never been enforced).

Also supporting the Court's determination that *Tison* did not represent an unforeseeable alteration of the *Enmund* holding is the fact that, as Respondents note, the Supreme Court has consistently applied *Tison* to capital cases in which the murder occurred prior to the *Tison* decision.  *See, e.g.*, *Schad v. Arizona*, 501 U.S. 624 (1991); *Walton v. Arizona*, 497 U.S. 639 (1990); *Lewis v. Jeffers*, 497 U.S. 764 (1990). With no clearly established federal law supporting Petitioner's argument, the Arizona Supreme Court's rejection of his ex post facto claim is not a basis for habeas relief.

### B.     Major participant

In determining whether *Enmund/Tison* has been satisfied, "[t]he court must examine the entire course of the state court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made."  *Cabana v. Bullock*, 474 U.S. 376, 387-88 (1986), *overruled in part on other grounds, Pope v. Illinois*, 481 U.S. 497, 503 n.7 (1987).  The requisite findings were made in Petitioner's case by the trial court and affirmed by the Arizona Supreme Court.

A state court's *Enmund/Tison* finding is sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could have made the finding beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.  On habeas review, the provisions of the AEDPA demand an additional level of deference for state court findings. A state court's findings regarding *Enmund/Tison* are factual determinations which are presumed correct and which Petitioner "bear[s] the heavy burden of overcoming."  *Cabana v. Bullock*, 474 U.S. at 388; *see Paradis v. Arave*, 20 F.3d 950, 959 (9th Cir. 1994); *Deputy v. Taylor*, 19 F.3d 1485, 1488 (3d Cir. 1994).

In *Henry I*, the Arizona Supreme Court outlined its factual findings in support of

Petitioner's death eligibility under *Tison*:

> Here, the evidence supporting Henry's kidnapping and robbery convictions clearly warrants the finding that he was a major participant in those crimes. Furthermore, the evidence that two people dragged the victim up the berm, that Henry's clothes were spattered with blood, that he drove off immediately after the stabbing, and that he failed to immediately tell officers about the victim, supports not only a finding of reckless indifference to human life, but also a conclusion that Henry was an active, intentional participant in the killing.

*Henry I*, 176 Ariz. at 588, 863 P.2d at 880.

Although Petitioner challenges these findings, repeating the defense theory that Foote alone, with no foreknowledge or participation by Petitioner, dragged Estes from the vehicle and stabbed him to death, he has not presented clear and convincing evidence to overcome the presumption of correctness which attaches to the state court's factual determinations. This Court concludes that a rational factfinder could have determined, based on eyewitness testimony, the crime-scene evidence, and Petitioner's conduct following the murder, that he was a major participant in the kidnapping and armed robbery and that he "knowingly engag[ed] in criminal activities known to carry a grave risk of death." *Tison*, 481 U.S. at 157 (upholding death penalty for two brothers who helped arm prisoners for a successful prison escape, aided that escape, participated in the robbery of a family to further the escape, and then did nothing to stop the murder of that family); *see Foster v. Quarterman*, 466 F.3d 359, 370-71 (5th Cir. 2006) (defendant convicted of capital murder as an accomplice displayed reckless indifference to human life where the murder occurred while defendant knowingly participated in series of armed robberies by driving his coconspirators, who he knew had a firearm, from victim to victim).

Because the Arizona Supreme Court's rejection of this claim was not an unreasonable application of *Tison* and was not based on an unreasonable determination of the facts, Petitioner is not entitled to relief. Claim 15 is denied.

**Claim 16      Erroneous Finding of (F)(2) Aggravating Factor**

Petitioner contends that his rights under the Eighth and Fourteenth Amendments were

violated by the state courts' erroneous determination that his 1970 California robbery conviction constituted a crime of violence in satisfaction of the aggravating factor set forth in A.R.S. § 13-703(F)(2).  (Dkt. 154 at 156-59.)

At the time of Petitioner's crime, A.R.S. § 13-703(F)(2) provided that it is an aggravating circumstance if "[t]he defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person."  A prior conviction satisfies § 13-703(F)(2) only if according to its statutory definition it involves the use or threat of violence against a person. *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983).

In sentencing Petitioner, the trial court found that Petitioner's prior armed robbery conviction met the definition of a felony involving the use or threat of violence against another person.  (RT 4/1/88 at 108-09.)  The Arizona Supreme, citing its holding in *State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986), rejected Petitioner's argument that (F)(2) was erroneously applied because robbery in California is not necessarily a crime against a person.  *Henry I*, 176 Ariz. at 587, 863 P.2d at 879.  On appeal from resentencing, the court reaffirmed this conclusion.  *Henry II*, 189 Ariz. at 551, 944 P.2d at 66.

The Ninth Circuit has observed, "If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."  *Horton v. Mayle*, 408 F.3d at 576 (citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the expositors of state law, and that we are bound by their constructions except in extreme circumstances not present here") (citations omitted)); *see Hawkins v. Mullin*, 291 F.3d 658, 662-63 (10th Cir. 2002) (habeas court is bound by state court's interpretation of its felony-murder statute).  In determining that Petitioner's California robbery conviction satisfied the (F)(2) aggravating factor, the state supreme court construed its own law, and this Court is bound by that interpretation.

1       With respect to the state courts' application of the factor to Petitioner's sentence,

2   habeas review "is limited, at most, to determining whether the state court's finding was so

3   arbitrary and capricious as to constitute an independent due process or Eighth Amendment

4   violation." *Jeffers*, 497 U.S. at 780.  In making that determination, the reviewing court must

5   inquire "whether, after viewing the evidence in the light most favorable to the prosecution,

6   *any* rational trier of fact could have found that the factor had been satisfied."  *Id.* at 781

7   (quoting *Jackson v. Virginia*, 443 U.S. at 319).

8       The relevant California statutes defined robbery as "the felonious taking of personal

9   property in the possession of another, from his person or immediate presence, and against his

10  will, accomplished by means of force or fear," with fear defined as "(1) The fear of an

11  unlawful injury to the person or property of the person robbed . . . or (2) The fear of an

12  immediate and unlawful injury to the person or property of another in the company of the

13  person robbed at the time of the robbery."  Cal. Penal Code §§ 211 & 212.  In *Correll*, the

14  Arizona Supreme Court explained that, "[a]s a practical matter 'armed' robbery against the

15  property of a victim does not occur without use or threat of violence against the person as

16  well.  Such an act by an armed person would also be a threat of violence against the victim

17  himself within the meaning of A.R.S. § 13-703(F)(2)."  148 Ariz. at 479, 715 P.2d at 732.

18  As the court further explained in *State v. Kemp*, 185 Ariz. 52, 64, 912 P.2d 1281, 1293

19  (1996):

> First, even though it is possible to commit robbery in California by threatening
> force against property, the person from whom property is being taken actually
> experiences the fear.  Under *State v. Arnett,* 119 Ariz. 38, 51, 579 P.2d 542,
> 555 (1978), this fear is the violence.  *Id.* (defining violence as the "exertion of
> any physical force so as to injure or abuse.").  Second, the California robbery
> statute requires the "taking of personal property in the possession of another,
> *from his person or immediate presence,* and against his will" by means of
> force or fear.  Cal.Penal Code § 211 (1951) (emphasis added).  Implicit in the
> California robbery statute is the danger that either the taking itself or the
> foreseeable resistance to the taking presents the risk of violence.  This threat
> of violence is what makes robbery a more serious crime than larceny.  And this
> threat of violence is the same whether the robbery is accomplished by
> threatening force against a person or against property.  Robbery is clearly a
> crime against a *person.*  It necessarily carries with it the threat or use of

1    violence.  Accordingly, Kemp's robbery conviction satisfies A.R.S. § 13-703(F)(2).

2    Petitioner's reliance on *State v. Roque*, 213 Ariz. 193, 216-17, 141 P.3d 368, 391-92

3 (2006), is inapposite because in that case the court was assessing whether a California

4 attempted robbery satisfied a later-version of the (F)(2) aggravating factor, which requires

5 a prior conviction for a "serious offense."  Although the attempted robbery did not satisfy the

6 factor in that instance, the Arizona Supreme Court has found that it is impossible, even

7 theoretically, to commit robbery in California without the use or threat of force against a

8 person.

9    In Petitioner's case, the trial court and the Arizona Supreme Court interpreted Arizona

10 state law and determined that the (F)(2) factor was satisfied by Petitioner's California

11 robbery conviction.  This determination was not so arbitrary or capricious as to constitute a

12 due process violation.  Therefore, Petitioner is not entitled to habeas relief on Claim 16.

13 **Claim 17      Erroneous Finding of (F)(5) Aggravating Factor**

14    Petitioner contends that his rights under the Eighth and Fourteenth Amendments were

15 violated when the state courts found that he committed the offense in expectation of

16 something of pecuniary value under A.R.S. § 13-703(F)(5).  (Dkt. 154 at 159-67.)

17    "[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-

18 703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the

19 murder, not merely the result of the murder."  *Moormann v. Schriro*, 426 F.3d 1044, 1054

20 (9th Cir. 2005).  The trial court found that the factor was satisfied because "the only reason

21 the victim in this case was murdered was so that his vehicle could be taken by one or both

22 of the Defendants and I believe that the pecuniary gain of getting that vehicle was the only

23 reason for the murder being committed."  (RT  4/1/88 at 110.)

24    Petitioner contends that only the actual killer of Estes could have acted with a motive

25 for pecuniary gain and that the trial court found insufficient evidence to establish that

26 Petitioner killed or intended to kill Estes.  (Dkt. 154 at 162.)  The Arizona Supreme Court

27

28

1    rejected this argument:

2           The trial judge found the pecuniary gain aggravating factor of A.R.S.
           § 13-703(F)(5).  Henry argues that he cannot be responsible for Foote's
3          expectation of pecuniary gain.  This argument misses the point.  The record
           supports a finding of Henry's *own* expectation of pecuniary gain.  He knew of
4          the California warrant, and when his truck broke down on the way out of
           California, he had a motive to commandeer the victim's truck and eliminate
5          him.  Moreover, he was convicted of both robbery and theft, and we have
           determined that these convictions were based on sufficient evidence.

6
7    *Henry I*, 176 Ariz. at 588, 863 P.2d at 880.  On appeal from resentencing, the court

8    reaffirmed this conclusion.  *Henry II*, 189 Ariz. at 551, 944 P.2d at 66.

9           This Court agrees with the Arizona Supreme Court's analysis.  Based on the facts

10   proven at the trial, a rational factfinder could have determined that Estes was murdered in the

11   expectation of pecuniary gain and that Petitioner was motivated by the expectation of such

12   gain.  *See Correll v. Stewart*, 137 F.3d at 1420; *Woratzeck v. Stewart*, 97 F.3d 329, 336 (9th

13   Cir. 1996).  Indeed, it is difficult to ascribe to the murder of Estes, and to the events

14   preceding it, a motivation other than a desire to gain something of pecuniary value, namely

15   Estes's vehicle.  *Compare State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986)

16   (insufficient evidence to support pecuniary gain aggravating factor where defendant's motive

17   was relationship difficulties with the victim and the taking of money and keys was incidental

18   to the murder).

19          Petitioner is not entitled to relief on Claim 17.

20   **Claim 18        Failure to Consider Non-statutory Mitigation**

21          Petitioner alleges that the state courts refused to consider the nonstatutory mitigating

22   circumstances he presented at sentencing.  (Dkt. 154 at 167-73.)  Specifically, Petitioner

23   contends that the courts applied a causal nexus requirement to the mitigating information in

24   violation of *Tennard v. Dretke*, 542 U.S. 274, 289 (2004).  (*Id.* at 168.)  The Court disagrees.

25          Background

26          As noted earlier, during the initial sentencing, the court determined that Petitioner

27   failed to prove the following nonstatutory mitigating circumstances:  high intelligence and

28
                                        - 126 -

education level; a troubled and traumatic childhood; psychological disturbance; a history of helping others, including saving the lives of four people; cooperation with the police; and remorse. In *Henry I*, the Arizona Supreme Court rejected Petitioner's contention that the trial court refused to consider in mitigation his troubled upbringing and the fact that he had saved lives in the past, explaining: "Our review of the record shows that the judge did consider these factors, but concluded that they were entitled to little or no weight. We find no error." *Henry I*, 176 Ariz. at 588, 863 P.2d at 880.

On resentencing, Petitioner argued for additional non-statutory mitigating factors, which the court rejected, including the disparity in his and Foote's sentences, the felony murder instruction, and his history of substance abuse. In *Henry II*, the state supreme court again rejected Petitioner's argument that the trial court failed to consider his mitigating evidence, making the following findings with respect to the proffered mitigation:

> We turn first to the disparity in sentences received by defendant and his co-defendant, Vernon Foote. The same judge presided over both cases. After Foote's trial resulted in a hung jury, the prosecutor offered to let him plead guilty to attempted murder. Foote accepted and was sentenced to 15 years in prison. At defendant's resentencing, the court emphasized that he attached no importance to the fact that Foote had entered into the plea agreement. Instead, he stated, "[w]hat I did attach significance to is what he pled to. He pled guilty to attempted first degree murder. That is not the same as pleading to first degree murder obviously and he didn't plead guilty to kidnapping. . . ." The judge also noted that unlike defendant, Foote had no prior felonies or convictions involving crimes against persons.
>
> Unexplained disparity between sentences may constitute a mitigating factor. As defendant asserts, plea bargaining will not always explain gross differences in punishment. Here, however, the men's distinct criminal backgrounds were sufficient to justify the disparity in penalties. Furthermore, defendant's assertion that Arizona law prohibits judges from using criminal history to reject mitigation is meritless.
>
> According to defendant, the trial judge failed to consider intelligence and education as mitigating factors because he believed they could never qualify as such. This is not an accurate representation of the record. The court stated that it would be "totally incomprehensible to find [intelligence and education] as a mitigating factor *in this case* . . . ." (Emphasis added). We agree. Defendant frequently used his intelligence for purposes of deception. For example, he gave police a false name to avoid being connected to an outstanding warrant and lied about events surrounding the murder to conceal his involvement. We see no reason to reward an individual who uses his

education and intelligence in duplicitous ways.

Defendant also claims that the trial court erred in refusing to consider that he assisted other inmates with legal research and helped to establish a prison law library.  The record belies his assertion, revealing that the court expressly considered this evidence but decided it was not "the type of circumstance that rises to the level of what mitigation ought to be." Although there is no requirement that evidence reach a particular threshold to warrant consideration as a mitigating factor, we believe the judge was saying that this information, even if true, carried little or no weight.

Our review of the record confirms the court's conclusion.  First, aside from testimony by defendant – described by the judge as one of the least credible witnesses ever seen in his courtroom – there is no evidence that he helped establish a library.  As for providing legal assistance, the court had warned defendant on several occasions that he was authorized to use the library only for his own case.  He was not permitted to do research for other inmates.  Therefore, any mitigating value was nullified by his disregard of this directive.

According to defendant, his "lack of disciplinary problems" in prison should also have been regarded as a mitigating circumstance. [T]his court [has] held that a sentencing judge is not required to accept in mitigation the fact that a defendant has been a model prisoner.  Moreover, the record here indicates that defendant was less than the ideal inmate.  In response to specific questioning, his own witness would only admit that he was "about the average" for a person on death row.

Defendant also challenges the resentencing judge's refusal to find that the felony murder instruction given at trial was a mitigating circumstance.  We have held that such an instruction may be mitigating where there is some doubt as to a defendant's specific intent to kill.  As stated in our earlier opinion, however, the evidence "supports . . . a conclusion that Henry was an active, *intentional* participant in the killing."  176 Ariz. at 588, 863 P.2d at 880 (emphasis added).  Among other things, the record indicates that two people dragged the victim up the berm, defendant's clothes were spattered with blood, he hastily drove off after the stabbing, and later gave false information to the police.  *Id.* Thus, we find no error despite some confusion in the trial judge's explanation for his refusal to give the instruction mitigating effect. . . .

Defendant also claims that the court improperly failed to find his intoxication and history of alcohol and drug abuse as non-statutory mitigating factors.  With respect to the former, the court found that defendant's intoxication at the time of the homicide impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law under A.R.S. § 13-703(G)(1).  It would have been redundant to count this evidence again as non-statutory mitigation.  We find insufficient proof of historical substance abuse, but in any event, this would provide no additional mitigation without evidence of a causal connection to the crime.  *See State v. Medrano,* 185 Ariz. 192, 195-96, 914 P.2d 225, 228-29 (1996); *Bible,* 175 Ariz. at 609, 858 P.2d at 1212.

Finally, defendant argues that the court erred in failing to give mitigating weight to the fact that he had saved the lives of four people during his lifetime and had endured a traumatic upbringing. In *Henry*, we upheld the court's conclusions regarding these factors, 176 Ariz. at 588, 863 P.2d at 880, and nothing presented since that decision persuades us to do otherwise.

*Henry II*, 189 Ariz. at 551-53, 944 P.2d at 66-68 (citations omitted). The court concluded: "Following our independent review, we affirm the two aggravating factors and one statutory mitigating factor. On balance, we conclude that the mitigation is not sufficiently substantial to call for leniency. Therefore, defendant's capital sentence is affirmed." *Id.* at 553, 944 P.2d at 68.

Analysis

A sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604; *see Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of

evidence submitted as mitigation.  Instead, it reviews the record to ensure the state court allowed and considered all relevant mitigation.  *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007) (rejecting claim that sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant), *cert. denied*, 128 S.Ct. 1227 (2008).

As previously noted, Petitioner contends that the language used by the state courts reveals that they excluded consideration of mitigation evidence by applying an unconstitutional causal nexus requirement to it, in violation of *Tennard*.  In *Tennard*, the Supreme Court explained that the test for the relevance of mitigation evidence is the same standard applied to evidence proffered in other contexts – namely, whether the evidence has any tendency to make the existence of any fact that is of consequence to a determination of the action more or less likely than it would be without the evidence.  542 U.S. at 284.  Thus, the Court held that evidence of impaired intellectual functioning is inherently mitigating at the penalty phase of a capital case, regardless of whether the defendant has established a nexus between the mental incapacity and the crime.  *Id.* at 287.

During both sentencing proceedings, the trial judge outlined his appropriately expansive view of the scope of relevant mitigating information.  At the initial sentencing hearing, he explained:

> [A.R.S. §] 13-703(G) indicates that any other factors that are relevant in determining whether to impose a sentence other than death including any aspect of the Defendant's character, propensities or record and any of the circumstances of the offense can be considered and these are not exclusive. I believe that this is a wide-open mitigation statute. I can consider basically everything that is presented to me.

(RT 4/1/88 at 115.)  On resentencing, the judge again observed: "Recent cases I think have

really emphasized the necessity of addressing non-statutory mitigation so I want to go through and address anything that I think has even arguably been presented as non-statutory mitigation." (RT 2/23/95 at 134-35.) From these comments it is clear that the court did not exclude any potentially mitigating evidence based on an overly stringent relevancy test of the type found invalid in *Tennard*. As set forth below, the record further indicates that Petitioner's specific allegations are without merit.

Petitioner contends that the trial court improperly refused to consider Petitioner's allegedly dysfunctional childhood as a mitigating factor. At the initial sentencing hearing, the trial judge made the following determination: "I do not find the fact that the Defendant had a troubled and traumatic upbringing, if he had one, would be a mitigating factor in this case." (RT 4/1/88 at 116.) The judge explained that he was "not sure that [Petitioner's childhood] was all that troubled and traumatic," particularly when compared with that of other defendants the judge had sentenced. (*Id.*) He also noted that "20 or 25 years have intervened since that upbringing and I believe that at some point a person has to accept responsibility for his own life and not always fall back on what happened when he was young." (*Id.*) In resentencing Petitioner, the judge first stated that he had "previously considered the possibility of the Defendant's troubled and traumatic upbringing as being a non-statutory mitigating factor." (RT 2/23/95 at 135.) Noting that the Arizona Supreme Court had upheld his "non-finding" with respect to Petitioner's childhood, and that Petitioner had presented no new evidence in support of the factor, the judge reiterated that "any argument that the Defendant had a troubled and traumatic childhood is not a non-statutory mitigating factor." (*Id.*) In *Henry II*, the supreme court upheld the trial court's assessment of the mitigating circumstances but did not specifically address its finding with respect to Petitioner's traumatic childhood. *Henry II*, 189 Ariz. at 551-53, 944 P.2d at 66-68.

From this record it is clear that the trial court considered evidence of Petitioner's troubled upbringing. In weighing the factor, the judge took into account the severity of the

1   alleged dysfunction, the evidence supporting the allegations, and Petitioner's age at the time

2   of the crimes.  *See State v. Ellison*, 213 Ariz. 116, 144, 140 P.3d 899, 927 (2006) (finding

3   childhood experiences of little mitigating value for murders committed at thirty-three where

4   there was no evidence defendant could not tell right from wrong); *State v. Hampton*, 213

5   Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty, in

6   part, because defendant was thirty at the time of the crime).

7        Petitioner likewise contends that the court impermissibly ignored as a mitigating

8   factor the disparity between his sentence and Foote's.  In resentencing Petitioner, the trial

9   court stated:

10       I specifically find that any disparity in the sentence given to Mr. Henry
         previously, specifically, the death penalty, and the fifteen years I believe that
11       Mr. Foote got are [sic] justified based upon the fact Mr. Foote was not found
         guilty of first degree murder and that he had significantly less of a criminal
12       history and I am therefore finding that any disparity in the sentences between
         Mr. Foote and Mr. Henry does not rise to the level of a non-statutory
13       mitigating factor.

14   (RT 2/23/95 at 144-45.)  The Arizona Supreme Court, while acknowledging that in some

15   circumstances a disparity in sentences may constitute a mitigating factor, likewise outlined

16   the various factors which reduced its weight as mitigation in Petitioner's case.  *Henry II*, 189

17   Ariz. at 551, 944 P.2d at 66.  There is no indication that either court refused to consider the

18   factor because it did not pass a relevancy test; instead, the courts analyzed the factor and

19   found that the disparity in sentences was explained by the circumstances of the convictions

20   and the records of both Petitioner and Foote.  Given this explanation, the courts did not

21   violate Petitioner's rights by concluding that Foote's lesser sentence did not constitute a

22   mitigating circumstance.

23       On appeal from resentencing, Petitioner argued that the trial court improperly failed

24   to find his chronic alcohol abuse a mitigating factor, a claim which the Arizona Supreme

25   Court rejected.  *Henry II*, 189 at 552-53, 944 P.2d at 67-68.  Petitioner contends that in

26   reviewing the factor the supreme court applied an unconstitutional nexus requirement, as

27

28
                                    - 132 -

evidenced by its statement that information concerning Petitioner's history of alcohol abuse "would provide no additional mitigation without evidence of a causal connection to the crime." *Id.* However, the court first explained that there was "insufficient proof of historical substance abuse," so that its reference to a causal connection represented at most an alternative basis for discounting chronic alcohol abuse as a mitigating circumstance. Thus, *Tennard* was not violated; the court considered the factor but found that it had not been proved.

In resentencing Petitioner, the trial judge reviewed mitigation claims related to Petitioner's conduct in prison, including his lack of a disciplinary record, his role in establishing a prison law library, and the fact that he performed legal research for other inmates. Petitioner alleges that the trial court did not consider these circumstances, citing, for example, the court's determination that the fact that Petitioner helped establish a law library was not "the type of circumstance that rises to the level of what mitigation ought to be." (RT 2/23/95 at 141.) The Arizona Supreme Court rejected Petitioner's argument that the trial judge refused to consider this information as a mitigating circumstance: "Although there is no requirement that evidence reach a particular threshold to warrant consideration as a mitigating factor, we believe the judge was saying that this information, even if true, carried little or no weight." *Henry II*, 189 at 552, 944 P.2d at 67. This observation is borne out by the record. At the resentencing hearing, Petitioner presented evidence about his record while incarcerated and the judge, in rendering his special verdict, discussed at length Petitioner's conduct in prison, including his part in establishing the library and the legal research he had performed for other inmates. (RT 2/23/95 at 139-42.) The judge found, however, that the evidence showed that Petitioner, while not a disciplinary problem, was also not a model inmate; that he derived personal benefit from the establishment of the law library; and that, in performing research for other inmates, he violated the terms by which the judge granted him access to the library. (*Id.*) These factors affected the weight the judge

assigned to the proffered mitigation; they did not serve as a preliminary screening test barring its consideration.

Conclusion

The state courts did not unconstitutionally screen the mitigating evidence. The trial judge considered all of the evidence Petitioner presented at sentencing. The Arizona Supreme Court likewise reviewed all of the mitigating evidence proffered by Petitioner and did not impose a test based on severity or nexus in violation of *Tennard*. Therefore, Petitioner is not entitled to relief on Claim 18.

**Claim 19        Ineffective Assistance of Post-Conviction Counsel**

Petitioner alleges that he was denied effective assistance of counsel during his third round of PCR proceedings, in violation of his rights under the Sixth Amendment. (Dkt. 154 at 173-82.) This claim is meritless.

"State collateral proceedings are not required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal." *Murray v. Giarratano*, 492 U.S. 1, 10 (1989). There is no constitutional right to counsel in state collateral review proceedings, *see Coleman v. Thompson*, 501 U.S. at 752, and where there is no right to counsel there can be no deprivation of effective assistance of counsel, *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982). Consequently, Petitioner cannot claim constitutionally ineffective assistance of counsel in state post-conviction collateral proceedings. *See Coleman*, 501 U.S. at 752; *Campbell v. Wood*, 18 F.3d 662, 677 (9th Cir. 1994) (en banc). Further, this claim is not cognizable: "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(I). Claim 19 is denied.

**Claim 20        Juror Misconduct**

Petitioner alleges that his constitutional rights were violated by juror misconduct.

(Dkt. 154 at 182-85.)  Specifically, Petitioner contends that several jurors conducted an experiment to test the credibility of Petitioner's testimony that he heard Foote and Estes arguing while he was in the camper of Estes's truck.  Respondents counter that Petitioner did not raise this claim in a procedurally appropriate manner and that the claim is meritless. (Dkt. 167 at 113-18.)

Background

Petitioner raised this claim in his third PCR petition, alleging that it was supported by newly discovered evidence.  (PCR 3, 1/16/01 at 10, 19.)  The new evidence consisted of a report prepared by Petitioner's investigator and what purported to be a transcript of a juror interview.  (*Id.*, Ex. G.)  As set out in these documents, the juror told the investigator that early in the trial two unnamed jurors had conducted an experiment and reported the results to the other jurors.  (*Id.*)  According to this information, the jurors had driven a pickup truck over a dirt road with a third person in the camper or truck bed to determine whether that person could overhear a conversation taking place in the cab.  (*Id.*)  According to the juror, the results of the experiment damaged Petitioner's credibility.[23]  (*Id.*)

In analyzing this allegation of juror misconduct, the PCR court first found that Petitioner failed to demonstrate "due diligence" in presenting the claim as required by Rule 32.1(e) of the Arizona Rules of Criminal Procedure:[24]

---

[23]     Attached to Petitioner's motion for evidentiary development is a declaration by the juror, Patricia Holley, dated November 16, 2006. (Dkt. 178, Ex. 11.) Holley attests that during Petitioner's trial two jurors, whose names she cannot recall, conducted the experiment described above and discussed the results with other jurors.  (*Id.*)  This declaration does not describe the results of the test or the effect the information had on the jury's deliberations.  (*Id.*)

[24]     Rule 32.1(e) provides:

e. Newly-discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:

1

2

3

4

> These alleged material facts were discovered more than 10 years after the discharge of the trial jury and after a significant number of them had apparently died.  The Court does not consider this to be the exercise of due diligence by the Defendant or those acting on his behalf. . . . The Court determines that the Defendant did not exercise due diligence in raising the first juror misconduct issue.

(ME 7/16/01 at 10.)  The court proceeded to discuss the substance of the claim:

5

6

7

8

9

10

> The Court also questions whether the timely discovery of evidence of the "juror experiment" would have been likely to entitle the Defendant to any relief.  If such relief were to be measured by Rule 32.1(e), the Court would likely find that this was a material fact used solely for impeachment which was not of critical significance at trial.  This evidence would be founded greatly on the Court's recollection that the Defendant in this case was one of the most inherently incredible witnesses it has ever seen testify in a courtroom and the Court's opinion that his testimony at trial was probably the final nail in his coffin for the jury. . . .

11

12

13

14

15

16

> The affidavit by the Defendant's investigator and the transcript of the interview with the juror indicate that, aside from the experiment of the 2 jurors, other jurors who had campers had said that one could not hear a conversation under the circumstances described by the Defendant and that they thus concluded he was making a false statement as to this fact.  Jurors are often told that they are not required to check at the door to the courtroom their common sense or their previous lifetime experiences.  The Court determines that the inability of a person riding in a camper on a dirt road at 40 miles per hour to hear a conversation between persons in a vehicle cab is a matter capable of being determined by jurors based upon their own collective experience and common sense without having to resort to a recreation of a certain set of circumstances.

17

18

19

> Although not critical to the Court's analysis of the above issue, the Court also expresses its reservations about the manner in which this issue was presented.  The investigator's affidavit regarding the juror's statements is almost as long as the transcript of her actual statements.

20

21

> That transcript appears to be only a portion of an interview and also makes reference to statements which are described in parentheses rather than

22

23

24

25

26

> (1) The newly-discovered material facts were discovered after trial.
> (2) The defendant exercised due diligence in securing the newly-discovered material facts.
> (3) The newly-discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.

27

Rule 32.1(e) represents an exception to the preclusion provisions set forth in Rule 32.2(a).

28

being included verbatim.  The 2 jurors who conducted the experiment are not even identified by name.  The use of a generic form certification by the investigator is somewhat disconcerting, especially where a conscious decision has apparently been made in this case to not include affidavits from any persons with first-hand knowledge of the facts underlying the claims for relief. For all the reasons indicated earlier and independent from the observations made in this paragraph above, the Court determines that the Defendant is not entitled to relief based on his . . . claim of juror misconduct. . . .

(*Id.* at 10-11.)

<u>Analysis</u>

Respondents contend that this claim is procedurally barred based on the PCR court's finding that Petitioner was not diligent under Arizona's post-conviction rules.  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. at 263.  The Court agrees with Petitioner that the PCR court did not clearly and expressly invoke a state procedural rule in denying the claim.  Although the court discussed Petitioner's diligence in the context of Rule 32.1(e)(2), it is unclear from the remainder of the court's analysis, which addresses the substance of the jury misconduct allegations, whether the court's denial of the claim was based upon a procedural bar or the merits of the claim.  *Coleman*, 501 U.S. at 735; *see Siripongs v. Calderon*, 35 F.3d 1308, 1317 (9th Cir. 1994) ("unless the state court makes clear that it is resting its decision denying relief on an independent and adequate state ground, it is presumed that the state denial was based at least in part upon federal grounds, and the petitioner may seek relief in federal court"); *Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir. 2001) (alleged procedural default did not bar claim where state court failed to make a clear and express statement that its decision was based on a procedural default), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002) (en banc).  The Court will, therefore, consider Claim 20 on the merits.

In conducting their deliberations, "[j]urors have a duty to consider only the evidence which is presented to them in open court." *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th

1    Cir. 1986) (citing *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)).   "Evidence not

2    presented at trial, acquired through out-of-court experiments or otherwise, is deemed

3    'extrinsic.'"  *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991).  However,

4    a petitioner is entitled to habeas relief only if the jury's consideration of extrinsic evidence

5    had "a substantial and injurious effect or influence in determining the jury's verdict."

6    *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995) (quoting *Brecht v. Abrahamson,* 507 U.S.

7    at 637).

8         According to the Ninth Circuit, several factors are relevant to determining whether

9    the alleged introduction of extrinsic evidence constitutes reversible error, including how and

10   when the extrinsic material was actually received, the extent to which the jury discussed and

11   considered the information, and "any other matters which may bear on the issue of . . .

12   whether the introduction of extrinsic material [substantially and injuriously] affected the

13   verdict."  *Lawson*, 60 F.3d at 612 (quoting *Bayramoglu,* 806 F.2d at 887).  While none of the

14   factors is dispositive, courts place great weight on the nature of the extrinsic evidence

15   introduced.  *Jeffries v. Blodgett*, 5 F.3d 1180, 1190-91 (9th Cir.1993); *see Lawson*, 60 F.3d

16   at 612; *see also Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (en banc) (potential

17   prejudice may be diminished if the information was "insufficiently prejudicial given the

18   issues and evidence in the case"), *overruled on other grounds by Lindh v. Murphy*, 521 U.S.

19   320 (1997).  The relevant inquiry is whether there is a direct and rational connection between

20   the extrinsic material and the prejudicial jury conclusion, and whether the misconduct relates

21   directly to a material aspect of the case.  *Mancuso v. Olivarez*, 292 F.3d 939, 953 (9th Cir.

22   2002); *see Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997), *overruled on other*

23   *grounds by Payton v. Woodford*, 299 F.3d 815, 828-29 & n.11 (9th Cir. 2002) (en banc); *see*

24   *also Navarro-Garcia*, 926 F.2d at 822-23; *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir.

25   1988).

26        The Court concludes that the extrinsic evidence allegedly introduced to the jury was

27

28

"insufficiently prejudicial given the issues and evidence in the case." *Jeffries v. Wood*, 114 F.3d at 149. The extrinsic evidence impeached an aspect of Petitioner's testimony, but the information was not materially related to the ultimate issue – i.e., Petitioner's participation in the murder. *See Jeffries v. Blodgett*, 5 F.3d at 1190; *Navarro-Garcia*, 926 F.2d at 822-23; *Dickson*, 849 F.2d at 406. The reported experiment did not involve the jury's receipt of information excluded from trial as unduly prejudicial, such as evidence of the facts surrounding a defendant's prior conviction, bad reputation, or propensity to violate the law. *See, e.g., Jeffries v. Wood,* 114 F.3d at 1490 (extraneous information of prior armed robbery conviction); *Lawson,* 60 F.3d at 612 (jurors learned that defendant had a reputation as a violent man); *Dickson,* 849 F.2d at 408 (deputy's statement to jurors that defendant had "done something like this before.").

The Ninth Circuit denied habeas relief in cases involving similar out of court experiments conducted by jurors. In *Rodriguez*, 125 F.3d at 743, the jury was exposed to extrinsic information in the form of a "memory experiment" performed by one of the jurors, who drove the route taken by the defendant, attempted to discern and recall the makes and colors of cars on the side of the freeway, and reported to the other jurors that he could not do so with accuracy. The court denied relief on Rodriguez's claims of jury misconduct finding that memory recall while driving is a matter of common knowledge and that the information was not "the kind of prejudicial material which is routinely kept from the jury." *Id.* at 745-47. Similarly, in this case, Judge Conn noted that the jurors' experiment, if it occurred, merely confirmed the common sense proposition that a person riding in the camper of a truck as it traveled over an unpaved road at forty miles per hour would not be able to hear an argument occurring in the cab.

In *Navarro-Garcia*, defense counsel submitted an affidavit stating that the jury foreman had told him that another juror had informed him that she had conducted an out-of-court experiment during a weekend break in jury deliberations. 926 F.2d at 820. The

defendant was arrested with 344 pounds of marijuana in the trunk of her vehicle. *Id.* To determine the credibility of the defendant's claim that she was unaware of the drugs – which she suggested had been planted in the vehicle while she was inside a nightclub – the juror had placed approximately 300 pounds in the trunk of her car to test the effect of the additional weight. *Id.* The juror discussed the experiment with other jurors when deliberations resumed. *Id.* The Ninth Circuit ordered an evidentiary hearing, emphasizing that "the extrinsic evidence involved the central disputed issue in the case" because "[r]esolution of the question of Navarro-Garcia's knowledge [of the drugs] was a prerequisite to determining guilt or innocence." *Id.* at 823; *see also Marino*, 812 F.2d at 506 (juror's unauthorized out-of-court experiment with trigger on ex-husband's gun "relate[d] to the defense theory of self-defense, which was a material element in . . . trial for murder"). In contrast to *Navarro-Garcia*, where the extrinsic evidence related directly to the ultimate issue in the case, the experiment allegedly performed by Petitioner's jurors impeached Petitioner's testimony on a secondary issue – his report of an argument between Foote and Estes in the cab of Estes's truck before the murder occurred.

Petitioner cites *Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001), *abrogated on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003), in support of his claim that the jurors' misconduct entitles him to habeas relief. In *Doan*, which involved charges of murder and child endangerment, a juror performed an experiment to test the defendant's claim that he could not see the victim's bruises because it was too dark. *Id.* at 726-27. The Sixth Circuit found that the jury's receipt of this extrinsic information violated the defendant's Sixth Amendment rights. *Id.* at 736. The court denied habeas relief, however, finding the error harmless under *Brecht* given the strength of the case against the defendant and the inconsistencies in his own testimony regarding what he could see with respect to the child's injuries. *Id.* at 737-39.

The holding in *Doan* does not support Petitioner's request for relief on his jury

misconduct claim.  First, the extrinsic information obtained by the juror in *Doan* related directly to a key element of the defense, Doan's testimony that he did not cause the child's injuries.  Again, the extrinsic evidence in Petitioner's case did not relate directly to the central issue of who was responsible for the victim's death.  Second, even if the jury's exposure to the improper information amounted to constitutional error, Petitioner would not be entitled to relief because, as in *Doan*, the information would not have substantially affected the jury's verdict.  As Judge Conn explained, the credibility of Petitioner's testimony suffered damage from many causes unrelated to the results of the jurors' road test.  *Cf. United States v. Hanley*, 190 F.3d 1017, 1031(9th Cir.1999) (special deference is accorded to the trial judge's impression of the impact of alleged juror misconduct); *Mancuso*, 292 F.3d at 953.  Likewise the evidence supporting his conviction – including the physical evidence at the crime scene and on his clothes – extended beyond and was unrelated to Petitioner's testimony about what he heard while in the camper.  *See Mason v. Mitchell*, 320 F.3d at 638 (juror's presentation of her out-of-court findings from experiment in which she disassembled her husband's revolver to see whether the grip looked like the one shown in court may have been constitutional error, but petitioner could not demonstrate that it substantially affected the jury's verdict because evidence at trial was more extensive than the gun grip).

For the reasons set forth above, Petitioner has not met his burden of establishing that the jury's consideration of the extrinsic information had a substantial and injurious effect as required under *Brecht*.  The PCR court's conclusion that the jury experiment did not improperly influence the verdict was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Claim 20 is therefore denied.

Evidentiary development

Petitioner seeks to expand the record to include declarations by the juror who reported the unauthorized experiment and by Blair Abbot, Petitioner's investigator during the PCR

1   proceedings.  (Dkt. 178 at 5-77.)  He also requests an evidentiary hearing.  (*Id.*)

2           Petitioner is not entitled to evidentiary development because the facts underlying the

3   claim – even if accepted as true, as in the above analysis – are not sufficient to establish by

4   clear and convincing evidence that absent the alleged jury misconduct no reasonable

5   factfinder would have found Petitioner guilty.  28 U.S.C. § 2254(e)(2)(B); *see Townsend*, 372

6   U.S. at 312-13; *Landrigan*, 127 S. Ct. at 1940.  In making this determination, the court has

7   reviewed all of the materials submitted by Petitioner in support of the claim.

8   **Claim 21        "Actual Innocence"**

9           Petitioner alleges that because he is actually innocent of first degree murder his

10  execution would violate the Constitution.  (Dkt. 154 at 185-91.)  Respondents contend that

11  the claim is procedurally barred because Petitioner did not raise it in state court. (Dkt. 167

12  at 118.)  Notwithstanding the claim's procedural status, Petitioner is not entitled to habeas

13  relief.

14          Petitioner asserts a substantive, or "freestanding," claim of actual innocence.  In

15  *Herrera v. Collins*, 506 U.S. 390, 398-99 (1993), the United States Supreme Court left

16  unresolved the question of whether the execution of an innocent person would violate the

17  Eighth Amendment absent an independent constitutional violation occurring in the state trial.

18  The Court recently revisited the issue in *House v. Bell*, 547 U.S. at 555, again without

19  resolving the question:

20          We conclude here, much as in *Herrera*, that whatever burden a hypothetical
            freestanding innocence claim would require, this petitioner has not satisfied it.
21          To be sure, House has cast considerable doubt on his guilt – doubt sufficient
            to satisfy *Schlup*'s gateway standard for obtaining federal review despite a
22          state procedural default.   In *Herrera*, however, the Court described the
            threshold for any hypothetical freestanding innocence claim as "extraordinarily
23          high." . . . *Herrera* requires more convincing proof of innocence than *Schlup*.
            It follows, given the closeness of the *Schlup* question here, that House's
24          showing falls short of the threshold implied in *Herrera*.

25  *Id.*

26          In *Schlup*, the Court stated that a credible claim of innocence requires presentation of

27

28                                          - 142 -

1    "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy

2    eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*

3    *v. Delo*, 513 U.S. 298, 324 (1995).  Even if the Supreme Court had confirmed the existence

4    of the "hypothetical freestanding innocence claim," Petitioner would not be able to satisfy

5    its "extraordinarily high" threshold with the new evidence he has presented.  For the reasons

6    set forth in Claim 1, the theoretical existence of additional photographs and unaltered

7    originals showing crime scene footprints cannot establish "conclusive exoneration." *House*,

8    547 U.S. at 553.  Claim 21 is therefore denied.

9    **Claim 22       Unfair Clemency Process**

10           Petitioner asserts that he is being denied a fair clemency process.  (Dkt. 154 at 191-

11   95.)   Petitioner acknowledges that because he has not sought clemency this claim is

12   premature and not ripe for adjudication.  More significantly, however, this claim is not

13   cognizable on federal habeas review.  Habeas relief can only be granted on a claim that a

14   prisoner "is in custody in violation of the Constitution or laws or treaties of the United

15   States." 28 U.S.C. § 2254(a).  Petitioner's challenge to state clemency procedures does not

16   constitute an attack on his detention and thus is not a proper ground for habeas relief.  *See*

17   *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989); *see also Woratzeck v. Stewart*, 118 F.3d

18   648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal

19   habeas law).  Therefore,  Claim 22 is dismissed as not cognizable.

20   **Claim 23       Lethal Injection**

21           Petitioner alleges that his execution by lethal injection constitutes cruel and unusual

22   punishment. (Dkt. 154 at 195-219.)  Petitioner concedes he did not present this claim to the

23   state courts but argues it could not be raised there due to the absence of an available state

24   corrective process.  (*Id.* at 195.) Notwithstanding the issue of exhaustion, the claim is plainly

25   meritless.  *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005). The

26   United States Supreme Court has never held that lethal injection constitutes cruel and unusual

27

28                                              - 143 -

1    punishment, *see Baze v. Rees*, 128 S. Ct. 1520 (2008), and the Ninth Circuit has concluded

2    that death by lethal injection in Arizona does not violate the Eighth Amendment.  *See*

3    *LaGrand*, 133 F.3d at 1265; *Poland*, 117 F.3d at 1104-05.  Claim 23 is denied.

4    **Claim 24        *Lackey* Violation**

5            Petitioner asserts that his execution after more than twenty years on death row would

6    violate his right to be free from cruel and unusual punishment under the Eighth Amendment.

7    (Dkt. 154 at 219-31.)  Petitioner concedes he did not present this claim to the state courts but

8    argues it could not be raised there due to the absence of an available state corrective process.

9    (*Id.* at 219.)  Notwithstanding the issue of exhaustion, the claim is plainly meritless.  *See* 28

10   U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

11          The Supreme Court has not held that lengthy incarceration prior to execution

12   constitutes cruel and unusual punishment.  *See Lackey v. Texas*, 514 U.S. 1045 (1995)

13   (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not

14   been addressed).  Circuit courts, including the Ninth Circuit, have held that prolonged

15   incarceration under a sentence of death does not offend the Eighth Amendment.  *See*

16   *McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79

17   F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995).

18   Accordingly, Petitioner cannot establish a right to federal habeas relief, *see Allen v. Ornoski*,

19   435 F.3d 946, 958-60 (9th Cir. 2006), and Claim 24 is denied.

20   **Claim 25        Incompetence to be Executed**

21          Petitioner contends, citing *Ford v. Wainwright*, 477 U.S. 399 (1986), that he is

22   incompetent to be executed.  (Dkt. 154 at 231-33.)  As Petitioner acknowledges, this claim

23   is not yet ripe for federal review.  Under *Martinez-Villareal v. Stewart*, 118 F.3d 628, 634

24   (9th Cir. 1997), *aff'd*, 523 U.S. 637 (1998), a claim of incompetency for execution had to "be

25   raised in a first habeas petition, whereupon it also must be dismissed as premature due to the

26   automatic stay that issues when a first petition is filed."  The Supreme Court revisited

27

28                                              - 144 -

1   *Martinez-Villareal* and concluded in *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007), that it

2   is unnecessary to raise unripe *Ford* claims in the initial habeas petition in order to preserve

3   any possible unripe incompetency claim. *Id.* at 2854. Thus, if this claim becomes ripe for

4   review, it may be presented to the district court; it will not be treated as a second or

5   successive petition. *See id.* at 2854-55. Therefore, the Court dismisses Claim 25 without

6   prejudice as premature.

7                                   **CONCLUSION**

8          The Court finds that Petitioner has failed to establish entitlement to habeas relief on

9   any of his claims. The Court further finds that additional evidentiary development in this

10  matter is neither required nor warranted.

11                           **CERTIFICATE OF APPEALABILITY**

12         In the event Petitioner appeals from this Court's judgment, and in the interests of

13  conserving scarce resources that might be consumed drafting and reviewing an application

14  for a certificate of appealability (COA) to this Court, the Court on its own initiative has

15  evaluated the claims within the petition for suitability for the issuance of a certificate of

16  appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

17  2002).

18         Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

19  is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

20  COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C.

21  § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of

22  the denial of a constitutional right." This showing can be established by demonstrating that

23  "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

24  have been resolved in a different manner" or that the issues were "adequate to deserve

25  encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

26  *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will

27

28                                      - 145 -

1   issue only if reasonable jurists could debate whether the petition states a valid claim of the

2   denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

3          The Court finds that reasonable jurists could debate its resolution of Claims 1 and 13.

4   For the reasons stated in this Order, the Court declines to issue a COA with respect to any

5   other claims.

6          Based on the foregoing,

7          **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus

8   (Dkt. 154) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

9          **IT IS FURTHER ORDERED** that Petitioner's Motion for Discovery, to Expand the

10  Record and for Evidentiary Hearing (Dkt. 178) is **DENIED**.

11         **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

12  April 16, 2002 (Dkt. 2), is **VACATED.**

13         **IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the

14  following issues:

15         Whether Claim 1 of the Amended Petition – alleging violations of *Brady* and
       *Napue* – is procedurally barred and/or without merit.
16

17         Whether Claim 13 of the Amended Petition – alleging ineffective assistance
       of counsel at sentencing – is without merit.

18          **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

19  this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

20  85007-3329.

21

22         DATED this 17th day of March, 2009.

23

24

25

26  _____
                Susan R. Bolton
27            United States District Judge

28
                                    - 146 -